# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| **ASHLEY FURNITURE INDUSTRIES, LLC, ASHLEY FURNITURE TRADING COMPANY, WANEK FURNITURE CO., LTD., MILLENNIUM FURNITURE CO., LTD. AND COMFORT BEDDING COMPANY LIMITED,**<br><br>      **Plaintiffs,**<br><br>  **v.**<br><br>**UNITED STATES,**<br><br>      **Defendant,**<br><br>  **and**<br><br>**BROOKLYN BEDDING, LLC; CORSICANA MATTRESS COMPANY; ELITE COMFORT SOLUTIONS; FXI, INC.; INNOCOR, INC.; KOLCRAFT ENTERPRISES INC.; LEGGETT & PLATT, INCORPORATED; THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS; AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**<br><br>      **Defendant-Intervenors.** | **Nonconfidential Version**<br>**Ct. No. 21-00283** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS ASHLEY FURNITURE INDUSTRIES, LLC, ASHLEY FURNITURE TRADING COMPANY, WANEK FURNITURE CO., LTD., MILLENNIUM FURNITURE CO., LTD. AND COMFORT BEDDING COMPANY LIMITED

Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
Sarah M. Wyss
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

November 19, 2021

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ADMINISTRATIVE DETERMINATION UNDER REVIEW ............................... 2

ISSUES OF LAW PRESENTED .......................................................................... 2

SUMMARY OF ARGUMENT ............................................................................. 4

STATEMENT OF FACTS .................................................................................... 6

STANDARD OF REVIEW ................................................................................. 10

I. COMMERCE'S USE OF EMIRATES SLEEP'S FINANCIAL STATEMENTS WAS
UNSUPPORTED BY SUBSTANTIAL EVIDENCE BECAUSE EMIRATES SLEEP'S
DEFICIENT FINANCIAL STATEMENTS WERE CLEARLY INFERIOR TO SHEELA
FOAM'S ............................................................................................................. 11

    A.  Commerce's Use of Emirates Sleep's Financial Statements Was Unreasonable
Because They Were Not Contemporaneous with the POI ................................... 13

    B.  Commerce Erred in Relying on Emirates Sleep's Financial Statements Because They
Were Incomplete ............................................................................................... 17

    C.  Emirates Sleep's Financial Statements Are Not Reflective of the Ashley
Respondents' Business Operations and Therefore Not the Best Available Information . 20

    D.  Commerce Improperly Departed from its Practice in Selecting Emirates Sleep's
Financial Statements Because They Were Not Publicly Available .......................... 24

    E.  Commerce's Determination to Reject Sheela Foam Based on Receipt
Countervailable Subsidies Was Unreasonable ................................................... 28

        1.  Commerce Had No Specific Information on the Alleged Subsidy Programs in
Sheela Foam's Financial Statements and No Reasonable Basis to Conclude That the
Alleged Programs Have Been Found to Be Countervailable ............................. 29

        2.  Commerce's Reasoning in Rejecting Sheela Foam Should Also Have Led to the
Rejection of Emirates Sleep's Financial Statements Because of Evidence of Distortive
Government Loans ........................................................................................ 33

        3.  In Weighing the Two Financial Statements, No Reasonable Person Could
Conclude that Emirates Sleep was Superior to Sheela Foam ........................... 35

II. COMMERCE'S RELIANCE ON HTS SUBHEADING 7320.90.90 TO VALUE
POCKET COIL INNERSPRING UNITS WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE BECAUSE HTS SUBHEADING 7320.90.90 WAS NOT SPECIFIC TO THE
ASHLEY RESPONDENTS' INPUT ................................................................... 36

    A.  Commerce Improperly Relied on HTS 7320.90.90 Rather than HTS 9404.29.90 .. 36

**B.   Commerce's Selection of Indian HTS 7320.90.90 to Determine the SV for Pocket Coil Innerspring Units Yielded Aberrational Results** ........................................................ 39

**III. COMMERCE IMPROPERLY REFUSED TO LIST AFI AND AFTC AS ELIGIBLE FOR THE DUMPING MARGIN ASSIGNED TO WANEK, MILLENNIUM AND COMFORT BEDDING** ........................................................................................................ 42

**IV. COMMERCE'S APPLICATION OF THE COHEN'S *D* TEST TO THE ASHLEY RESPONDENTS' U.S. SALES STRUCTURE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** ................................................ 44

**V. CONCLUSION** ................................................................................................................ 47

## TABLE OF AUTHORITIES

**Cases**

Ancientree Cabinet Co. v. United States, No. 20 - 00114, 2021 CIT LEXIS 85, at *17 (July 12, 2021)................................................................................................................................ 23

Baroque Timber Indus. (Zhongshan) Co. v. United States, __ CIT __, __, 925 F. Supp. 2d 1332 (2013) ................................................................................................................................. 14

Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984)........................................................... 11

China Mfrs. All., __ CIT at __, 205 F. Supp. 3d at 1359 ........................................................ 16

China Mfrs. All., LLC v. United States, __ CIT __, __, 205 F. Supp. 3d 1325 (2017).............. 14

Clearon Corp. v. United States, 35 CIT 1685, 800 F. Supp. 2d 1355 (2011).............................. 30

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938) ............................................................... 10

CP Kelco U.S., Inc. v. United States, 949 F.3d 1348 (Fed. Cir. 2020) ...................................... 18

Dorbest Ltd. v. United States, 30 CIT 1671, 462 F. Supp. 2d 1262 (2006) ....................... 12, 35

Fine Furniture (Shanghai) Ltd. v. United States, __ CIT __, __ 321 F. Supp. 3d 1282 (2018) ... 19

Fine Furniture (Shanghai) Ltd. v. United States, __ CIT __, __ 353 F. Supp. 3d 1323 (2018) ... 31

Fuyao Glass Indus. Grp. Co. v. United States, 29 CIT 109 (2005) ............................................ 30

Home Meridian Int'l, Inc. v. United States, 36 CIT 1279, 865 F. Supp. 2d 1311 (2012) ........... 23

Home Prods. Int'l, Inc. v. United States, 32 CIT 337, 556 F. Supp. 2d 1338 (2008).................. 14

Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369 (Fed. Cir. 2003)........................... 10

Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States, __ CIT __, __, 322 F. Supp. 3d 1308 (2018) ............................................................................................................................. 37

Lifestyle Enter. v. United States, 35 CIT 158, 768 F. Supp. 2d 1286 (2011).............................. 19

Marmen Inc. v. United States, No. 20-00169, 2021 Ct. Intl. Trade LEXIS 150, at *26 (Oct. 22, 2021)................................................................................................................................ 46

Melamine Chemicals., Inc. v. United States, 732 F.2d 924 (Fed. Cir. 1984).............................. 43

Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, __, 273 F. Supp. 3d 1348 (2017) .......................................................................................................................................... 20

Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, __, 495 F. Supp. 3d 1298 (2021) .......................................................................................................................................... 45

Mittal Steel Galati S.A. v. United States, 31 CIT 730, 491 F. Supp. 2d 1273 (2007).................. 43

NEC Am., Inc. v. United States, __ CIT __, 681 F. Supp. 862 (1987) ........................................ 38

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) ........................................ 11

NMB Sing. Ltd. v. United States, 557 F.3d 1316 (Fed. Cir. 2009) ........................................ 11, 25

Olympia Indus., Inc. v. United States, 22 CIT 387, 7 F. Supp. 2d 997 (1998)............................. 12

Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378 (Fed. Cir. 2014)........................ 12

Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 927 F. Supp. 451 (1996)................. 11, 14, 15

Seah Steel Corp. v. United States, No. 20-00150, 2021 Ct. Intl. Trade LEXIS 148, at *16 (Oct. 19, 2021)........................................................................................................................... 46

SeAH Steel VINA Corp. v. United States, __ CIT __, 269 F. Supp. 3d 1335 (2017).................. 12

Since Hardware (Guangzhou) Co., Ltd. v. United States, __ CIT, __, __, 911 F. Supp. 2d 1362 (2013) ................................................................................................................................. 24

Stupp Corp. v. United States, 5 F.4th 1341 (Fed. Cir. 2021).............................................. 6, 45

Swiff-Train Co. v. United States, 793 F.3d 1355 (Fed. Cir. 2015)................................................ 10
Taian Ziyang Food Co. v. United States, 33 CIT 828, 637 F. Supp. 2d 1093 (2009) .................. 20
Tri Union Frozen Prods. v. United States, __ CIT, __, __, 227 F. Supp. 3d 1387 (2017) .......... 41
Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ............................................................. 11
Vinh Hoan Corp. v. United States, No. 13 - 00156, 2015 Ct. Intl. Trade LEXIS 156, at *60 (Aug. 3, 2015)...................................................................................................................................... 16
Weishan Hongda Aquatic Food Co. v. United States, 917 F.3d 1353 (Fed. Cir. 2019).............. 12
Yantai Xinke Steel Structure Co. v. United States, No. 10-00240, 2014 Ct. Intl. Trade LEXIS 39 at *61 (Apr. 9, 2014)............................................................................................................ 31, 34
Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333 (Fed. Cir. 2011)................. 12
Zhejiang Native Produce & Animal By-Products Imp. & Exp. Grp. Corp. v. United States, __ CIT __, __, 227 F. Supp. 3d 1375 (2017) ........................................................................ 14, 15

## Statutes

19 U.S.C. § 1673d............................................................................................................. 4, 5, 43
19 U.S.C. § 1677b.................................................................................................................... 28
19 U.S.C. § 1677f-1 ................................................................................................................. 44

## Regulations

19 C.F.R. § 351.408 ................................................................................................................. 25
19 C.F.R. § 351.408(c)(1) ........................................................................................................ 24

## Administrative Decisions

Certain Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 74 Fed. Reg. 14,414 (Dep't of Commerce Mar. 31, 2009) ...................................................................................................... 31
Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam: Issues and Decision Memorandum for Final Results of Administrative Review, 2014-2015, 82 Fed. Reg. 18,611 (Dep't of Commerce Apr. 20, 2017) ....................................................................................... 25
Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part, 85 Fed. Reg. 25,398 (May 1, 2020) ................................................................................................... 29
Circular Welded Carbon-Quality Steel Pipe From India: Final Affirmative Countervailing Duty Determination, 77 Fed. Reg. 66,468 (Oct. 22, 2012)................................................................ 29
Common Alloy Aluminum Sheet From the Sultanate of Oman: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Determination of Critical Circumstances, 86 Fed. Reg. 13,328 (Dep't of Commerce Mar. 8, 2021) ............................................................. 14
Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720 (Dep't of Commerce May 9, 2014) ("Differential Pricing Analysis")......................................................................... 45
Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 15,297 (Dep't of Commerce Mar. 21, 2011)........................................................................................ 25

Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 78 Fed. Reg. 58,273 (Dep't of Commerce Sept. 23, 2013)13, 14

Honey From the People's Republic of China: Final Results of First Antidumping Duty Administrative Review, 69 Fed. Reg. 25,060 (May 5, 2004) .................................................... 16

Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) ................................. 6

Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021) .............................................................................................................................. 2

Mattresses from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 15,889 (Dep't of Commerce Mar. 25, 2021) ................. 2, 9

Mattresses from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 69,591 (Dep't of Commerce Nov. 3, 2020) ..................... 8

Notice of Final Determination of Sales at Less Than Fair Value: Steel Concrete Reinforcing Bars From Belarus, 66 Fed. Reg. 33,528 (Dep't of Commerce June 22, 2001) ............................... 17

Persulfates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 68,030 (Dep't of Commerce Dec. 5, 2003) ................. 32

Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review, 73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008) ...................................................................................... 17

Wooden Bedroom Furniture From the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729 (Dep't of Commerce Aug. 11, 2011) ........................ 23

**INTRODUCTION**

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Plaintiffs Ashley Furniture Industries, LLC ("AFI") (previously Ashley Furniture Industries, Inc.), Ashley Furniture Trading Company ("AFTC"), Wanek Furniture Co., Ltd. ("Wanek"), Millennium Furniture Co., Ltd. ("Millennium") and Comfort Bedding Company Limited ("Comfort Bedding") (collectively, "Ashley Respondents"), hereby move for judgment upon the agency record.

As this court weighs whether or not decisions by the Department of Commerce ("Commerce") were supported by substantial evidence, it should bear in mind that, out of 80 total surrogate values ("SVs") and numerous other methodological choices, the entirety of the difference between a zero or *de minimis* margin and a margin of 144.92 percent, hinged on just two SV choices. For each of these critical SV choices, Commerce's record contained only two options. For surrogate financial ratios, Commerce had a choice between one set of financial statements with obvious and fatal flaws and that w so incomplete as to lack entire sections devoted to "loans and advances" from government entities totaling 12 percent of total revenue, and another set of financial statements suitable in every way and with only negligible detracting information. For pocket coil innerspring units, Commerce had a choice between an Indian customs classification "conclusively" endorsed by six Indian customs experts and supported by a member of the petitioning group prior to this case and a less-specific classification of a basket category of iron and steel completely unsupported by Indian customs determinations. In both instances, Commerce chose incorrectly. Commerce's erroneous decision with respect to these two SVs alone meant the difference between the 144.92 margin percent assigned by Commerce in its final determination and a zero margin that would have excluded the Ashley Respondents

from the antidumping order. As described below, based on factual and legal errors committed by Commerce in the final determination, the Court should find certain aspects of Commerce's final determination to be unsupported by substantial evidence or otherwise not in accordance with law.[1]

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

The Ashley Respondents challenge certain aspects of Commerce's final determination in the antidumping duty investigation on mattresses from Vietnam.  See Mattresses from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 15,889 (Dep't of Commerce Mar. 25, 2021) ("Final Determination") (P.R. 525), and accompanying Issues and Dec. Mem. ("I&D Mem.") (P.R. 505).  The antidumping duty order implementing the final determination was published on May 14, 2021.  See Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021) (" Order") (P.R. 526).

## ISSUES OF LAW PRESENTED

The Ashley Respondents seek judgement on the agency record with respect to the following issues:

**I.   Whether Commerce's selection of Emirates Sleep's financial statements to calculate the surrogate financial ratios of factory overheard, selling, general and administrative ("SG&A") expenses and profit was supported by substantial evidence and otherwise in accordance with law.**

Commerce's selection of Emirates Sleep's financial statements to calculate the surrogate financial ratios was unsupported by substantial evidence because Emirates Sleep's financial

---

[1] All references to record documents are to public versions unless otherwise noted.

statements are significantly flawed in comparison to the financial statements of Sheela Foam Limited ("Sheela Foam") in that the financial statements of Emirates Sleep were not contemporaneous with the period of investigation ("POI"), were incomplete, were primarily representative of retail operations rather than production of mattresses and were not publicly available.

II. **Whether Commerce's selection of HTS 7320.90.90 to determine the SV for pocket coil innerspring units was supported by substantial evidence and otherwise in accordance with law.**

Commerce's selection of Harmonized Tariff Schedule ("HTS") subheading 7320.90.90 (springs and leaves for springs, of iron or steel: other: other) to determine the SV for pocket coil innerspring units was unsupported by substantial evidence because record evidence demonstrated that HTS subheading 9404.29.90 (mattress supports; articles of bedding and similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs or stuffed or internally fitted with any material or of cellular rubber or plastics, whether or not covered: mattresses: of other materials: other) was the most specific to the pocket coil innerspring units and, therefore, the best available information.

III. **Whether Commerce's decision not to list AFI and AFTC as eligible for the deposit rate assigned to Wanek, Millennium and Comfort Bedding was supported by substantial evidence and in accordance with law.**

Commerce's decision not to list AFI and AFTC as eligible for the deposit rate assigned to their affiliates Wanek, Millennium and Comfort Bedding was unsupported by substantial evidence and not in accordance with law because as the reinvoicing entities, AFI's and AFTC's names appear on certain entry documents presented to the U.S. Customs and Border Protection ("Customs") and failure to list AFI's and AFTC's names in Customs instructions could

incorrectly expose merchandise reinvoiced by AFI or AFTC to the Vietnam-wide rate and Commerce failed to properly implement 19 U.S.C. § 1673d(c)(1)(B)(ii).

IV.     **Whether Commerce's use of the Cohen's *d* test to determine the differential pricing analysis of the Ashley Respondents' U.S. sales was supported by substantial evidence and otherwise in accordance with law.**

Commerce's use of the Cohen's *d* test in determining differential pricing analysis for the Ashley Respondents' U.S. sales was unsupported by substantial evidence and otherwise not in accordance with law because the sample and test groups created by the Cohen's *d* test fail to create valid statistical sampling groups, provide misleading or incorrect pass/fail results, and consequently bias the dumping margin applicable to Wanek, Millennium and Comfort Bedding.

## SUMMARY OF ARGUMENT

Commerce's decision to use Emirates Sleep's financial statements to calculate the surrogate financial ratios, its determination to use HTS subheading 7320.90.90 to derive the SV pocket coil innerspring units, its decision to omit AFI and AFTC as eligible for the rate assigned to Wanek, Millennium and Comfort Bedding, and its implementation of the Cohen's *d* test to the Ashley Respondents' U.S. sales data were unsupported by substantial evidence or otherwise not in accordance with law.

First, Commerce improperly relied on Emirates Sleep's financial statements to calculate the Ashley Respondents' surrogate financial ratios because these financial statements were non-contemporaneous, non-representative of the Ashley Respondents' Vietnamese business activities, were missing key information describing loan balances with government entities totaling more than 12 percent of total revenue and were not publicly available in their complete form. Commerce unreasonably chose Emirates Sleep's clearly deficient financial statements over the complete, contemporaneous and more comparable financial statements of Sheela Foam.

Commerce improperly disregarded Sheela Foam's financial statements based on supposed receipt of subsidies which were so small that they could have had no distortive impact on the antidumping calculation. Commerce, therefore, failed to select the best available information to determine the surrogate financial ratios. In light of the totality of record evidence supporting the use of Sheela Foam's financial statements as the "best" available information, Commerce's reliance on Emirates Sleep's financial statements was unsupported by substantial evidence.

Second, Commerce unreasonably ignored overwhelming record evidence and erred in its decision to select Global Trade Atlas ("GTA") data derived from HTS subheading 7320.90.90 over HTS subheading 9404.29.90 to determine the SV for the pocket coil innerspring units. There is no reasonable interpretation of the record that could lead to any conclusion other than that the data for Indian HTS 9404.29.90 were the best available information.

Third, Commerce's decision not to list AFI and AFTC as companies eligible for the rate applicable to Wanek, Millennium and Comfort Bedding was unsupported by substantial evidence. Commerce's failure to include AFI and AFTC in its customs instructions violated Commerce's mandate under 19 U.S.C. § 1673d(c)(1)(B)(ii) to base estimated cash deposits on the rate calculated for the producer and exporter of subject merchandise, subjecting AFI and AFTC to the Vietnam-wide rate of 668.38 percent instead of the rate calculated for the Ashley Respondents.

Finally, Commerce erred in its decision to use the Cohen's *d* test to determine the differential pricing of the Ashley Respondents' U.S. sales data. In <u>Stupp Corp. v. United States</u>, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") noted its concerns as to Commerce's application of the Cohen's *d* test where "the data groups being compared are small, are not normally distributed, and have disparate variances." <u>Stupp Corp. v. United States</u>, 5

F.4th 1341, 1357 (Fed. Cir. 2021) ("Stupp").  Commerce's Cohen's *d* test as applied to the Ashley Respondents' sales data generated precisely the small test/comparison groups, abnormal distributions, and disparate variances of concern to the Federal Circuit in Stupp, rendering Commerce's application of the Cohen's *d* test unsupported by substantial evidence and not in accordance with law.

## STATEMENT OF FACTS

On March 31, 2020, Brooklyn Bedding, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Petitioners") filed a petition with Commerce and the U.S. International Trade Commission ("ITC") for the imposition of antidumping duty on mattresses from Vietnam.  See Letter on Behalf of Pet'rs to Dep't of Commerce and Int'l Trade Comm'n re: Antidumping and Countervailing Duty Pet. (Mar. 31, 2020) (P.R. 1-4).  On April 24, 2020, Commerce initiated an antidumping investigation on imports of mattresses from Vietnam.  See Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (P.R. 57).  Commerce selected Wanek as one of the mandatory respondents for individual examination in the investigation.  See Mem. from Dakota Potts to James Maeder re: Selection of Mandatory Resp'ts for Individual Examination at 1, 6 (May 15, 2020) (P.R. 107).  Commerce subsequently collapsed the three entities.  See Mem. from Stephen Bailey to Abdelali Elouaradia re: AFI, AFTC, Wanek, Millennium and Comfort

Bedding Prelim. Affiliation and Collapsing Mem. at 8 (Oct. 27, 2020) ("Affiliation Mem.") (P.R. 441).

On June 11, 2020, Commerce solicited comments on surrogate country selection and SV data to value the factors of production ("FOPs"). See Letter from Dep't of Commerce to All Interested Parties re: Req. for Economic Development, Surrogate Country and Surrogate Value Comments and Information at 3 (June 11, 2020) (P.R. 171). Petitioners and Ashley Respondents suggested India as the primary surrogate country, and both filed proposed SVs based on Indian data. See Letter on Behalf of the Ashley Respondents to Dep't of Commerce re: Surrogate Value Comments at 2-4 (July 30, 2020) (P.R. 278-281) ("Ashley Resp'ts' SV Cmts."); Letter on Behalf of Petitioners to Dep't of Commerce re: Petitioners' Surrogate Values Submission at 1 (July 30, 2020) (P.R. 276-277) ("Pet'rs SV Cmts."). In their SV comments, the Ashley Respondents submitted Sheela Foam's financial statements as the appropriate data source for Commerce's calculation of surrogate financial ratios. See Ashley Resp'ts' SV Cmts. at 3, Ex. SV-4 (P.R. 278-281). The Ashley Respondents also proposed GTA data under HTS subheading 9404.29.90 as the best available information to determine the SV for pocket coil innerspring units. See id. at 2, Exs. SV-1, SV-3 (P.R. 278-281). Petitioners submitted Emirates Sleep's financial statements and proposed GTA data under HTS subheading 7320.90.90 as the appropriate SV for pocket coil innerspring units. See Pet'rs SV Cmts. at 2-3, Ex. 11 (P.R. 276-277).

The Ashley Respondents submitted comments to Commerce prior to the issuance of the Preliminary Determination arguing that Commerce should utilize the financial statements of Sheela Foam to calculate the surrogate financial ratios and HTS subheading 9404.29.90 to value the pocket coil innerspring units, and to refrain from using the Cohen's *d* test on the Ashley

Respondents' U.S. sales data, which would generate distortions.  See Letter on Behalf of the Ashley Respondents to Commerce re: Mattresses from the Socialist Republic of Vietnam: Pre-Prelim Comments (Oct. 2, 2020) ("Pre-prelim Cmts.") (P.R. 391).

On November 3, 2020, Commerce published its Preliminary Determination, calculating a 190.79 percent weighted-average dumping margin for Wanek, Millennium and Comfort Bedding.  See Mattresses from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 69,591, 69,592 (Dep't of Commerce Nov. 3, 2020) (P.R. 524) ("Prelim. Determination"), and accompanying Dec. Mem. at 2 (P.R. 437) ("Prelim. Mem.").  Commerce preliminarily (1) calculated the surrogate financial ratios using Emirates Sleep's financial statements, (2) selected GTA data under HTS subheading 7320.90.90 to determine the SV for pocket coil innerspring units and (3) applied the Cohen's $d$ test to the Ashley Respondents' U.S. sales.  See Prelim. Dec. Mem. at 19, 26 (P.R. 437); Mem. from Stephen Bailey to the File re: Surrogate Value Mem. at 5-8 (Oct 27, 2020) (P.R. 449).

The Ashley Respondents thereafter submitted preliminary ministerial error comments asking Commerce to list AFI and AFTC as eligible for the deposit rate assigned to Wanek, Millennium and Comfort Bedding because, although AFI and AFTC are not foreign producers, their names may appear in the entry documentation presented to Customs as the reinvoicing parties of merchandise exported by Wanek, Millennium or Comfort Bedding.  See Letter on Behalf of the Ashley Resp'ts to Commerce re: Ministerial Error Cmts. at 3-4 (Nov. 5, 2020) (P.R. 451).  Commerce later issued its preliminary ministerial error memorandum declining to list AFI and AFTC as eligible to receive the deposit rate assigned to the other Ashley

Respondents.  See Mem. from Abdelali Elouaradia to James Maeder re: Allegation of Ministerial Error in the Prelim. Determination at 3-4 (Dec. 1, 2020) (P.R. 478).

On December 29, 2020, the Ashley Respondents filed a case brief disputing Commerce's Preliminary Determination on several grounds.  See Letter on Behalf of the Ashley Respondents to Dep't of Commerce re: Case Br. (Dec. 29, 2020) (P.R. 488) ("Ashley Resp'ts Admin. Case Br.").  The Ashley Respondents challenged Commerce's decision to rely on Emirates Sleep's financial statements instead of Sheela Foam's financial statements to calculate the financial ratios because the Emirates Sleep statements were not contemporaneous with the POI, were incomplete, were much smaller and primarily representative of retail operations rather than production of mattresses and were not publicly available.  See id. at 5-34.  Further, the Ashley Respondents argued that Commerce failed to use the best available information to determine the SV for pocket coil innerspring units in selecting HTS subheading 7320.90.90 over HTS subheading 9404.29.90 because record evidence overwhelmingly confirmed that HTS subheading 9404.29.90 represented the most accurate data to value the Ashley Respondents' pocket coil innerspring units.  See id. at 34-54.  In addition, the Ashley Respondents argued that Commerce should include AFI and AFTC as eligible for the rate assigned to Wanek, Millennium and Comfort Bedding because AFI's and AFTC's names may appear as reinvoicing parties in the entry documentation presented to Customs.  See id. at 60-62.

Commerce issued its Final Determination on March 25, 2021, assigning a 144.92 percent weighted-average dumping margin to Wanek, Millennium and Comfort Bedding.  See Final Determination, 86 Fed. Reg. at 15,891 (P.R. 525).  Although Commerce acknowledged that Emirates Sleep's financial statements were not contemporaneous with the POI, it nevertheless continued to rely on them to calculate the surrogate financial ratios.  See I&D Mem. at Cmt. 2

(P.R. 505).   Commerce also continued to use Indian HTS subheading 7320.90.90 to determine the SV for pocket coil innerspring units despite record evidence showing that HTS subheading 9404.29.90 was the best available information on the record.   See id. at Cmt 3.   Additionally, Commerce found a pattern of export prices or constructed export prices of the Ashley Respondents that differed significantly among purchasers, regions, or time periods, but continued to find that the average-to-average method appropriately accounted for such differences.   See Mem. from Stephen Bailey to the File re: Analysis Mem. for Ashley Group at 6 (Mar. 18, 2021) (P.R. 511) ("Final Analysis Mem.").   Following its Final Determination and the affirmative determination by the ITC, Commerce published the antidumping duty order on May 14, 2021. See Order, 86 Fed. Reg. at 26,462 (P.R. 526).

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . .  to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.  §  1516a(b)(1)(B)(i).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citation omitted).   Substantial evidence requires "more than a mere scintilla," see, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin, 322 F.3d at 1374 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the "record fairly detracts from its weight."  Nippon Steel Corp. v.

United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)).   Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable."   NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  "The court will find a determination unlawful where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions."   Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996) (internal citations omitted).

Regarding Commerce's interpretation of statutes, the Court applies the two-prong standard established in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43 (1984).  First, the Court determines whether Congress' intent can be ascertained.  If it can, the Court "must give effect to the unambiguously expressed intent of Congress."  Id. at 843.   Second, the Court determines whether the agency's interpretation of the statute is permissible.  See id. at 843-44.  The Court will uphold agency interpretations that are reasonable.  See id. at 844.

## ARGUMENT

### I.      COMMERCE'S USE OF EMIRATES SLEEP'S FINANCIAL STATEMENTS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE BECAUSE EMIRATES SLEEP'S DEFICIENT FINANCIAL STATEMENTS WERE CLEARLY INFERIOR TO SHEELA FOAM'S

Commerce's selection of Emirates Sleep's financial statements was unsupported by substantial evidence because Emirates Sleep's financial statements were not the best available information.  The statute requires Commerce to value FOPs using the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate."  19 U.S.C. § 1677b(c)(1).  "For the court to conclude that a reasonable mind would support Commerce's selection of the best available information, Commerce needs to justify its selection of data with a reasoned explanation."   Dorbest Ltd. v. United States, 30 CIT 1671,

1717, 462 F. Supp. 2d 1262, 1302 (2006)   In reviewing Commerce's SV determination, the "court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  "Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable." Olympia Indus., Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998).  Commerce has not done so here.

In selecting the best available information, "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  There is no hierarchy for applying such factors and Commerce must weigh available information and make case-specific decisions based on the best available information. See SeAH Steel VINA Corp. v. United States, __ CIT __, 269 F. Supp. 3d 1335, 1349 (2017). Because "best available information" is a standard involving comparison of record evidence, Commerce was required to have weighed the two financial statements on the record and determined which one was "best." Weishan Hongda Aquatic Food Co. v. United States, 917 F.3d 1353, 1356 (Fed. Cir. 2019).

In this case, no reasonable mind could conclude that Commerce chose the best available information.  In analyzing the two financial statements, Commerce evaluated contemporaneity, completeness and reliability, business operations and production of subject merchandise, public availability and countervailable subsidies. See I&D Mem at Cmt. 2 (P.R. 505). With respect to countervailable subsidies, the financial statements of both potential surrogate companies raised

subsidy issues but not on an equivalent basis since Emirates Sleep's potential subsidization reached nearly 12 percent of its revenue while Sheela Foam's potential subsidization was less than 0.001 percent of its revenue as discussed *infra*. With every other factor, Emirates Sleep's financial statements were inferior. Emirates Sleep's financial statements were unusable because they: (1) were not contemporaneous with the POI, (2) were incomplete and the omissions contained key information related to countervailable subsidies, (3) were based primarily on retail operations rather than mattress production and (4) were not publicly available. Any one of these factors could have rendered the Emirates Sleep financial statements unusable under Commerce's normal practice. Taken together, they fatally disqualify Emirates Sleep. Commerce should have instead used the financial statements of Sheela Foam because they were: (1) fully contemporaneous, (2) complete, (3) representative of the Ashley Respondents' business operations (4) publicly available and (5) displayed negligible or non-distortive evidence of subsidies.

### A. Commerce's Use of Emirates Sleep's Financial Statements Was Unreasonable Because They Were Not Contemporaneous with the POI

Commerce improperly relied on Emirates Sleep's financial statements despite Commerce's acknowledgment that Emirates Sleep's financial statements were not contemporaneous with the POI. See I&D Mem. at Cmt. 2 (P.R. 505) (stating that "Emirates Sleep fiscal year does not match the POI"). Commerce's practice is to calculate surrogate financial ratios based on POI-contemporaneous financial statements. See Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 78 Fed. Reg. 58,273 (Dep't of Commerce Sept. 23, 2013) ("HPW Final Determination"), and accompanying Issues and Dec. Mem. at 61 ("HPW I&D Mem.") ("{T}he Department has a clear preference for and well-established practice of calculating surrogate

13

financial ratios based on financial statements that are contemporaneous with the POI."); see also Home Prods. Int'l, Inc. v. United States, 32 CIT 337, 342, 556 F. Supp. 2d 1338, 1342 (2008) ("Beyond that, 'Commerce generally considers the quality, specificity, and contemporaneity of the available financial statements.'") (citation omitted).  Contemporaneity is an important factor for Commerce to "ensure{} it is valuing factors of production as accurately as possible" and to determine the most accurate dumping margin.  See China Mfrs. All., LLC v. United States, __ CIT __, __, 205 F. Supp. 3d 1325, 1359 (2017); see also Rhone Poulenc, 899 F. 2d 1185 at 1191 (1990).  Commerce regularly rejects non-contemporaneous financial statements.  See Common Alloy Aluminum Sheet From the Sultanate of Oman: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Determination of Critical Circumstances, 86 Fed. Reg. 13,328 (Dep't of Commerce Mar. 8, 2021), and accompanying Issues and Dec. Mem. at Cmt. 6 (rejecting non-contemporaneous financial statements); HPW Final Determination, 78 Fed. Reg. at 58,273, and accompanying HPW I&D Mem. at 61 (Commerce "removed non-contemporaneous financial statement from further consideration.").  The Court has recognized Commerce's preference for contemporaneous surrogate financial statements on numerous past occasions.  See, e.g., Zhejiang Native Produce & Animal By-Products Imp. & Exp. Grp. Corp. v. United States, __ CIT __, __, 227 F. Supp. 3d 1375, 1387 (2017) (affirming Commerce's determination in using contemporaneous financial statements over non-contemporaneous financial statements); Baroque Timber Indus. (Zhongshan) Co. v. United States, __ CIT __, __, 925 F. Supp. 2d 1332, 1351 (2013) (affirming Commerce's rejection of non-contemporaneous financial statements").

Using non-contemporaneous financial statements has a pervasive and distortive impact far beyond the simple calculation of financial ratios themselves.  The surrogate overhead, SG&A

and profit percentages are multiplied by each and every other SV choice in Commerce's normal value build-up, with few exceptions.[2]  By using a non-contemporaneous financial statement, Commerce infects nearly <u>all</u> other aspects of the antidumping calculation with potential distortion from costs outside the period of investigation.  Where nearly all costs determining normal value incorporate non-contemporaneous financial ratios, all of those otherwise-contemporaneous individual surrogate values are distorted *en masse* by non-period costs, making the ultimate comparison with U.S. pricing completely misaligned and defying the requirement that Commerce calculate margins as accurately as possible.  See <u>Rhone Poulenc</u>, 899 F. 2d at 1191.

Commerce unreasonably failed to follow its past practice by relying on non-contemporaneous financial statements.  As Commerce acknowledged, Emirates Sleep's financial statements covered the financial year ending on March 31, 2019, and therefore did not overlap with any portion of the POI, which was July 1, 2019 through December 31, 2019.  See Pet'rs' SV Cmts. at Ex. 11 (P.R. 276-277).  Commerce's unavailing rationale that Emirates Sleep's financial statements were only removed from the POI by one fiscal year obscures the fact that non-contemporaneous financial ratios affect every other element of the calculation of normal value.  See <u>id.</u> at 31.  As noted, the Court has previously upheld Commerce's determination to reject non-contemporaneous financial statements.  For example, in <u>Zhejiang Native</u>, the Court upheld Commerce's determination to use contemporaneous financial statements over financial statements from a later period because the more contemporaneous financial statements were "more specific, reliable, and contemporaneous with the {period of review}." <u>Zhejiang Native</u>, __ CIT at __, 227 F. Supp. 3d at 1380.  In that case, Commerce was faced with financial

---

[2] Packing costs and byproducts are not directly impacted by the financial ratios.

statements that overlapped with the period of review by ten months as well as financial statements that overlapped by only eight months.  See id. __ CIT at __, 227 F. Supp. 3d. at 1386. In upholding Commerce's selection of the more contemporaneous financial statements, the Court emphasized Commerce's "established practice to select the most contemporaneous surrogate values to value the {FOPs} and financial ratios" because the Court reasoned that "the less contemporaneous financial statement . . . is less representative of {the respondent's} factory overhead, SG&A, and profit during the . . . POR, including the {less contemporaneous} data in Commerce's financial ratio calculations would have resulted in a less accurate margin."  Id., __ CIT at __, 227 F. Supp. 3d. at 1386-87 (emphasis added).

In contrast, record evidence shows that Sheela Foam's financial statements are fully contemporaneous with the POI and thus represent the only data source on the record that would yield accurate financial ratios, aligning the costs underlying the surrogate financial ratios with surrogate value costs for the same time period.  Commerce's use of the most contemporaneous financial statements is crucial to create the most representative surrogate financial ratio calculation and thus the most accurate dumping margin.  See, e.g., Honey From the People's Republic of China: Final Results of First Antidumping Duty Administrative Review, 69 Fed. Reg. 25,060 (May 5, 2004), and accompanying Issues and Dec. Mem. at Cmt. 5 (outlining Commerce's established practice in selecting surrogate data based on "quality, specificity, and contemporaneity of such data"); see also China Mfrs. All., __ CIT at __, 205 F. Supp. 3d at 1359.  Commerce may only depart from its past practice in selecting non-contemporaneous financial statements when no other reliable and representative financial statements exist on the record.  See Vinh Hoan Corp. v. United States, No. 13 - 00156, 2015 Ct. Intl. Trade LEXIS 156, at *60 (Aug. 3, 2015).  Here, Sheela Foam presents a reliable and representative alternative.

In short, because Commerce failed to rely on contemporaneous financial statements or properly articulate why it departed from its practice on this issue, its determination was unsupported by substantial evidence because Commerce selected the less specific, non-contemporaneous Emirates Sleep financial statements over the contemporaneous financial statements of Sheela Foam.

**B. Commerce Erred in Relying on Emirates Sleep's Financial Statements Because They Were Incomplete**

Despite the Ashley Respondents' argument that Emirates Sleep's financial statements were unusable because they were incomplete, Commerce determined that the "Emirates Sleep's financial statements, while missing certain annexures, is complete for purposes of calculating financial ratios." I&D Mem. at Cmt. 2 (P.R. 505). Commerce is wrong. Commerce's practice is to disregard incomplete financial statements as a basis for calculating surrogate financial ratios "where they are "missing key sections . . . that are vital to {Commerce's} analysis and calculations." Notice of Final Determination of Sales at Less Than Fair Value: Steel Concrete Reinforcing Bars From Belarus, 66 Fed. Reg. 33,528 (Dep't of Commerce June 22, 2001), and accompanying Issues and Dec. Mem. at Cmt 2; Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review, 73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008), and accompanying Issues and Dec. Mem. at Cmt. 1.C (rejecting financial statements missing listed schedules).

Record evidence demonstrates that Emirates Sleep's financial statements were missing multiple annexures, i.e., Annexures 1-5. See Pet'rs' SV Cmts. at Ex. 11 (P.R. 276-277). In its Final Determination, however, Commerce erroneously concluded that the missing annexures are "supplemental details" and "unnecessary" for Commerce to calculate the surrogate financial ratios. I&D Mem. at Cmt. 2 (P.R. 505). While illogical given that Commerce cannot draw

conclusions about information it does not have, this conclusion is also wrong.  The missing Annexure 5 contained key details regarding "Balances with government authorities," a line item under Note 13 of the financial statements detailing "Short-term loans and advances" in the amount of 7,518,007 Rupees.  Pet'rs' SV Cmts. at Ex. 11 p. 402 (P.R. 276-277).  The missing information is "key" to determine whether such a relatively large, potentially countervailable balance with government authorities would disqualify Emirates Sleep.  Commerce unreasonably determined, even though the line item is included within the "Short-term <u>loans</u> and advances" section of Emirates Sleep's financials, that this line item "does not reference government loans, only balances."  I&D Mem. at Cmt. 2 (emphasis added) (P.R. 505).  Because Annexure 5 is missing from the record, Commerce cannot know its contents and cannot reasonably conclude that it "has no bearing on {its} financial ratio calculations."  <u>Id.</u>  Commerce engages in impermissible speculation that the missing information had no bearing on its calculation.

The courts have consistently sustained Commerce's determination not to rely on incomplete financial statements.  For instance, the Federal Circuit has upheld Commerce's determination to reject incomplete financial statements where they were missing information vital to Commerce's calculations.  <u>See</u> <u>CP Kelco U.S., Inc. v. United States</u>, 949 F.3d 1348, 1359 (Fed. Cir. 2020).  In that case, the Federal Circuit upheld Commerce's determination to reject incomplete financial statements and to instead rely on financial statements that contained evidence of countervailable subsidies because the missing information was of "critical importance" as the missing information "can provide vital information" not shown on "the numeric fixed asset schedule" and that can "significantly impact the surrogate financial ratios." <u>Id.</u>  Similarly, the Court has affirmed Commerce's determination to reject incomplete financial statements where the record evidence contained other, complete financial statements.  <u>See</u>

Lifestyle Enter. v. United States, 35 CIT 158, 182, 768 F. Supp. 2d 1286, 1311 (2011) (affirming Commerce's rejection of incomplete financial statements missing notes or accounting policies); Fine Furniture (Shanghai) Ltd. v. United States, __ CIT __, __ 321 F. Supp. 3d 1282, 1290-91 (2018) (affirming Commerce's determination rejecting financial statements missing a note on property, plant and equipment).

The reasoning in these past cases is compelling here. Financial statements like those of Emirates Sleep that are missing vital information, (Annexures 1 through 5 in this case), are not reliable because the missing information is vital to determine the viability of these statements. Here, the missing Annexure 5 is critical because it contains details of the government loans received by Emirates Sleep, which are key to determining whether such loans were distortive and disqualified the company under Commerce precedent. Commerce's analysis that "there is no record evidence that the line item 'balances with government authorities' is a loan or distortive" underscores how important the missing Annexure 5 actually is, since this annexure likely contains precisely this missing record evidence. See I&D Memo at Cmt 2 (P.R. 505).

Commerce's reliance on Emirates Sleep's financial statements is also unsustainable given that other complete financial statements, i.e., Sheela Foam's, exist on the record. In comparing the two financial statements, Commerce was faced with one set of financial statements missing key information and one complete set. Given the missing information in Emirates Sleep's financial statements, no reasonable mind could conclude that Emirates Sleep provided the "best" information considering the presence of complete statements from Sheela Foam. See Weishan Hongda, 917 F.3d at 1356.

19

**C. Emirates Sleep's Financial Statements Are Not Reflective of the Ashley Respondents' Business Operations and Therefore Not the Best Available Information**

Commerce also erroneously relied on Emirates Sleep's financial statements because Emirates Sleep's primary business operations in India are completely dissimilar from those of the Ashley Respondents' business operations in Vietnam.  Commerce should consider a respondent's production experience in selecting SVs and "prioritize{} the data on the record that best reflected the respondent's production experience."  Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, __, 273 F. Supp. 3d 1348, 1352 (2017).  "Commerce is tasked with choosing a surrogate representative of respondents' production experience, and is essentially required to create a 'hypothetical' market value to approximate the production experience in the NME country."  Taian Ziyang Food Co. v. United States, 33 CIT 828, 875, 637 F. Supp. 2d 1093, 1136 (2009).

Commerce's finding that Emirates Sleep's financial statements were representative of the Ashley Respondents' business operations was unsupported by record evidence.  Despite statements that Emirates Sleep "is a manufacturing company . . . of mattresses, bases, and other sleep related products," record evidence shows that Emirates Sleep's primary business is retail and not manufacturing.  Pet'rs' SV Cmts. at Ex. 11 (P.R. 276-277).  Commerce found that some of Emirates Sleep's showroom rental expenses, detailed below, are "five times greater than {its} factory rent," indicating significantly greater involvement in retail than production.  Letter from Dep't of Commerce to Pet'rs' re: Suppl. Questions at 5 (Apr. 3, 2020) ("Commerce Suppl. Question") (emphasis added) (P.R. 19).  Emirates Sleep's financial statements also show that its revenue from operations did not include any revenue from its manufacturing activity, but instead captured its retail activity as shown by the following line items: "(a) Sale of products" in the

amount of 47.4 million Rupees, or approximately $600,000, and "(b) Sale of services (Marketing Fee relates to fee charged to Dubai Manufacturing Company LLC which is the holding company)" in the amount of 14.4 million Rupees, or approximately $191,198. Pet'rs' SV Cmts. at Ex. 11 (P.R. 276-277). Note 20.4 of Emirates Sleep's financial statements also specifically shows Emirates Sleep registered 13,213,255 Rupees in import purchases from its foreign holding company, suggesting that Emirates Sleep is primarily engaged in resale of imported merchandise and retail rather than manufacturing. Id. Further, Emirates Sleep reported revenue from sales of products was only 47.4 million Rupees or roughly $600,000, compared to Sheela Foam's reported revenue from operations of 175,476 Lakh, or approximately $240 million. Compare Pet'rs SV Cmts. at Ex. 11 (P.R. 276-277) with Ashley Resp'ts' SV Cmts. at Ex. SV-4 (P.R. 278-281). While Wanek reported its [ ███████████████████████████████████████

████████████████████████████ ] during the POI. See Letter on Behalf of Wanek to Dep't of Commerce re: Separate Rate Application of Wanek at Ex. 7 (June 1, 2020) (Proprietary Version) (C.R. 87-90). The disparity in revenue shows that Emirates Sleep is a much smaller company than either Sheela Foam or Wanek, and Commerce should not base the surrogate financial ratios on Emirates Sleep's financial statements because they do not represent the actual business size of the Ashley Respondents.

Importantly, Commerce reasoned that its reliance on Emirates Sleep's financial statements was proper because "record evidence demonstrates that Ashley Group in Vietnam does incur showroom expenses." I&D Mem. at Cmt. 2 (P.R. 505). This reasoning is flat wrong and ignores record evidence directly contradicting this claim. Petitioners alleged that the Ashley Respondents maintain a retail store in Vietnam. See Letter on Behalf of the Pet'rs' to Commerce re: Resp. to Petition Suppl. Questionnaires at Ex. I-Supp-5 p. 8-9 (Apr. 8, 2020) (P.R. 23-24).

Unrebutted evidence submitted in the earliest stages of the investigation directly contradict the Petitioner's false accusation.  See Letter on Behalf of AFI to Dep't of Commerce re: Resp. to Pt'rs' Cmts. at 2 (Apr. 17, 2020) ("AFI Resp. to Pt'rs' Cmts.") (P.R. 41) (stating that neither AFI nor any affiliate owns nor operates any retail locations in Vietnam).  Despite clear evidence on the record to the contrary, Commerce accepted Petitioners' allegation at face value.  It was improper for Commerce to have relied on the financial statements of a company engaged primarily in retail (with miniscule manufacturing) as opposed to manufacturing operations when no such operations are performed by Wanek, Millennium or Comfort Bedding.

Emirates Sleep's showroom expenses alone account for more than half of Commerce's total calculated SG&A expenses:[3]



As shown in the [        ] line item in Wanek's, Millennium's and Comfort Bedding's financial statements, none of these entities incurs any expenses related to retail operations in Vietnam. See Letter on Behalf of the Ashley Resp'ts to Dep't of Commerce re: Section A Questionnaire Response at Exs. A-I-3, A-II-3, A-III-4 (Business Proprietary Document) (C.R. 108-122).  Given that Wanek, Millennium and Comfort Bedding do not own or operate any showrooms nor engage in any retail activities in Vietnam, Commerce's reliance on Emirates Sleep is further discredited.

---

[3] See Final Analysis Mem. at Attach VIII, Fin Ratios Tab (Business Proprietary Document) (C.R. 691).

Commerce's reliance on Emirates Sleep's financial statements is also contrary to Commerce's own past practice.  Commerce has previously rejected financial statements of a company engaged in "significant retail operations" on the basis that a company engaged in retail is not representative of the business operations of a company engaged in manufacturing.  See Wooden Bedroom Furniture From the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729 (Dep't of Commerce Aug. 11, 2011), and accompanying Issues and Dec. Mem. at Cmt. 19 (finding financial statements showing significant retail operations were not the best available information where there were "multiple usable financial statements on the record from other companies for which there is no indication on the record that they have retail operations"); see also Home Meridian Int'l, Inc. v. United States, 36 CIT 1279, 1295, 865 F. Supp. 2d 1311, 1325-26 (2012) (upholding Commerce's determination to reject the financial statements of a company that had significant retail operations with showroom expenses reflected in its financial statements when there were "multiple usable financial statements on the record from other companies that d{id} not have retail operations").  Here, the evidence established that Wanek, Millennium and Comfort Bedding do not own or operate any showroom facilities or local sales operations in Vietnam, and the storefront referenced by Petitioners is owned and operated by unaffiliated entities.  See AFI Resp. to Pt'rs' Cmts. at 2 (P.R. 41).  Therefore, applying ratios from a surrogate producer with a dramatically different cost structure injected distortion in the resulting normal value.

In contrast to the numerous deficiencies in Emirates Sleep's financial statements, the record contained a suitable surrogate company engaged in manufacturing – Sheela Foam.  When selecting surrogate financial statements, Commerce must select as representative a company as possible "to fulfill its statutory mandate of calculating dumping margin as accurately as

possible." <u>Ancientree Cabinet Co. v. United States</u>, No. 20 - 00114, 2021 CIT LEXIS 85, at *17 (July 12, 2021) (citations omitted).  The record in this case demonstrates that Sheela Foam's business operations were the most representative of the Ashley Respondents' Vietnamese operations as manufacturers and therefore was the best available information on the record. Specifically, Sheela Foam engaged in similar operations to Wanek, Millennium and Comfort Bedding as a "pioneer{} in the manufacturing of polyurethane foams in India and has ten manufacturing facilities . . . across the country."  Ashley Resp'ts' SV Cmts. at Ex. SV-4 p. P-95 (P.R. 278-281).

In short, Commerce improperly concluded that Emirates Sleep's retail operations in India are comparable to Wanek's, Millennium's and Comfort Bedding's manufacturing operations in Vietnam and also improperly disregarded the more comparable financial statements of Sheela Foam.  Commerce's determination that the financial statements of Emirates Sleep were the best available information was, therefore, unsupported by substantial evidence.

### D. Commerce Improperly Departed from its Practice in Selecting Emirates Sleep's Financial Statements Because They Were Not Publicly Available

Commerce's reliance on Emirates Sleep's financial statements in calculating the Ashley Respondents' surrogate financial ratios was also unsupported by substantial evidence because Emirates Sleep's financial statements were not publicly available.   The best available information is generally publicly available information.  <u>See</u> 19 C.F.R. § 351.408(c)(1).  Because "publicly available information addresses the concern that a lack of transparency about the source of the data could lead to proposed data sources that lack integrity or reliability."  <u>Since Hardware (Guangzhou) Co., Ltd. v. United States</u>, __ CIT __, __, __, 911 F. Supp. 2d 1362, 1367 (2013) (quotation marks omitted).

Commerce enjoys broad discretion "to determine what constitutes the best available information, as this term is not defined by statute." Weishan Hongda, 917 F.3d at 1364-65 (quotation marks omitted).  When selecting the "best available information" on the record, Commerce's analysis involves "a comparison of the competing data sources to identify what available information is 'best' to value factors of production."  Id. at 1367.  In undertaking its analysis, Commerce "must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."  Id. at 1368 (citing NMB Sing. Ltd v. United States, 557 F.3d at 1319 (Fed. Cir. 2009)). Commerce has codified its preference to use publicly available information to value the FOPs in its regulations.  See 19 C.F.R. § 351.408(c)(1).  To determine whether financial statements are "publicly available," Commerce considers, for example, whether they are "obtained … from a public source … which could be verified," whether the party submitting the information "provided sufficient information regarding how the financial statement could be obtained from public sources," whether the financial statements are "displayed on the companies' websites" and whether, "when using the web addresses provided, any party, including the respondents, is able to view." Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 15,297, 15,299 (Dep't of Commerce Mar. 21, 2011), and accompanying Issues and Dec. Mem. at Cmt. 1; see also Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam: Issues and Decision Memorandum for Final Results of Administrative Review, 2014-2015, 82 Fed. Reg. 18,611 (Dep't of Commerce Apr. 20, 2017), and accompanying Issues and Dec. Mem. at Cmt. 1.  That standard is not met here.

Commerce improperly disregarded these factors in the Final Determination in relying on Emirates Sleep's financial statements. Commerce erroneously concluded that "given the facts on the record (i.e., both Ashley Group and the petitioners acknowledging that the Emirates Sleep financial statements are available in a subscription database), we conclude that Emirates Sleep's financial statements are publicly available." I&D Mem. at Cmt. 2 (P.R. 505). Commerce's conclusion elides the fact that the Ashley Respondents acknowledged only that the incomplete financial statements provided by Petitioners existed in a subscription database. Publicly available, complete financial statements (including Annexures 1-5) for Emirates Sleep do not exist, however, calling into question their "integrity and reliability." Since Hardware, 911 F. Supp. 2d at 1367. Commerce's reasoning is flawed because Emirates Sleep's financial statements do not meet Commerce's "publicly available" threshold as they did not come from a public source, Petitioners did not provide sufficient information on how the financial statements were obtained, and Emirates Sleep's complete financial statements remain absent from the record because they are not publicly available.

The Court has repeatedly emphasized the importance of public availability of financial statements used for surrogate values. See, e.g., Home Prods., 32 CIT at 341-42, 556 F. Supp. 2d at 1342-43; Since Hardware, CIT at __, 911 F. Supp. 2d at 1366 (2013). In Since Hardware, for example, the Court found Commerce's reliance on financial statements not available to respondent parties to be unreasonable, describing Commerce's rigorous standard for public availability of surrogate financial statements. See Since Hardware, __ CIT at __, 911 F. Supp. 2d at 1366-69. First, Commerce requires a detailed step-by-step explanation by the submitter of how the financial statements were obtained so "any party would be able to replicate these steps" in acquiring the financial statements. Id. Second, if the step-by-step explanation is not provided,

Commerce required that the submitter to "provide a detailed explanation as to the reason they believed the financial statements were described as publicly available and . . . to indicate if the financial statements were required under Indian law to be filed publicly with any government authority."  Id.  Thus, when public availability of a set of surrogate financial statements is at issue, Commerce's practice is to require the submitter to provide a detailed explanation on how it obtained the financial statements.  Despite the fact that public availability was an issue in this case, Commerce improperly failed to pursue the matter .

The Ashley Respondents alerted Commerce early in the investigation that Emirates Sleep's financial statements were not publicly available, explaining that:

> Commerce would be unable to find these financial statements by searching the internet because the statements provided by Petitioners exist only within subscription databases. . . . Emirates Sleep does not maintain a website and does not publish its own financial statements.  The Emirates Sleep Financial Statements indicate that the company is not publicly listed.

Letter from the Ashley Respondents to Commerce re: Rebuttal Surrogate Value Cmts. at 41 (Aug. 17, 2020) ("Rebuttal SV Cmts.") (P.R. 311-313).  Despite acknowledging that it did not request information on the source of the financial statements, Commerce did not request additional clarification from Petitioners, inquire as to how Petitioners obtained the Emirates Sleep's financial statements, or attempt to obtain the complete financial statements of Emirates Sleep.  I&D Mem. at Cmt. 2 (P.R. 505).  While Commerce turned a blind eye to each and every apparent flaw in Emirates Sleep's financial statements, the non-public manner by which the financial statements were available could very well explain why numerous key Annexures were missing from information placed on the record by the petitioners.

In short, the Court should find that Commerce's reliance on Emirates Sleep's financial statements was unsupported by substantial evidence because the record established that these financial statements were not publicly available.

**E. Commerce's Determination to Reject Sheela Foam Based on Receipt Countervailable Subsidies Was Unreasonable**

Commerce also improperly rejected Sheela Foam's financial statements for alleged evidence of receipt of countervailable subsidies.  See id. at Cmt. 2 (P.R. 505).  The statute provides that "Commerce may disregard price or cost values without further investigation if Commerce has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values . . . ."  19 U.S.C. § 1677b(c)(5) (emphasis added).  As the wording of the statute suggests, Commerce is under no obligation to reject financial statements that have evidence of subsidies, but it "may" do so based on record evidence and on a case-by-case basis.  See Goldlink Indus., 30 CIT at 619, 431 F. Supp. 2d at 1327.  The Supreme Court, however, has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner," and "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 48 (1983) (citations omitted).  Commerce has not done so here.

The critical issue in examining the "countervailable subsidies" factor, is to note that both potential sets of financial statements contain references to government assistance, yet no conclusive evidence exists that this assistance was pursuant to a program found to be countervailable.  Without conclusive evidence, Commerce cannot disregard Sheela Foam's financial statements as unusable over a mere mention of government assistance.  Commerce cannot reasonably select the fatally flawed financial statements of Emirates Sleep where other reliable financial statements, i.e., those of Sheela Foam, exist on the record.

28

1. **Commerce Had No Specific Information on the Alleged Subsidy Programs in Sheela Foam's Financial Statements and No Reasonable Basis to Conclude That the Alleged Programs Have Been Found to Be Countervailable**

Commerce improperly rejected Sheela Foam's financial statements on the grounds that they contained evidence of subsidies previously found to be countervailable.  In its Final Determination, Commerce determined that Sheela Foam's financial statements contained evidence of "investment subsidy" and "duty drawback subsidy" previously countervailed in two prior proceedings.  See I&D Mem. at Cmt. 2 (P.R. 505) (citing Circular Welded Carbon-Quality Steel Pipe From India: Final Affirmative Countervailing Duty Determination, 77 Fed. Reg. 66,468 (Oct. 22, 2012), and accompanying Issues and Dec. Mem. at Cmt. 8 and Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part, 85 Fed. Reg. 25,398 (May 1, 2020), and accompanying Issues and Dec. Mem. at Cmt. 6).  Commerce reasoned that the programs listed in Sheela Foam's financial statements have similar names to programs it "previously found countervailable" and "each of the programs reflected money received during the POI."  Id. at 35.  Commerce's conclusion was meritless because no specific evidence linked the programs in Sheela Foam's financial statements to subsidies previously countervailed by Commerce.  Commerce cannot, therefore, reject Sheela Foam's financial statements based on such allegations in favor of the financial statements of Emirates Sleep, which are "demonstrably unrepresentative or distortional, a reasonable mind may rightly question how such a selection could be the 'best.'"  Dorbest, 30 CIT at 1677, 462 F. Supp. 2d at 1269.

Commerce improperly interpreted the record evidence and misapplied its past practice in this case.  Commerce employs the following framework when evaluating whether a financial statement contains evidence of subsidies previously found to be countervailable:

> (1) If a financial statement contains a reference to a <u>specific subsidy</u> program found to be countervailable in a formal CVD determination, Commerce will exclude that financial statement from consideration. (2) If a financial statement contains only a <u>mere mention</u> that a subsidy was received, and for which there is no additional information as to the specific nature of the subsidy, Commerce will not exclude the financial statement from consideration.

<u>Clearon Corp. v. United States</u>, 35 CIT 1685, 1688, 800 F. Supp. 2d 1355, 1359 (2011) (emphasis added).  Commerce's determination that the investment subsidy and duty drawback programs are the same subsidies previously countervailed in <u>Circular Welded Pipe from India</u> and <u>Quartz Products from India</u> was unreasonable.  There was no specific information in Sheela Foam's financial statements that sufficiently described the nature of the programs that would meet Commerce's "specific information" standard.  <u>See</u> Ashley Resp'ts' SV Cmts. at Ex. SV-4 (P.R. 278-281) (providing no specific information to the nature of the investment subsidy and duty drawback programs).

Further, Commerce failed to satisfy its reason to believe or suspect standard in determining that the mention of "investment subsidy" and "duty drawback" in Sheela Foam's financial statements as countervailable subsidies.  To justify a subsidy finding, the Court found that

> Commerce must demonstrate by specific and objective evidence that (1) subsidies of the industry in question existed in the supplier countries during the {POI}; (2) the supplier in question is a member of the subsidized industry or otherwise could have taken advantage of any available subsidies; and (3) it would have been unnatural for a supplier to not have taken advantage of such subsidies.

<u>Fuyao Glass Indus. Grp. Co. v. United States</u>, 29 CIT 109, 114 (2005).  There is no evidence on the record of this case that Sheela Foam was in receipt of the alleged countervailable subsidies because there was no information that the Sheela Foam is a member of the subsidized industry or could have taken advantage of any available subsidies during the POI.

Even where financial statements contain information suggesting receipt of subsidies, Commerce cannot exclude that financial statement "absent <u>specific information,</u> such as evidence that this statement refers to programs previously found by {Commerce} to provide countervailable subsidies." <u>Certain Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,</u> 74 Fed. Reg. 14,414 (Dep't of Commerce Mar. 31, 2009), and accompanying Issues and Dec. Mem. at 30 (emphasis added).  A mere mention of "investment subsidy" and "duty drawback" does not meet the "specific information" standard and fail to meet Commerce's reason to believe and suspect standard.  <u>See</u> <u>Clearon,</u> 35 CIT at 1688, 800 F. Supp. 2d at 1359.  Commerce's determination that the "investment subsidy" and "duty drawback" were the same programs countervailed by Commerce was, therefore, unreasonable.

Even where financial statements contain evidence of receipt of subsidies, Commerce may nevertheless rely on it.  <u>See, e.g.,</u> <u>Fine Furniture (Shanghai) Ltd. v. United States,</u> __ CIT __, __ 353 F. Supp. 3d 1323, 1351 (2018).  In <u>Fine Furniture,</u> for example, the Court found that Commerce's determination to rely on financial statements referencing an "investment subsidy" was reasonable where there was "no additional information on the record as to the specific nature of this line item or where it {came} from (e.g., whether the 'subsidy' is conferred under a government program)."  <u>Id.</u>  Similarly, here, the programs Commerce found to be countervailable in Sheela Foam's financial statements (i.e., "investment subsidy" and "duty drawback") were described only in general terms without any specific information regarding the nature and origin of the programs.  Commerce cannot rely on speculation that Sheela Foam was received countervailable subsidies without any support tying the line items in Sheela Foam's

financial statements to the specific subsidy programs that Commerce has previously found to be countervailable.

Moreover, "Commerce's policy is not to reject financials containing evidence of subsidies of an unknown character unless there is evidence that the subsidies were distortive with respect to the subject merchandise during the POI." Yantai Xinke Steel Structure Co. v. United States, No. 10-00240, 2014 Ct. Intl. Trade LEXIS 39 at *61 (Apr. 9, 2014) (emphasis added) (citing Persulfates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 68,030 (Dep't of Commerce Dec. 5, 2003), and accompanying Issues and Dec. Mem. at Cmt. 3.  There is no evidence on the record that the "investment subsidy" and "duty drawback" programs in Sheela Foam's financial statements were distortive.  On the contrary, ss shown in the next section, the "investment subsidy" equates to 0.001 percent of Sheela Foam's revenue while "duty drawback" equates to only 0.000046 percent.  In contrast, Note 13 of Emirates Sleep's financial statements lists "Balances with Government authorities" in the amount of 7,518,007 Rupees, equating to approximately 12 percent of Emirates Sleep's revenue.[4]   In its Final Determination, however, Commerce unreasonably concluded that the line item of "Balances with Government authorities" "does not reference government loans, only balances," even though this line item is included within the section titled "short-term loans and advances."  I&D Mem. at Cmt. 2 (P.R. 505).  Sufficient information exists for Commerce to have "reason to believe or suspect" that Emirates Sleep received an amount of government support that is significantly distortive.  It was, therefore,

---

[4] Emirates Sleep reports 62,425,677 Rupees of total revenue in its profit and loss statement and balances with government authorities in Note 13 of 7,518,007 Rupees. Thus, 7,518,007 Rupees / 62,425,677 Rupees = 12 percent. See Pet'rs SV Cmts. at Ex. 11 (P.R. 276-277); see also Letter on Behalf of the Ashley Resp'ts to Dep't of Commerce re: Factual Information Responsive to the Pet'rs Factual Allegation of Subsidy Receipt at 9 (Oct. 22, 2020) (P.R. 429).

unreasonable for Commerce to have dismissed Sheela Foam's financial statements as unusable whereas Emirates Sleep's financial statements that show distortive government assistance.

Even if, *arguendo*, the alleged programs in Sheela Foam's financial statements were found to be countervailable in the past, Commerce may still use financial statements showing receipt of countervailable subsidies where, as here, the other options on the record are missing key information.  See CP Kelco, 949 F.3d at 1359 (2020) (noting that missing information "can provide vital information" relevant to Commerce's calculations and affirming Commerce's use of surrogate financial statements with evidence of countervailable subsidies over incomplete financial statements).  Id.  Thus, regardless of whether the Sheela Foam financial statements contained evidence of subsidies, Commerce may rely on those statements when the alternative source is missing key information, as are Emirates Sleep's financial statements.

Given that there was no specific information as to the nature of the alleged subsidy programs and Commerce failed to follow its own practice for disqualifying financial statements with evidence of subsidies only if certain criteria are met, Commerce's rejection of Sheela Foam's financial statements was unsupported by substantial evidence.

2. **Commerce's Reasoning in Rejecting Sheela Foam Should Also Have Led to the Rejection of Emirates Sleep's Financial Statements Because of Evidence of Distortive Government Loans**

A further flaw in Commerce's decision to use Emirates Sleep's financial statements was the distortion caused by Emirates Sleep's receipt of significant government loans in excess of any potential assistance received by Sheela Foam.  In the Final Determination, Commerce stated that "although Commerce may have found it appropriate in a past case, it is not Commerce's current practice to consider the amount of the benefit received when analyzing surrogate financial statements."  I&D Mem. at Cmt. 2 (P.R. 505).  Contrary to Commerce's assertion, it is

pertinent here to analyze the amounts listed under "investment subsidy" and "duty drawback" in Sheela Foam's financial statements compared to the amount of "Balances with Government Authorities" under Emirates Sleep's financial statements.

As shown below, the amount of government loans under "Balances with Government Authorities" in Emirates Sleep's financial statements is significantly distortive compared to the combined amount of "investment subsidy" and "duty drawback" programs in Sheela Foam's financial statements:

| | Item | Amount (a) | Revenue (b) | Ratio to revenue (a)/(b) |
|---|---|---|---|---|
| Emirates Sleep's Financial Statements | "Balances with Government authorities" | 7,518,007 Rupees[5] | 62,425,677 Rupees[6] | **12 percent** |
| | | | | |
| Sheela Foam's Financial Statements | "Investment subsidy" | 2.84 Lakhs[7] | 175,476 Lakhs[8] | **0.001 percent** |
| | "Duty drawback" | 0.08 Lakhs[9] | | **0.000046 percent** |

The Court has previously upheld Commerce's decision in accepting financial statements with alleged receipt of subsidies unless, as with Emirates Sleep, they are distortive.  In <u>Yantai Xinke</u>, for example, the Court recognized Commerce's "policy is not to reject financials containing evidence of subsidies of an unknown character unless there is evidence that the subsidies were distortive with respect to the subject merchandise during the POI." <u>Yantai Xinke</u>, 2014 Ct. Intl. Trade LEXIS 39 at 1.  As shown in the above chart, the amount received by Emirates Sleep under "Balances with Government Authorities" is highly distortive, equating to

---

[5] <u>See</u> Pet'rs' SV Cmts. at Ex. 11 (P.R. 276-277)
[6] <u>Id.</u>
[7] <u>See</u> Ashley Resp'ts' SV Cmts. at Ex SV-4 (P.R. 278-281)
[8] <u>Id.</u>
[9] <u>Id.</u>

approximately 12 percent of Emirates Sleep's revenue, a significantly higher relative amount than received by Sheela Foam under both the "Investment subsidy" and "Duty drawback" programs.

Given the facts, Commerce improperly departed from its practice in selecting Emirates Sleep's financial statements because Emirates Sleep's financial statement show significant distortive government loans. Commerce's determination in selecting Emirates Sleep's financial statements was, therefore, unreasonable.

### 3. In Weighing the Two Financial Statements, No Reasonable Person Could Conclude that Emirates Sleep was Superior to Sheela Foam

In this case, Commerce was presented with two options of financial statements to calculate surrogate financial ratios: (1) Sheela Foam's financial statements that were publicly available, contemporaneous, complete, and that captured a similar production experience to the Ashley Respondents versus (2) Emirates Sleep's flawed financial statements that were missing key annexes, not publicly available, not contemporaneous with the POI, and captured primary business activities distinct from those of the Ashley Respondents. Again, "the term 'best available' is one of comparison, i.e., the statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping margin." Dorbest, 30 CIT at 1675, 462 F. Supp. 2d at 1268. Commerce failed that mandate here. The only financial statements on the record usable for purposes of calculating the surrogate financial ratios were those of Sheela Foam. Commerce strained to ignore the myriad flaws in Emirates Sleep's financial statements, flouting its own past practice and court precedent, and in doing so failed to select the "best" available data in accordance with its statutory mandate. Commerce's decision to reject Sheela Foam's financial statements was, therefore, unsupported by substantial evidence.

II.    **COMMERCE'S RELIANCE ON HTS SUBHEADING 7320.90.90 TO VALUE POCKET COIL INNERSPRING UNITS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE BECAUSE HTS SUBHEADING 7320.90.90 WAS NOT SPECIFIC TO THE ASHLEY RESPONDENTS' INPUT**

Commerce's determination to base the pocket coil innerspring units SV on data from Indian HTS subheading 7320.90.90 (springs and leaves for springs, of iron or steel: other: other) was unsupported by substantial evidence, and was in fact contrary to overwhelming record evidence.  See I&D Mem. at Cmt. 3 (P.R. 505).  The statute requires Commerce to value FOPs based on the best available information in a market economy country.  See 19 U.S.C. § 1677b(c)(1)(B).  "'{P}roduct specificity' logically must be the primary consideration in determining 'best available information.'"  Taian Ziyang, 35 CIT at 907, 783 F. Supp. 2d at 1330.  In this case, Commerce did not select the best available information to determine the pocket coil innerspring units SV because overwhelming record evidence demonstrates that HTS subheading 9404.29.90 (mattress supports; articles of bedding and similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs or stuffed or internally fitted with any material or of cellular rubber or plastics, whether or not covered: mattresses: of other materials: other) properly describes Indian imports of the input used by the Ashley Respondents.

A. **Commerce Improperly Relied on HTS 7320.90.90 Rather than HTS 9404.29.90**

Commerce improperly concluded that HTS subheading 7320.90.90 "covers imports more specific to the input in question than HTS 9404.29.90."  I&D Mem. at Cmt. 3 (P.R. 505).  As noted, product specificity is the primary consideration in determining the best available information.  Taian Ziyang, 35 CIT at 907, 783 F. Supp. 2d at 1330.  Throughout the investigation, the Ashley Respondents demonstrated that Commerce should value pocket coil

innerspring units using HTS subheading 9404.29.90 because that classification covers the innerspring unit used in production by the Ashley Respondents. See Rebuttal SV Cmts. at 4 (P.R. 311-313); see also Letter on Behalf of the Ashley Respondents to Dep't of Commerce re: Factual Information Submission at 8 (Oct. 7, 2020) (P.R. 407-411) ("Final SV Cmts."). Commerce, however, improperly determined that HTS subheading 7320.90.90 "is a better category because it expressly covers springs of iron or steel of coil, other than spring for railways, tramways or spring pins, used by Ashley Group, while HTS 9404.29.90 covers items that are dissimilar to the innerspring coil unit." I&D Mem. at Cmt. 3 (P.R. 505). Commerce is mistaken for several reasons.

First, the Ashley Respondents' pocket coil innerspring units are properly considered mattress supports classified under HTS heading 9404 because the pocket coil innerspring units are not articles of iron and steel. Commerce must conduct an analysis based on tariff classification rules and principles to determine the "best available information" of a certain input. See, e.g., Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States, __ CIT __, __, 322 F. Supp. 3d 1308, 1320 (2018). In its Final Determination, Commerce did not conduct a proper analysis based on the tariff classification rules and principles set forth in the General Rules of Interpretation ("GRI"). GRI 1 provides that "classification shall be determined according to the terms of the headings and relative Section or Chapter Notes." Id. Here, the Ashley Respondents described their pocket coil innerspring units as "{i}nnerspring assemblies unit made of steel wire, fabric and glue" intended to be used as cores for mattresses. See Letter on Behalf of the Ashley Respondents to Dep't of Commerce re: Second Supp. Section D Questionnaire Response at Ex. SD2-3b (Sept. 14, 2020) ("Second Supp. Section D") (P.R. 352-354). As is clear from this description, Ashley Respondents' pocket coil innerspring units are not exclusively made of

springs.  See I&D Mem. at Cmt. 3 (P.R. 505).  Petitioner Leggett & Platt, Inc., also a petitioner

in the Uncovered Innerspring Units case, agreed with this classification, testifying before the ITC

that imports of uncovered innersprings, including pocket coil innerspring units, should be

classified under U.S. HTS subheading 9404.29.  See Final SV Cmts. at 6 (P.R. 406-411).

Second, the record contained unrebutted classification opinions from six separate Indian

customs law experts supporting the classification of the Ashley Respondents' pocket coil

innerspring units under Indian HTS subheading 9404.29.90.  See Final SV Cmts. at SV2-16,

SV2-17  (P.R. 406-411); see also Letter on Behalf of the Ashley Respondents to Dep't of

Commerce re: Comments on Petitioners' Surrogate Value Comments at Ex. SV3-1 to SV3-4

(Oct. 16, 2020) (P.R. 420-421) ("Cmts. on Pet'rs SV").  Where Commerce derives surrogate

values based on Indian import data, professional opinions of Indian classification legal experts

are highly relevant in ensuring that Commerce uses the correct HTS code to capture the specific

material.

These classification opinions all indicated that pocket coil innerspring units are properly

classified under HTS subheading 9404.29.90 based on Indian tariff classification:

- The "spring coil innerspring unit" as presented to us is correctly classifiable under the ITC-HS tariff line/ item 9404.29.90.
- We have reviewed the description of the {pocketed spring coil mattress innerspring} and relevant regulations relating to the ITC (HS) and are of the view that the correct ITC (HS) for the {p}roduct is 9404.29.90 . . . .  We have also studied the description of the products that are listed under {HTS} 7320.90.90. Based on our analysis, we are of the view that the Product cannot be classified under the {HTS} 7320.90.90.
- The answer to correct classification lies in this description alone to the effect that the Product is meant for support and it is not solely made out of Iron or Steel. . . . conclusively, the Product would merit to fall under heading of 9404.29.90, as sub-heading 9404.29.

Final SV Cmts. at SV2-16, SV2-17 (P.R. 407-411); Cmts. on Pet'rs SV SV3-1 to SV3-4 (P.R.

420-421).  The Court "considers expert opinions, not as fact witnesses, but as experts on the

common meaning or understanding of a term in a particular industry." Samsung Int'l v. United States, 36 CIT 1531, 1539, 887 F. Supp. 2d 1330, 1338 n.18 (2012). Specifically, the Court considers that "opinions of experts are relevant in determining the common and commercial understanding of a tariff term." NEC Am., Inc. v. United States, __ CIT __, 681 F. Supp. 862, 866 (1987). Contrary to Commerce's finding that HTS 7320.90.90 "more closely matches" the Ashley Respondents' pocket coil innerspring unit, the classification opinions from customs experts in India confirmed that the Ashley Respondents' pocket coil innerspring units are unfinished mattresses under India's HTS subheading HTS 9404.29.90. See Final SV Cmts. at SV2-16, SV2-17 (P.R. 407-411); see also Cmts. on Pet'rs SV at Ex. SV3-1 - SV3-4 (P.R. 420-421). Commerce unreasonably ignored this evidence.

Because HTS subheading 9404.29.90 is the most specific classification for the Ashley Respondents' pocket coil innerspring units when applying both the GRI and Indian HTS, Commerce's reliance on HTS 7320.90.90 to value this SV was unreasonable and not supported by substantial evidence. Record evidence in this case confirms that HTS 9404.29.90 represents the best available information to value pocket coil innerspring units. Commerce's failure to use HTS 9404.29.90 was, therefore, unsupported by substantial evidence.

### B. Commerce's Selection of Indian HTS 7320.90.90 to Determine the SV for Pocket Coil Innerspring Units Yielded Aberrational Results

Commerce's determination also cannot represent the best available information because reliance on HTS 7320.90.90 to value the Ashley Respondents' pocket coil innerspring units yielded results so aberrational as to be unusable based on Commerce's precedent. GTA import data for HTS 7320.90.90 yielded an AUV for the pocket coil innerspring units of 1,319.57 Rupees per kilogram, which is more than 35 times greater than the 37.34 Rupees per kilogram AUV for HTS 9404.29.90. Compare Final Analysis Mem. at Attach. VIII (AGSVSummary tab)

(C.R. 694) <u>with</u> Ashley Resp'ts' SV Cmts. at Ex. SV-4 (P.R. 278-281).   For the reasons outlined below import data under HTS 7320.90.90 distorts and misrepresents the contribution of this SV to the normal value and, when examined in the context of the data on the record, must be discarded as aberrational.

In their case brief, the Ashley Respondents provided information "showing that the {SVs} for pocket coil innerspring units alone represents a majority of the normal value for the entire mattress when compared to all other direct material inputs combined" under Commerce's calculation.   Ashley Resp'ts Admin. Case Br. at 53, Ex. 1 (P.R. 488).   In the Final Determination, however, Commerce concluded that the Ashley Respondents "provided insufficient evidence that the Indian value used in the Preliminary Determination is aberrational and not the best information available on the record."   I&D Mem. at Cmt. 3 (P.R. 505). Commerce further defined its practice, stating that "{i}f a party presents sufficient evidence to demonstrate a particular SV is aberrational, and therefore unreliable, Commerce will examine all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question." Id.  In reaching this conclusion, Commerce improperly ignored record evidence submitted by the Ashley Respondents.

As the Court previously held, for SVs that "would exceed{} the total cost of all other direct materials," the "data for {such} an HTS provision substantially overstates the cost, {and} it may be presumed that it is not accurate data."   Gleason Indus. Prods. v. United States, 32 CIT, 382, 387-8, 559 F. Supp. 2d 1364, 1369-71 (2008).   In that case, the Court found that Commerce's determination to weight-average the SVs of two HTS codes for an input "would result in a surrogate value that 'would have exceeded the total cost of all other direct materials incorporated in {the subject merchandise}'" and thus an SV "disproportionate {} total cost of

materials of the subject merchandise." Id., 32 CIT at 388, F. Supp. 2d at 1371.   Here,
Commerce's calculation of the SV for pocket coil innerspring units using HTS 7320.90.90
produced distorted and inflated value that was "greater than all other material inputs combined."
Ashley Resp'ts' Admin. Case Br. at 53, Ex. 1 (P.R. 488) (calculating that the Ashley
Respondents' pocket coil innerspring unit based on HTS 7320.90.90 represented [ ███ ]
of total normal value compared to the normal value of the Ashley Respondents' other inputs of [

███████ ]).

Based on information for only the control numbers (or "CONNUMs") of subject
merchandise containing pocket coil innerspring unit inputs, the total contribution to normal value
of the pocket coil innerspring unit SV equates to [ ███ ] percent of the total net sales value:

| Total U.S. Net Sales Value (USD) | [ █████████ ] |
|---|---|
| Pocket Coil Innerspring Unit Total NV | [ █████████ ] |
| Spring Coil Total NV as a % of Total U.S. Net Sales Value | [ █████████ ] |

Commerce's use of the data derived from HTS subheading 7320.90.90 was disproportionate and
should not be as part of its SV calculation for the Ashley Respondents.[10]

Commerce "considers data to be aberrational when it is an 'extreme outlier,' is distorted
or misrepresentative, or is 'somehow incorrect.'" Tri Union Frozen Prods. v. United States, __
CIT, __, __, 227 F. Supp. 3d 1387, 1394-95 (2017) (internal citation omitted).  As demonstrated,
the data derived from HTS 7320.90.90 constitute a distorted, misrepresentative outlier value that
no reasonable mind could constru as anything but aberrational.

---

[10] The use of HTS 7320.90.90 alone yielded an SV that exceeded the cost of all other raw
materials is further indication that Commerce was wrong not to use the HTS code specific to
mattress supports and instead opt for a generic steel HTS for little reason other than it contained
the word "springs" which was unrebutted based on professional customs classification opinions
of multiple Indian experts.

In short, Commerce's determination to use HTS 7320.90.90 rather than HTS 9404.29.90 was unsupported by substantial evidence because HTS 7320.90.90 was not specific to the Ashley Respondents' input and the data for this code yielded an aberrant, incorrect SV.

### III.   COMMERCE IMPROPERLY REFUSED TO LIST AFI AND AFTC AS ELIGIBLE FOR THE DUMPING MARGIN ASSIGNED TO WANEK, MILLENNIUM AND COMFORT BEDDING

In the Preliminary Determination, Commerce improperly omitted AFI and AFTC from its draft customs instructions.  See Cash Deposit Instructions from Commerce to Customs re: Notice of preliminary determination in the antidumping duty investigation of mattresses from the Socialist Republic of Vietnam (A-552-827), Message No. 0310407 (Nov. 5, 2020) (P.R. 528). The Ashley Respondents consistently requested that Commerce include AFI/AFTC in the customs instructions to avoid improper collection of duties.  See Ashley Resp'ts' Admin. Case Br. at 60-62 (P.R. 488); Letter on Behalf of Ashley Respondents to Dep't of Commerce re: Quantity and Value Questionnaire Response at 2 (May 11, 2020) (P.R. 94); Wanek SRA at 5 (P.R. 158); Letter on Behalf of Millennium to Dep't of Commerce re: Separate Rate Application of Millennium at 5 (June 1, 2020) (P.R. 156-157); Letter on Behalf of Comfort Bedding to Dep't of Commerce re: Separate Rate Application of Comfort Bedding at 10 (June 1, 2020) (P.R. 159). Nevertheless, in the Final Determination, Commerce stated that "neither AFI nor AFTC is eligible to receive a combination rate in this investigation" and refused to modify its customs instructions to include AFI's and AFTC's names.  I&D Mem. at Cmt. 8 (P.R. 505).  Commerce's decision to omit AFI and AFTC was unsupported by substantial evidence because, as the reinvoicing entities, AFI's and AFTC's names appear on certain entry documents presented to Customs and failure to list them in the Customs instructions could subject AFI and AFTC to the Vietnam-wide rate.

It is uncontroverted that in certain circumstances, exports from Vietnam by Wanek, Millennium and/or Comfort Bedding were reinvoiced by AFI and AFTC prior to importation into the United States.  As Commerce has noted, [ ███████████████████████ ███ ] made through [ ██████████████ ], and coordinated [ █████████████████████ ████████████████████████ ].  Affiliation Mem. at 7 (Proprietary Document) (C.R. 619).  The Ashley Respondents did not argue that AFI and AFTC are foreign producers of subject merchandise.  As reinvoicing entities that may appear on certain entry documents, however, AFI and AFTC can be seen by Customs as the seller or exporting party of subject merchandise and thus could face duties at the Vietnam-wide rate of 668.38 percent.

The purpose of the antidumping laws "is to discourage the practice of selling in the United States at {Less-Than-Fair-Value} by the imposition of appropriately increased duties." Melamine Chemicals., Inc. v. United States, 732 F.2d 924, 933 (Fed. Cir. 1984).  Customs is the agency responsible for collecting the appropriate AD/CVD duties based on instructions issued by Commerce.  See Mittal Steel Galati S.A. v. United States, 31 CIT 730, 738, 491 F. Supp. 2d 1273, 1281 (2007).  The statute directs that, upon an affirmative final determination, Commerce shall order the posting of a cash deposit for each entry of subject merchandise based on the amount of estimated weighted-average dumping margin or all-others rate.  See 19 U.S.C. § 1673d(c)(1)(B)(ii).  Because AFI or AFTC may appear as the seller or exporting party in the final invoice presented to Customs, Commerce's default instruction language would deny AFI/AFTC access to the producer/exporter-specific rate calculated for Wanek, Millennium and Comfort Bedding and instead assign these sales the Vietnam-wide rate, which is contrary to Commerce's obligation to ensure that the appropriate duties are collected based on the applicable dumping margin for entries of subject merchandise.

By refusing to modify its default instructions to Customs, Commerce will effectively subject AFI's and AFTC's re-invoiced transactions to a punitive duty rate, i.e., the Vietnam-wide rate, instead of the remedial one, i.e., the calculated rate for Wanek, Millennium and Comfort Bedding. Commerce's decision, therefore, was unsupported by substantial evidence or otherwise not in accordance with law.

### IV.   COMMERCE'S APPLICATION OF THE COHEN'S *D* TEST TO THE ASHLEY RESPONDENTS' U.S. SALES STRUCTURE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

The results of Commerce's Cohen's *d* test are unreasonable as applied to the Ashley Respondents' sales data. Commerce found that "{b}ased on the results of the differential pricing analysis . . . 71.40 percent of Ashley Group's export sales pass the Cohen's *d* test, and confirms the existence of a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods." Final Analysis Mem. at 6 (P.R. 511). Commerce's analysis, however, includes data which violate the assumptions present in the Cohen's *d* test, generates incorrect or misleading results, and is thus inappropriate for application to the Ashley Respondents' sales.

The statute prioritizes use of the average-to-average ("A-A") method to calculate dumping margins. See 19 U.S.C. § 1677f-1(d)(1)(A). Commerce may resort to the statutory exception and use the average-to-transaction method only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time . . . ." 19 U.S.C. § 1677f-1(d)(1)(B)(i). Commerce's use of Cohen's d test in determining such pattern should be analyzed whether its use is based on a permissible construction of the statute. See Chevron, 467 U.S. at 843. To determine whether a pattern of significant U.S. price differences exists, Commerce applied its "differential pricing" analysis known as the Cohen's *d* test. See Prelim. Mem. at 26 (P.R. 437). The Cohen's *d* test is

"a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group."  <u>Differential Pricing Analysis; Request for Comments</u>, 79 Fed. Reg. 26,720, 26,722 (Dep't of Commerce May 9, 2014) ("<u>Differential Pricing Analysis</u>").

To begin the Cohen's *d* test, Commerce segments a respondent's sales by CONNUM, region, purchaser category and time period.  <u>Id.</u>  Commerce then undertakes a two-part test.  In the initial phase of the test, termed the "ratio test," Commerce separates for each CONNUM a "test group" of sales (for example, sales to one region) and compares the mean sales value of this CONNUM test group to the remaining sales from this CONNUM category (for example, sales to all other regions), or the "comparison group."  <u>See id.</u>  Commerce uses the simple average standard deviation of the entire category to generate a coefficient.  <u>See Mid Continent Steel & Wire, Inc. v. United States</u>, __ CIT __, __, 495 F. Supp. 3d 1298, 1304-08 (2021).  If the Cohen's *d* coefficient is 0.8 or greater, the sales in the test group are said to "pass," indicating the existence of a significant difference in pricing among purchasers, regions or time periods.  <u>See id.</u>, __ CIT at __, 495 F. Supp. 3d at 1304.  Commerce conducts this test for each CONNUM across all regions, purchaser categories, and time periods, to determine the total number of "passing" sales groups.  Commerce then assesses the number of "passing" sales and compares this to the total number of sales, generating a ratio evaluated by Commerce in the following manner:

- 0% to 33% passing transactions – Average-to-average method.
- 33% to 66% passing transactions – Hybrid method (average-to-transaction for passing sales, average-to-average for all other sales).
- 66% to 100% passing transactions – Average-to-transaction method.

<u>See</u> <u>Stupp</u>, 5 F.4th at 1347 (citing <u>Differential Pricing Analysis</u>, 79 Fed. Reg. at 26,723).  Commerce then moves to the second part of the Cohen's *d* analysis, termed the "meaningful

difference" test.  Here, Commerce calculates the weighted-average dumping margin using the average-to-average method as well as the tentatively selected method.  If the tentatively selected margin moves above the *de minimis* threshold or results in a margin at least 25 percent greater, Commerce determines there is a meaningful difference between methods and utilizes the method indicated in the "ratio test" rather than the average-to-average method.

The Federal Circuit has confirmed, however, that Commerce's differential pricing analysis rests on assumptions which, if violated, can produce misleading or incorrect results.  In Stupp, the Federal Circuit acknowledged that the Cohen's *d* test relies on assumptions that the data groups being compared are normally distributed, have equal variability, and are equally numerous.  Stupp, 5 F.4th at 1357.  The Federal Circuit found that the violation of these assumptions "can subvert the usefulness of the interpretive cutoffs, transforming what might be a conservative cutoff into a meaningless comparator."  Id. at 1360.  Specifically, the Federal Circuit found that Cohen's *d* "was not robust to mixed-normal distributions," "may produce an upward bias" in test groups with very few observations, and "tend{} to artificially inflate the dumping margins for a set of export sales prices that has minimal variance."  Id. at 1358-59.  The Federal Circuit ultimately remanded the decision to Commerce "to explain whether the limits on the use of the Cohen's *d* test . . . were satisfied in this case."  Stupp, 5 F.4th at 1360.  The Stupp decision is binding authority.  See Marmen Inc. v. United States, No. 20-00169, 2021 Ct. Intl. Trade LEXIS 150, at *26 (Oct. 22, 2021); Seah Steel Corp. v. United States, No. 20-00150, 2021 Ct. Intl. Trade LEXIS 148, at *16 (Oct. 19, 2021).  The Court must apply the Stupp determination in this case.

As in Stupp, Commerce failed to explain whether the Ashley Respondents' sales data conformed with the underlying assumptions necessary for the Cohen's d test, specifically

whether the test and comparison groups were normally distributed, equally variable, and equally numerous. In fact, the test and comparison groups generated during the Cohen's *d* test exhibited none of these characteristics. For CONNUM [███████████████████████████ ], for instance, [██████████████████████████████████████████████ ██████████████████████████████████████████ ]. See Final Analysis Mem. at Attach. III at p. 233, 237, 241, 243 (Proprietary Document) (C.R. 694). The standard deviation for the test group price for several test groups registers as [ ████ ] in the SAS output, exactly the type of "minimal variance" which <u>Stupp</u> warned could "artificially inflate dumping margins." <u>See id.</u> Attach. III at 241; <u>see also</u> <u>Stupp</u>, 5 F.4th at 1359. The data in the SAS output for the Ashley Respondents violate the assumptions of the Cohen's *d* test and confirm that Commerce's "ratio test" is likely generate false positives above the 0.8 threshold, invalidating the entire test.

The Federal Circuit in <u>Stupp</u> warned that examples of exactly these types of data could "produce an upward bias," "artificially inflate the dumping margins," and generally render the Cohen's *d* test a "meaningless comparator." <u>Stupp</u>, 5 F.4th at 1359-60. Commerce's determination to apply the Cohen's *d* test to the Ashley Respondents was, therefore, unreasonable and not in accordance with law.

## V.   CONCLUSION

For the foregoing reasons, the Ashley Respondents respectfully request that the Court grant their Motion for Judgement on the Agency Record because Commerce's Final Determination with regard to the surrogate financial ratios, SV for pocket innerspring units, Customs instructions and application of the Cohen's *d* test was unsupported by substantial evidence or otherwise not in accordance with law.

Respectfully submitted,

: November 19, 2021

/s/ Kristin H. Mowry
Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
Sarah M. Wyss
*Counsel to Ashley Furniture Industries, LLC, Ashley Furniture Trading Company, Wanek Furniture Co., Ltd., Millennium Furniture Co., Ltd., and Comfort Bedding Company Limited*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Kristin H. Mowry, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificate of counsel, the word count for this brief is 13,992 words.


/s/ Kristin H. Mowry
Kristin H. Mowry