**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| ASHLEY FURNITURE INDUSTRIES, LLC, ASHLEY FURNITURE TRADING COMPANY, WANEK FURNITURE CO., LTD., MILLENNIUM FURNITURE CO., LTD. AND COMFORT BEDDING COMPANY LIMITED, | ) ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) Consol. Ct. No. 21-00283 ) |
| *Defendant*, | ) ) |
| and | ) ) |
| BROOKLYN BEDDING, LLC ET AL., | ) ) |
| *Defendant-Intervenors.* | ) ) ) |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion for Judgment upon the Agency Record filed by Plaintiffs Ashley Furniture Industries, LLC, Ashley Furniture Trading Company, Wanek Furniture Co., Ltd., Millennium Furniture Co., Ltd., and Comfort Bedding Company Limited, the supporting memoranda of law, *see* ECF Nos. 38, 39, 40 (Nov. 19, 2021), all responses thereto, and all other papers and proceedings in this action, it is hereby:

ORDERED that Plaintiffs' motion is in all respects DENIED; and it is further

ORDERED that the Final Determination of the U.S. Department of Commerce is sustained in all challenged respects.

Dated: _____          _____
New York, New York                                      Timothy M. Reif, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| ASHLEY FURNITURE INDUSTRIES, LLC, <br> ASHLEY FURNITURE TRADING COMPANY, <br> WANEK FURNITURE CO., LTD., MILLENNIUM <br> FURNITURE CO., LTD. AND COMFORT BEDDING <br> COMPANY LIMITED, <br><br>         *Plaintiffs*, <br><br>     v. <br><br> UNITED STATES, <br><br>         *Defendant*, <br><br>     and <br><br> BROOKLYN BEDDING, LLC ET AL., <br><br>         *Defendant-Intervenors*. | Consol. Ct. No. 21-00283 <br><br> **PUBLIC VERSION** <br><br> Business Proprietary Information <br> Removed from Brackets on Pages <br> 35-36. |

## MATTRESS PETITIONERS' RESPONSE BRIEF IN OPPOSITION TO ASHLEY'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yohai Baisburd
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana*
*Mattress Company, Elite Comfort Solutions,*
*FXI, Inc., Innocor, Inc., Kolcraft Enterprises*
*Inc., Leggett & Platt, Incorporated,*
*International Brotherhood of Teamsters, United*
*Steel Paper and Forestry, Rubber,*
*Manufacturing, Energy, Allied Industrial and*
*Service Workers International Union, AFL-CIO*

Date:   February 17, 2022

PUBLIC VERSION

## Table of Contents

Page

I.   STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................................................ 2

   A.   Administrative Determination Under Review ............................................................ 2

   B.   Issues Presented and Summary of the Argument ..................................................... 2

II.   STATEMENT OF FACTS ............................................................................................ 4

III.   STANDARD OF REVIEW ............................................................................................ 8

IV.   ARGUMENT ................................................................................................................ 9

   A.   Commerce's Reliance on Emirates Sleep's Financial Statements to Calculate Surrogate Financial Ratios was Supported by Substantial Evidence ............................... 9

      1.   Sheela Foam's Financial Statements Demonstrate Receipt of Countervailable Subsidies and Therefore Commerce Appropriately Found Them Unusable for Surrogate Financial Ratio Purposes ...................................... 10

      2.   Emirates Sleep's Financial Statements Represent the Best Information Available……… ................................................................................................ 14

         i.   Emirates Sleep's Financial Statements are Publicly Available .................... 15

         ii.   Emirates Sleep's Financial Statements are Complete and Contain All Necessary Information for Calculating Surrogate Financial Ratios ............. 17

         iii.   Emirates Sleep's Financial Statements Do Not Evidence Receipt of Subsidies ................................................................................................... 20

         iv.   Although Not Contemporaneous, Emirates Sleep's Financial Statements are the Best Information Available ............................................. 21

         v.   Emirates Sleep's Financial Statements are Reflective of Production of the Subject Merchandise and Are the Best Available Information .............. 22

         vi.   Conclusion .................................................................................................. 24

   B.   Commerce's Decision to Rely on HTS Subheading 7320.90.90 to Value Pocket Coil Innerspring Units is Supported by Substantial Evidence ....................................... 25

      1.   Commerce Properly Relied on HTS 7320.90.90 To Value Pocket Coil Innersprings……............................................................................................... 26

**PUBLIC VERSION**

2.  Ashley Mischaracterizes Mattress Petitioners' Prior Statements Regarding Innerspring Units ........................................................................................ 30

3.  Commerce Rebutted Indian Classification Opinions on the Record, Which Ashley Failed to Discuss .................................................................................. 31

4.  Commerce's Valuation of Pocket Coil Innersprings Using HTS 7320.90.90 Does Not Yield an Aberrational Result; Using HTS 9404.29.90 Would Yield an Aberrational Result ...................................... 34

C.  Ashley's Challenge to Commerce's Application of the Cohen's *d* Test is not Justiciable…........................................................................................................ 36

V.  Conclusion ........................................................................................................................ 39

## Table of Authorities

**Page(s)**

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ..............................................................................8

19 U.S.C. § 1677(5)(E)(ii) ...............................................................................21

19 U.S.C. § 1677b(c)(1) ................................................................................9, 25

19 U.S.C. § 1677f-1(d)(1)(A) ...........................................................................37

19 U.S.C. § 1677f-1(d)(1)(B) ...........................................................................38

28 U.S.C. § 2637(d) ..........................................................................................38

**Regulations**

19 C.F.R. § 351.309(c)(2) .................................................................................38

19 C.F.R. § 351.414(c) ................................................................................37, 38

**Court Decisions**

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ............................8

*American Spring Wire Corp. v. United States*, 569 F. Supp. 73 (Ct. Int'l
Trade 1983) ......................................................................................................36

*Apple Inc. v. United States*, 375 F. Supp. 3d 1288 (Ct. Int'l Trade 2019) ............................28, 29

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ......................................................9

*Ass'n of Am. Sch. Paper Suppliers, v. United States*, 791 F. Supp. 2d,
1292 (Ct. Int'l Trade 2011) ..............................................................................18

*Camara Nacional de las Industrias Azucarera y Alcoholera*, 118 F.
Supp. 3d 1360 (Ct. Int'l Trade 2015) ..............................................................37

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837
(1984) .................................................................................................................9

*Clearon Corp. v. United States*, 800 F. Supp. 2d 1355 (Ct. Int'l Trade
2011) .................................................................................................................11

*Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*, 44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ..................................................................................................35

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...............................................8

*Consolo v. Federal Maritime Comm'n*, 383 U.S. 607 (1966) ....................................8, 9

*Fresh Garlic Producers Ass'n v. United States*, Slip Op. 2017-127 (Ct. Int'l Trade 2017) ...............................................................................................35

*GGB Bearing Tech (Suzhou) Co., Ltd. v. United States*, 279 F. Supp. 3d 1233 (Ct. Int'l Trade 2017) ...........................................................................12, 13

*Gleason Indus. Prods. v. United States*, 559 F. Supp. 2d 1364 (Ct. Int'l Trade 2008) ...............................................................................................27, 34

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...............................................................................................25

*Heze Huayi Chem. Co. v. United States*, Slip Op. 2021-97 (Ct. Int'l Trade 2021) ...............................................................................................33

*Honig v. Doe*, 484 U.S. 305 (1988) .............................................................................36

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) .........................38

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ..........................................................................27

*King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) .............................10

*Lifestyle Enter. v. United States*, 35 C.I.T. 158 (2011) ..................................................23

*Lifestyle Enter. v. United States*, 768 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ...............................................................................................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................36, 37

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ...............................................................................................8

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) ..........................34

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) ...............................................................................................12

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ...............................................................................................8

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ................................33

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)........................................8, 9

*Perry Chemical Corp. v. United States*, 375 F. Supp. 3d 1324 (Ct. Int'l Trade 2019) ........................................................................................................36

*QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ..........................................10, 22

*QVD Food Co. v. United States*, 721 F. Supp. 2d 1311 (Ct. Int'l Trade 2011) ................................................................................................................22

*Renne v. Geary*, 501 U.S. 312 (1991) ................................................................37

*Samsung Int'l v. United States*, 887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012) ................................................................................................................32

*Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158 (Fed. Cir. 2017) ................................................................................................................31

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ................................................26, 34

*Shenyang Yuanda Alum. Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015) ................................................................................10

*Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265 (Ct. Int'l Trade 2017) ................................................................................14

*Shenzhen Xinboda Indus. Co. v. United States*, 494 F. Supp. 3d 1347 (Ct. Int'l Trade 2021) ......................................................................12, 20

*Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) ................................33

*Since Hardware (Guangzhou) Co., Ltd. v. United States*, 911 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ................................................................17

*Taian Ziyang Food Co. v. United States*, 35 C.I.T. 863 (Ct. Int'l Trade 2011) ................................................................................................................25

*Tennessee Gas Pipeline Co. v. FPC*, 606 F.2d 1373 (D.C. Cir. 1979)........................................36

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ................................33

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) ....................................9

*Toyota Motor Sales, U.S.A., Inc. v. United States*, 585 F. Supp. 649 (Ct. Int'l Trade 1984) ................................................................................32

*Toyota Motor Sales, U.S.A., Inc. v. United States*, 753 F.2d 1061 (Fed. Cir. 1985) ...............................................................................................33

*Tri Union Frozen Prods. v. United States*, 277 F. Supp. 3d 1387 (Ct. Int'l Trade 2017) ........................................................................................35

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ................................9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .........................8

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) .................................................................................9, 10

*Yantai Xinke Steel Structure Co. v. United States*, Slip Op. 214-38 (Ct. Int'l Trade 2014) ......................................................................................15

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978) .....................9

*Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011) ...............................................................................................25

**<u>Administrative Determinations</u>**

*1-Hydroxyethylidene-1, 1 Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 10,545 (Mar. 11, 2009) ...............................................16

*Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,611 (Apr. 20, 2017) .......................................17

*Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 25,398 (May 1, 2020)...........................................................................................13, 14

*Circular Welded Carbon-Quality Steel Pipe from India: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 64,468 (Oct. 22, 2012) ..........................................................................................13

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Apr. 24, 2020) .......................................................................................................4

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021) .........................................2, 8

*Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) ................................................................................................5, 7, 30

*Mattresses from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,889 (Mar. 25, 2021) ................................................................................................ *passim*

*Mattresses from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 69,591 (Nov. 3, 2020) ................................................ *passim*

*Seamless Refined Copper Pipe and Tube from the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 75 Fed. Reg. 60,725 (Oct. 1, 2010) ....................................................................................19

*Uncovered Innerspring Units From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 79,443 (Dec. 29, 2008) ................................................................................29

*Wooden Bedroom Furniture from the People's Republic of China: Final Results of the 2004-2005 Semi-Annual New Shipper Reviews*, 71 Fed. Reg. 70,739 (Dec. 6, 2006) ................................................................................18

*Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 41,374 (Aug. 17, 2009) ...........................................23

## **Other Administrative Materials**

Department of Commerce, *Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004)....................................26

Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576 (1988)..................................................................................................11

PUBLIC VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| ASHLEY FURNITURE INDUSTRIES, LLC,<br>ASHLEY FURNITURE TRADING COMPANY,<br>WANEK FURNITURE CO., LTD., MILLENNIUM<br>FURNITURE CO., LTD. AND COMFORT BEDDING<br>COMPANY LIMITED,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant*,<br><br>and<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>*Defendant-Intervenors*. | Consol. Ct. No. 21-00283<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information<br>Removed from Brackets on Pages<br>35-36. |

---

**MATTRESS PETITIONERS' RESPONSE BRIEF IN OPPOSITION TO ASHLEY'S**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Defendant -

Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions,

FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, the

International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO

("USW") (collectively, "Mattress Petitioners") respectfully submit this response brief in

opposition to the November 19, 2021, Memorandum of Points and Authorities in Support of

Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record filed by Ashley Furniture

Industries, LLC ("AFI"), Ashley Furniture Trading Company ("AFTC"), Wanek Furniture Co.,

Ltd. ("Wanek"), Millennium Furniture Co., Ltd. ("Millennium"), and Comfort Bedding

Company Limited ("Comfort Bedding") (collectively, "Ashley").  *See* Memorandum of Points

and Authorities in Support of Rule 56.2 Motion for Judgment Upon the Agency Record of

Plaintiffs Ashley Furniture Industries, LLC, Ashley Furniture Trading Company, Wanek

Furniture Co., Ltd., Millennium Furniture Co., Ltd. and Comfort Bedding Company Limited

(Nov. 19, 2021) ("Ashley Br.").  For the reasons that follow, the Court should hold Commerce's

final determination supported by substantial evidence and in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2(c)(1)

### A.    Administrative Determination Under Review

Mattress Petitioners support Commerce's *Final Determination* in its antidumping duty

investigation concerning imports of mattresses from Vietnam.  *See Mattresses from the Socialist

Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed.

Reg. 15,889 (Mar. 25, 2021) ("*Final Determination*") (P.R. 525) and accompanying Issues and

Decision Memorandum ("IDM") (P.R. 505); *see also Mattresses From Cambodia, Indonesia,

Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam:

Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for

Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021) ("AD Order") (P.R. 526).

### B.    Issues Presented and Summary of the Argument

This response brief addresses three issues before the Court:

1.    **Whether Commerce acted reasonably in calculating surrogate financial ratios and
supported its determination with substantial evidence when it selected the financial
statements of Emirates Sleep, which did not reflect receipt of countervailable
subsidies, over the financial statements of Sheela Foam, which indicated receipt of
two separate subsidies previously countervailed by Commerce.**

Commerce's selection of Emirates Sleep Systems Private Limited's ("Emirates Sleep")

financial statements to calculate surrogate financial ratios was supported by substantial evidence

2

because Emirates Sleep's financial statements did not indicate receipt of any subsidies, showed a profit, were publicly available, and representative of a broad market average. Commerce followed its longstanding practice and acted reasonably in rejecting the financial statements of Sheela Foam because they indicated receipt of two separate subsidies previously countervailed by Commerce.

    **2.**    **Whether Commerce's reliance on HTS subheading 7320.90.90 to determine the surrogate value for Ashley's pocket coil innerspring unit was supported by substantial evidence and otherwise in accordance with law.**

Commerce's selection of Harmonized Tariff Schedule ("HTS") subheading 7320.90.90 to determine the surrogate value for Ashley's pocket coil innerspring units was supported by substantial evidence because it was the most specific subheading on the record and was consistent with previous antidumping investigations valuing the same input. Commerce reasonably rejected HTS 9404.29.90 as the basis for valuing Ashley's innerspring input because that subheading covers completed mattresses of a material other than a spring interior and, therefore, was less specific than HTS 7320.90.90.

    **3.**    **Whether Ashley's challenge to Commerce's use of the Cohen's *d* test is justiciable.**

Regardless of how Commerce applied the Cohen's *d* test, Commerce in fact relied on the average-to-average methodology to calculate Ashley's dumping margin. Ashley has not suffered any injury from Commerce's application of the Cohen's *d* test, so its claim is not ripe for adjudication.

PUBLIC VERSION

## II.   STATEMENT OF FACTS

Commerce initiated an antidumping investigation concerning imports of mattresses from

Vietnam on April 20, 2020.  *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia,*

*Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-*

*Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Apr. 24, 2020) (P.R. 57).  Commerce selected

Wanek Furniture Co., Ltd. ("Wanek") as one of the mandatory respondents.  *See* Commerce

Memorandum, "Selection of Mandatory Respondents for Individual Examination" (May 15,

2020) (P.R. 107).  In its questionnaire responses, Wanek reported that it had several affiliates

"involved in the production, sale, distribution and development of subject merchandise."

Commerce Memorandum, "Ashley Furniture Industries, Inc., Ashley Furniture Trading

Company, Wanek Furniture Co., Ltd., Millennium Furniture Co., Ltd., and Comfort Bedding

Company Limited Preliminary Affiliation and Collapsing Memorandum" (Oct. 27, 2020)

("Affiliation Memo") (P.R. 441) (C.R. 619) at 2.  Accordingly, Commerce collapsed and treated

the following entities as a single entity for the purposes of the investigation: AFI, AFTC, Wanek,

Millennium, and Comfort Bedding.  *See id.* at 8.

Because Vietnam is a non-market economy ("NME"), Commerce solicited comments on

the appropriate surrogate country and surrogate value ("SV") data to value the factors of

production ("FOPs") on June 11, 2020.  *See* Commerce Memorandum, "Request for Economic

Development, Surrogate Country and Surrogate Value Comments and Information" (June 11,

2020) (P.R. 171).  Both Mattress Petitioners and Ashley suggested India as the primary surrogate

country, and both filed proposed SVs based on Indian data.  *See* Letter from Mattress Petitioners,

"Petitioners' Surrogate Value Submission" (July 30, 2020) (P.R. 276-277) ("MPs' SV Data");

Letter from Ashley Respondents, "Surrogate Value Comments" (July 30, 2020) ("Ashley's SV

Data") (P.R. 278-281).  In their SV submission, Ashley provided the financial statements of

Sheela Foam Limited ("Sheela Foam") as the basis for surrogate financial ratios and proposed

HTS subheading 9404.29.90 as the basis for determining the SV for pocket coil innersprings.

*See* Ashley's SV Data at Exhibits SV-1, SV-3, and SV-4.  Mattress Petitioners provided the

financial statements of Emirates Sleep, an Indian producer of mattresses, as the basis for

surrogate financial ratios and identified HTS subheading 7320.90.90 as the appropriate basis for

determining the SV for pocket coil innersprings.  *See* MPs' SV Data at Exhibits 2-3, 11.

      In comments submitted in advance of the *Preliminary Determination*, Mattress

Petitioners explained, *inter alia*, that Ashley's attempt to classify innerspring coils as "mattress

supports" or "mattresses" under HTS 9404.29.90 was incorrect because (1) innerspring coils are

not "mattress supports" or "mattresses," and (2) Commerce had already determined in the prior

antidumping duty investigation concerning mattresses from China that HTS 7320.90.90 ("springs

or leaves for springs, of iron or steel, other suitable for use in mattress supports and mattresses")

was the proper classification of innerspring coils.  *See* Letter from Mattress Petitioners,

"Petitioners' Comments Concerning Ashley Respondents and the Preliminary Determination"

(Oct. 2, 2020) ("MP Pre-Prelim Cmts") (P.R. 393-394) (C.R. 514-515) at 2-3 (citing *Mattresses*

*from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair*

*Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg.

56,761 (Oct. 23, 2019) ("*China AD Final*"), IDM at 57-60).  Mattress Petitioners also explained

that Commerce should not rely on the Sheela Foam financial statements provided by Ashley

because they evidenced receipt of countervailable subsidies, and therefore Commerce should

calculate surrogate financial ratios using the financial statements of Emirates Sleep.  *See* Letter

from Mattress Petitioners, "Petitioners' Response to Ashley Respondents' Comments for the Preliminary Determination" (Oct. 13, 2020) (P.R. 416) (C.R. 607) at 3-4.

On November 3, 2020, Commerce published its *Preliminary Determination* and calculated a weighted-average dumping margin for Wanek, Millennium, and Comfort Bedding of 190.79 percent. *See Mattresses from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 69,591 (Nov. 3, 2020) ("*Preliminary Determination*") (P.R. 524) and accompanying Decision Memorandum ("PDM") (P.R. 437). In the *Preliminary Determination*, Commerce (1) relied upon the financial statements of Emirates Sleep to calculate surrogate financial ratios, (2) relied upon HTS 7320.90.90 as the basis for valuing innerspring coils, and (3) applied the Cohen's *d* test to the Ashley's U.S. sales. *See* PDM at 19, 26, 33-34; *see also* Commerce Memorandum, "Surrogate Value Memorandum" (Oct. 27, 2020) ("Preliminary SV Memo") (P.R. 449) at 5-8.

On December 29, 2020, Ashley filed its administrative case brief contesting various aspects of Commerce's *Preliminary Determination*. *See* Letter from Ashley, "Case Brief" (Dec. 29, 2020) ("Ashley Administrative Br.") (P.R. 488) (C.R. 684). On January 5, 2021, Mattress Petitioners filed a rebuttal brief supporting Commerce's *Preliminary Determination* and disputing various arguments put forward by Ashley in its case brief. *See* Letter from Mattress Petitioners, "Mattress Petitioners' Rebuttal Brief" (Jan. 5, 2021) ("MP Rebuttal Br.") (P.R. 490) (C.R. 685). Specifically, Mattress Petitioners explained that Commerce appropriately relied upon Emirates Sleep's financial statements to calculate surrogate financial ratios because they were reliable, sufficiently complete, reflected production of the subject merchandise, and were otherwise superior to Sheela Foam's financial statements, which demonstrated receipt of

countervailable subsidies. *See id.* at 4-25. Mattress Petitioners further explained that Commerce correctly used HTS 7320.90.90 to value Ashley's innerspring coils, consistent with its approach in the *China AD Final*. *See id.* at 25-37.

On March 25, 2021, Commerce published its *Final Determination* and calculated a 144.92 percent weighted-average dumping margin for Wanek, Millennium, and Comfort Bedding. *See Final Determination*. *First*, Commerce continued to rely on Emirates Sleep's financial statements because "it showed a profit, was publicly available, representative of a broad market average, and exclusive of those who received subsidies from Indian programs we have found to be countervailable." IDM at Comment 2. Commerce also found that Emirates Sleep's financial statements contained all critical and necessary information for calculating surrogate financial ratios, including "the audited financial statements, auditors report, and auditor's notes, which satisfies Commerce's requirements for sourcing surrogate financial statements." *Id. Second*, Commerce continued to find "that Indian HTS 7320.90.90 (Springs and leaves of springs, of iron or steel, other, other) provides the best available information for valuing Ashley Group's innerspring coil units because this HTS category covers imports more specific to the input in question than HTS 9404.29.90 (Mattresses of other materials, other)." *Id.* at Comment 3. *Third*, Commerce continued to find a pattern of export prices or constructed export prices for comparable merchandise that differed significantly among purchasers, regions, or time periods, and continued to find that the average-to-average method appropriately accounted for such differences because "there is not a meaningful difference in the weighted-average dumping margins when calculated using the average-to-average method and an alternative method based on the average-to-transaction method applied to the U.S. sales which pass the Cohen's *d* test." Commerce Memorandum, "Analysis Memorandum for Ashley Furniture Industries, Inc., Ashley

Furniture Trading Company, Wanek Furniture Co., Ltd., Millennium Furniture Co., Ltd., and

Comfort Bedding Company Limited (collectively, Ashley Group)" (Mar. 18, 2021) ("Final

Analysis Memo") (P.R. 511) (C.R. 694) at 6.

Following the *Final Determination* and the affirmative final determination by the U.S.

International Trade Commission ("USITC"), Commerce published the antidumping duty order.

*See* AD Order, 86 Fed. Reg. 26,460.

## III.  STANDARD OF REVIEW

This Court must sustain Commerce's determination unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. §

1516a(b)(1)(B)(i).

A "party challenging {Commerce's} determination under the substantial evidence

standard 'has chosen a course with a higher barrier to reversal.'"  *Nippon Steel Corp. v. United

States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v. United

States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).  The substantial evidence standard is a deferential

standard which tests whether a determination is supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v.

NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  The

Court must affirm Commerce's determination "if it is reasonable and supported by the record as

a whole, even if some evidence detracts from the {agency's} conclusion."  *Nippon Steel Corp.,*

458 F.3d at 1352 (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

Therefore, "even if it is possible to draw two inconsistent conclusions from evidence in the

record," this does not mean that Commerce's findings are unsupported by substantial evidence

within the meaning of the statute.  *Nippon Steel*, 458 F.3d. at 1352; *see also Consolo v. Federal

*Maritime Comm'n*, 383 U.S. 607, 620 (1966).  Succinctly stated by the Supreme Court: a

reviewing court "should not supplant the agency's findings merely by identifying alternative

findings that could be supported by substantial evidence."  *Arkansas v. Oklahoma*, 503 U.S. 91,

113 (1992).  Likewise, it is reversible error for the Court to "assess{} credibility and reweigh{}

the evidence," as "it is the role of the expert factfinder…to decide which side's evidence to

believe."  *Nippon Steel*, 458 F.3d at 1359.

    With respect to questions of law, this Court is guided by the framework provided in

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*").  Under

*Chevron*, an agency's "interpretation {of a statute} governs in the absence of unambiguous

statutory language to the contrary or unreasonable resolution of language that is ambiguous."

*United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).  As the Supreme Court has explained,

"'{t}he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute

with the implementing agency.'"  *Id*.  Importantly, an "agency's construction need not be the

only—or even the most reasonable—interpretation of the statute."  *See Zenith Radio Corp. v.

United States*, 437 U.S. 443, 450 (1978).  Rather, "any reasonable construction of the statute is a

permissible construction."  *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

## IV.  ARGUMENT

### A.  Commerce's Reliance on Emirates Sleep's Financial Statements to Calculate Surrogate Financial Ratios was Supported by Substantial Evidence

    "When valuing factors of production in the nonmarket economy context, the statute

directs that Commerce's decision 'shall be based on the best available information regarding the

values of such factors in a market economy country or countries.'"  *Weishan Hongda Aquatic

Food Co. v. United States*, 917 F.3d 1353, 1364 (Fed. Cir. 2019) (quoting 19 U.S.C. §

1677b(c)(1)).  The Court of Appeals for the Federal Circuit has recognized that Commerce "has

9

'broad discretion' to determine what constitutes the best available information as this term 'is not defined by statute.'"  *Id.* (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)).  Accordingly, a party challenging Commerce's selection of "the best available information" as unsupported by substantial evidence "has chosen a course with a higher barrier to reversal."  *Shenyang Yuanda Alum. Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) (quoting *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012)).

Ashley has not met that high barrier.  The record of the underlying investigation contained two possible surrogate financial statements: those of Sheela Foam and those of Emirates Sleep.  In the *Final Determination*, Commerce determined that the financial statements of Emirates Sleep were "the best information available on the record for calculating surrogate financial ratios because they meet all of Commerce's criteria for {surrogate values} and, unlike the financial statements of Sheela Foam, evince no receipt of subsidies we have previously found to be countervailable."  IDM at Comment 2.  As discussed below, Commerce appropriately rejected Sheela Foam's financial statements because they demonstrate receipt of countervailable subsidies.  Moreover, Ashley's arguments challenging Commerce's selection of Emirates Sleep's financial statements are without record support and are based on a flawed understanding of Commerce's surrogate value practice.  Accordingly, this Court should affirm Commerce's selection of Emirates Sleep's financial statements and its surrogate financial ratio calculations as supported by substantial evidence.

1.  *Sheela Foam's Financial Statements Demonstrate Receipt of Countervailable Subsidies and Therefore Commerce Appropriately Found Them Unusable for Surrogate Financial Ratio Purposes*

Ashley disputes Commerce's determination that Sheela Foam's financial statements were unusable because they indicate receipt of countervailable subsidies, arguing that "no specific

evidence linked the programs in Sheela Foam's financial statements to subsidies previously countervailed by Commerce."  Ashley Br. at 29.  Ashley is wrong.  Longstanding Commerce practice, as affirmed by courts of review, is to reject a financial statement if it contains a *reference to a specific subsidy program found to be countervailable* in a prior proceeding.  As demonstrated below, Sheela Foam's financial statements reference *two* separate subsidy programs previously found to be countervailable by Commerce.  Accordingly, Commerce's decision to reject Sheela Foam's financial statements because "Sheela Foam received countervailable subsidies during the POI," IDM at Comment 2, is supported by substantial evidence.

In amending the antidumping statute in 1988, Congress instructed that Commerce "should avoid prices that 'it has reason to believe or suspect may be subsidized,' and further explained that Commerce need not 'conduct a formal investigation to ensure that such prices are not subsidized, but rather … {should} *base its decision on information generally available to it at the time*.'"  *Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1358 (Ct. Int'l Trade 2011) (quoting Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 590 (1988)) (emphasis supplied).  Congress provided no further guidance as to what would constitute a "reasonable basis to believe or suspect" that prices were subsidized, and therefore Commerce has developed a practice and provided "some general guideposts."  *Id.*  With respect to financial statements, "{i}f a financial statement contains a reference to a specific subsidy program found to be countervailable in a formal CVD determination, Commerce will exclude that financial statement from consideration."  *Id.* at 1359.  Commerce recently reiterated that, "pursuant to its practice, Commerce looks to its past countervailing duty findings as evidence that a company received a countervailable subsidy.  If the financial statement or other documents refer to 'a

specific subsidy program found to be countervailable in a formal CVD determination,'"

Commerce will "exclude the company's financial statements from consideration." *Shenzhen*

*Xinboda Indus. Co. v. United States*, 494 F. Supp. 3d 1347, 1352 (Ct. Int'l Trade 2021).  This is

because "government subsidies are precisely the kind of factor that could distort the accuracy of

a surrogate company's information." *Mid Continent Steel & Wire, Inc. v. United States*, 941

F.3d 530, 544 (Fed. Cir. 2019).

In the *Final Determination*, Commerce found "Sheela Foam received countervailable

subsidies during the POI," specifically the Government of India's "investment subsidy" and

"duty drawback subsidy."  IDM at Comment 2.  Commerce noted that "the names of the

programs found in the Sheela Foam financial statements are the same names Commerce

previously found countervailable."  *Id.*  In addition, "each of these programs reflected money

received during the POI."  *Id.*  Accordingly, Commerce held that Sheela Foam's financial

statements were unusable and instead relied on the financial statements of Emirates Sleep, which

did not reflect receipt of countervailable subsidies.

Ashley asserts Commerce's finding with respect to Sheela Foam was unreasonable

because there "was no specific information in Sheela Foam's financial statements that

sufficiently described the nature of the programs," Ashley Br. at 30, and therefore "no conclusive

evidence exists that this assistance was pursuant to a program found to be countervailable," *Id.* at

28.  But Ashley's argument rests upon a misunderstanding of Commerce's practice.  Commerce

does not require "conclusive" evidence of receipt of countervailable subsidies.  As the Court

previously explained:

> the Department's determination of whether to use the financial statement of a
> producer that ***potentially received a countervailable subsidy cannot be, nor is it
> intended to be, a full investigation of the subsidy program in question***…Instead,
> the Department's practice is to review the financial statements to determine whether

> ***the evidence indicates that the company received a countervailable subsidy*** during the relevant period from a program previously investigated by the Department.

*GGB Bearing Tech (Suzhou) Co., Ltd. v. United States*, 279 F. Supp. 3d 1233, 1239 (Ct. Int'l

Trade 2017) (emphasis supplied).

Ashley is wrong that "there was no specific information" detailing the subsidies

contained in Sheela Foam's financial statements.  In fact, "the names of the programs found in

the Sheela Foam financial statements ***are the same names Commerce previously found***

***countervailable***."  IDM at Comment 2 (emphasis supplied).  In addition, other record evidence

further indicates that the subsidies mentioned in the Sheela Foam financial statements are the

same subsidies previously countervailed by Commerce.  *First*, Sheela Foam's financial

statements indicate receipt of the "Investment Subsidy."  *See* Ashley's SV Data at Exhibit SV-4

(Note 32) (PDF 578).  Commerce has previously countervailed this "Investment Subsidy" and

found that it is "limited to firms operating outside of the Bombay and Pune metropolitan areas."

*Circular Welded Carbon-Quality Steel Pipe from India: Final Affirmative Countervailing Duty*

*Determination*, 77 Fed. Reg. 64,468 (Oct. 22, 2012), IDM at 30-31.  Sheela Foam's financial

statements explain that in 1996 "two more plants started operations in Silvassa near Mumbai

{formerly known as Bombay}," indicating that it has plants in operation in the precise region

that benefits from this subsidy.  Ashley's SV Data at Exhibit SV-4 (p. P-7) (PDF 465).

*Second*, Sheela Foam's financial statements show an Indian Government subsidy under

the duty drawback program.  *See* IDM at Comment 2; *see also* Ashley's SV Data at Exhibit SV-4

(Note 31) (PDF 577).  Commerce has previously found that the Indian Government's duty

drawback program is countervailable and "only available to exporters."  *See Certain Quartz*

*Surface Products from India: Final Affirmative Countervailing Duty Determination and Final*

*Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 25,398 (May 1,

13

2020), IDM at Comment 6.  Sheela Foam explains that "{w}e export our international standard products to 25 countries," demonstrating that it is eligible for the duty drawback program. Ashley's SV Data at Exhibit SV-4 (p. P-5) (PDF 463).

In sum, "to exclude a set of financial statements from consideration for possible use in deriving surrogate financial ratios, Commerce requires, in essence, that the financial statements identify a subsidy program precisely, by its exact title." *Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265, 1310 (Ct. Int'l Trade 2017).  That is exactly what Sheela Foam's financial statements do.  Sheela Foam's financial statements refer to, and indicate receipt of, subsidies previously countervailed by Commerce.  *See* IDM at Comment 2.  The subsidies listed (*i.e.*, "Investment Subsidy" and "duty drawback subsidy") have the same names as programs Commerce has previously countervailed.  *See id.*  In addition, Sheela Foam's financial statements demonstrate that it was eligible for both programs insofar as it operated plants outside of Mumbai (Investment Subsidy) and engaged in exports (duty drawback).  Accordingly, Commerce's determination that "Sheela Foam's financial statements are unusable because they contain evidence of subsidies" previously countervailed by Commerce is supported by substantial evidence.  *Id.*

2.  *Emirates Sleep's Financial Statements Represent the Best Information Available*

Ashley constructs several arguments disputing Commerce's selection of Emirates Sleep's financial statements as the basis for surrogate financial ratios—each of which crumbles upon review of the record and Commerce's practice.  Contrary to Ashley's assertions, Emirates Sleep's financial statements "showed a profit, {were} publicly available, representative of a broad market average, and exclusive of those who received subsidies from Indian programs we have found to be countervailable."  IDM at Comment 2.  Moreover, Emirates Sleep's financial statements are complete and "include the audited financial statements, auditor's report, and

14

auditor's notes, which satisfies Commerce's requirement for sourcing surrogate financial statements." *Id.* Finally, although not contemporaneous with the POI, the Emirates Sleep financial statements reflect business operations similar to those of Ashley and are otherwise the best information available on the record given Sheela Foam's receipt of countervailable subsidies.

> i. *Emirates Sleep's Financial Statements are Publicly Available*

Ashley contends Emirates Sleep's financial statements "were not publicly available" and that "Commerce's reasoning is flawed because Emirates Sleep's financial statements do not meet Commerce's 'publicly available' threshold as they did not come from a public source, Petitioners did not provide sufficient information on how the financial statements were obtained, and Emirates Sleep's complete financial statements remain absent from the record because they are not publicly available." Ashley Br. at 24-27. Ashley is wrong. Commerce confirmed that Emirates Sleep's complete financial statements were from a public source and that the statements were available to all parties in the proceeding.

In a perfect scenario, any financial statement of a company proffered as a source of surrogate financial ratios in an NME case would be directly downloadable from the website of that company or available in the list of the financial report in a public newspaper. It is often not possible to provide such easily accessible financial statements in the context of an antidumping proceeding. Accordingly, as Commerce explained in the *Final Determination*, "the bar for public availability is that interested parties may individually access the information." IDM at Comment 2 (citing *Yantai Xinke Steel Structure Co. v. United States*, Slip Op. 214-38 at *45-46 (Ct. Int'l Trade 2014)). This "ensure{s} that interested parties are able to comment on the reliability and relevance of such information in the particular case." *Id.*

**PUBLIC VERSION**

Here, Commerce found that Emirates Sleep's financial statements "are publicly available" because "record evidence demonstrat{es} that the Emirates Sleep financial statements" were "obtained from a non-proprietary…subscription database."  IDM at Comment 2.  Commerce noted that "both Ashley Group and the petitioners acknowledg{e} that the Emirates Sleep financial statements are available in a subscription database."  *Id.*  Moreover, Commerce explained that although "obtaining the Emirates Sleep financial statements may involve paying a fee, in prior cases, we have found that a financial statement need not be free of charge for it to be publicly available."  *Id.* (citing *1-Hydroxyethylidene-1, 1 Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 10,545 (Mar. 11, 2009), IDM at Comment 1).  Accordingly, Ashley's contention that "Emirates Sleep's financial statements do not meet Commerce's publicly available' threshold as they did not come from a public source," Ashley Br. at 26, is belied by record evidence and based on a misunderstanding of Commerce practice.

Notwithstanding Commerce's conclusion that Emirates Sleep's financial statements were from a public source and publicly available (*i.e.*, that all interested parties could individually access the information through the subscription service), Ashley continues to assert that "public availability was an issue in this case," and therefore Commerce was required to conduct additional fact finding.  Ashley Br. at 27.  For example, Ashley complains that Commerce "did not request additional clarification from Petitioners" by "inquir{ing} as to how Petitioners obtained the Emirates Sleep's financial statements."  Ashley Br. at 27.  Commerce did not inquire because it already had the answer: Mattress Petitioners obtained Emirates Sleep's financial statements from a subscription database that was available to all parties, as acknowledged by Ashley.  *See* IDM at Comment 2.  This is consistent with Commerce practice.

For instance, in *OCTG from Vietnam*, the party who had submitted the surrogate financial statement at issue had "provided sufficient information regarding how the financial statement could be obtained from public sources," and therefore the Department "did not request any information on the source of the financial statement." *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,611 (Apr. 20, 2017), IDM at Comment 1.

For the reasons stated above, Ashley's reliance on *Since Hardware* is misplaced.  *See* Ashley Br. at 26-27.  In the administrative proceeding at issue there, Commerce

> was satisfied that Infiniti Modules' statements were publicly available because 'Petitioner was able to get them directly from the company simply by requesting them,'…even though respondents were apparently unsuccessful with similar requests…respondents' inability to obtain the data from the same source and in the same manner does seem to establish that Infiniti Modules' statements are now publicly unavailable.

*Since Hardware (Guangzhou) Co., Ltd. v. United States*, 911 F. Supp. 2d 1362, 1369 (Ct. Int'l Trade 2013).  That is not the case here.  Ashley did not claim before Commerce, nor do they claim now before the Court, that they are unable to locate or acquire Emirates Sleep's financial statements.  *See generally* IDM at Comment 2; Ashley Br. at 24-27.  Accordingly, Ashley has failed to undermine Commerce's reasoned conclusion that Emirates Sleep's financial statements were publicly available.

> ii.   *Emirates Sleep's Financial Statements are Complete and Contain All Necessary Information for Calculating Surrogate Financial Ratios*

Ashley next asserts that Emirates Sleep's financial statements were incomplete, and thus Commerce's reliance on them to calculate surrogate financial ratios was unlawful.  *See* Ashley Br. at 17-19 ("Record evidence demonstrates that Emirates Sleep's financial statements were missing multiple annexures, i.e., Annexures 1-5.").  Of the five annexures, however, Ashley only discusses Annexure 5 ("balances with government authorities"), which it contends ***may*** contain

17

information that is "key" to determine whether Emirates Sleep received countervailable

subsidies.  *Id.*  Ashley's speculation is without merit.  Commerce's practice is to accept financial

statements unless they are missing ***significant and critical*** information necessary to calculate

financial ratios, and only rejects financial statements if they ***explicitly*** identify receipt of

countervailable subsidies.  As demonstrated below, Emirates Sleep's financial statements contain

all necessary information to calculate surrogate financial ratios, and there is no explicit evidence

of receipt of countervailable subsidies, or of any government assistance.

      As an initial matter, Commerce's "practice is to disregard incomplete financial statements

as a basis for calculating surrogate financial ratios where 'the statement is missing ***key***

***sections***.'"  IDM at Comment 2 (emphasis supplied); *see also Wooden Bedroom Furniture from*

*the People's Republic of China: Final Results of the 2004-2005 Semi-Annual New Shipper*

*Reviews*, 71 Fed. Reg. 70,739 (Dec. 6, 2006) ("*WBF from China*"), IDM at Comment 2

(explaining Commerce's "practice {is} to disregard incomplete financial statements as a basis

for calculating surrogate financial ratios where '…the statement is missing key sections, such as

sections of the auditor's report, that are vital to our analysis and calculations.'").  In other words,

"incompleteness alone may not be sufficient to reject statements" but rather Commerce's

practice is to reject "incomplete {financial} statements that are missing critical information."

*Ass'n of Am. Sch. Paper Suppliers, v. United States*, 791 F. Supp. 2d, 1292, 1304 (Ct. Int'l Trade

2011).

      Commerce has previously identified what aspects of a financial statement are "critical" or

"key" to calculating a surrogate financial ratio.  Commerce has previously rejected financial

statements that do not contain an auditor's report, the auditor's opinion or notes to the financial

statements.  *See WBF from China*, IDM at Comment 2.  Commerce has previously rejected

financial statements that lack notes or a statement of accounting policies.  *See Lifestyle Enter. v. United States*, 768 F. Supp. 2d 1286, 1310 (Ct. Int'l Trade 2011).  Commerce has previously rejected financial statements that lack an income statement.  *See Seamless Refined Copper Pipe and Tube from the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 75 Fed. Reg. 60,725 (Oct. 1, 2010), IDM at Comment 2.

Given Commerce's practice, the question before the Court is whether the Emirates Sleep financial statements are missing "critical information" or "key sections" that are required for calculating a surrogate financial ratio.  In the *Final Determination*, Commerce acknowledged that the Emirates Sleep financial statements were missing certain annexures, but explained

> Commerce considers the missing annexures cited by Ashley Group (i.e., Annexures1 through 5) to be supplemental details not forming part of the Emirates Sleep financial statements and unnecessary for Commerce purposes of calculating surrogate financial ratios…The missing annexures constitute information related to the sub-parts of line items in the Emirates Sleep financial statements; the line items include explanatory notes. ***The Emirates sleep financial statements contain the balance sheet, profit and loss statement, statement of cash flow, notes forming the financial statements including sub parts to the notes, independent auditor's report, as well as a board's report, Annexure A extract of annual report, and Annexure B particulars of contractors/arrangements made with related parties***.

IDM at Comment 2 (emphasis supplied).  In other words, the Emirates Sleep financial statements were not missing "critical" or "key" information and "satisf{y} Commerce's requirements for sourcing surrogate financial statements."  *Id.*

Ashley's only argument that Emirates Sleep's financial statements are missing critical information is its speculation that Annexure 5 may include a "potentially countervailable balance with government authorities."  Ashley Br. at 18.  But "Balances with Government Authorities" is a common itemized entry in many companies' financial statements.  Indeed, Sheela Foam's financial statement also includes an item for "Balances with Statutory/Government authorities."  *See* Ashley's SV Data at Exhibit SV-4 (PDF 572).  Put simply, the mere existence of balances

19

with a government does not indicate receipt of countervailable subsidies.  More importantly,

Ashley fails to recognize that Commerce "will only disregard financial statements where there is

***explicit evidence of a subsidy previously determined to be countervailable***."  *Shenzhen Xinboda*

*Indus. Co. v. United States*, 494 F. Supp. 3d at 1353.  Commerce requires explicit evidence of

countervailable subsidies because anything less would "require Commerce to resort to less

appropriate financial statements, leading to inaccuracies." *Id.*  Emirates Sleep's financial

statements do not contain explicit evidence of countervailable subsidies, or subsidies of any kind.

Accordingly, Commerce's determination that Emirates Sleep's financial statements were

complete is supported by substantial evidence.

iii.   *Emirates Sleep's Financial Statements Do Not Evidence Receipt of Subsidies*

Relatedly, Ashley asserts that the "critical issue in examining the 'countervailable

subsidies' factor, is to note that both potential sets of financial statements contain references to

government assistance…."  Ashley Br. at 28.  Ashley's assertion is without record support, and

its attempt to conflate loans with government authorities as "governmental assistance" that

necessarily results in distortion is itself a gross distortion of Commerce's practice and record

evidence.  Put simply, Commerce does not disqualify financial statements because a company

has loans and balances with a government; rather, Commerce will reject financial statements if

they reflect receipt of ***countervailable subsidies***.  Ashley provides no evidence that Emirates

Sleep received countervailable subsidies, or any subsidies or "governmental assistance," and

therefore its claim that Emirates Sleep's financial statements were distorted and unusable should

be rejected.

Ashley points to a single line item in Emirates Sleep's financial statement that refers to

"Balances with Government Authorities" as evidence that Emirates received "governmental

assistance" that was "significantly distortive."  Ashley Br. at 33-34.  But again, loans and

balances with government authorities are not synonymous with "subsidy," or more importantly with "countervailable subsidy." Moreover, loans with government authorities are not inherently distortive; rather, they are only distortive if they are not market-based, and Ashley provides no evidence, and no argument, that the loans and balances listed on Emirates Sleep's financial statements were not market based. Under U.S. countervailing duty law, a government loan is only countervailable (*i.e.*, distortive) "if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market." 19 U.S.C. § 1677(5)(E)(ii).

In sum, Ashley's contention that Emirates Sleep's financial statements are distorted and demonstrate receipt of "governmental assistance" is without record support and based on a flawed understanding of Commerce's practice. Emirates Sleep's financial statements do not indicate receipt of countervailable subsidies, subsidies of any kind, or governmental assistance. Accordingly, Ashley's argument that Commerce erred in selecting Emirates Sleep's financial statements on this basis should be rejected.

iv. *Although Not Contemporaneous, Emirates Sleep's Financial Statements are the Best Information Available.*

Ashley contends that Commerce "unreasonably failed to follow its past practice by relying on non-contemporaneous financial statements." Ashley Br. at 15. But as Ashley admits, Commerce may "depart from its past practice in selecting non-contemporaneous financial statements when no other reliable and representative financial statements exist on the record." *Id.* at 16. That is precisely the fact pattern at issue here, rendering Commerce's selection of Emirates Sleep's financial statements supported by substantial evidence.

As discussed *supra*, in the *Final Determination* Commerce found that Sheela Foam's financial statements evidenced receipt of countervailable subsidies and therefore were unusable

21

as surrogate financial statements.  Thus, although "the Emirates Sleep financial statement is not

contemporaneous, the only other financial statement on the record, Sheela Foam, has evidence of

countervailable subsidies."  IDM at Comment 2.  "In similar situations, Commerce has opted to

use financial statements that are not contemporaneous because it was the best information on the

record."  *Id.*  Commerce specifically cited *QVD Food Co. v. United States*, 721 F. Supp. 2d

1311, 1316-1317 (Ct. Int'l Trade 2011) wherein Commerce "disregarded contemporaneous

financial statements for those that were issued more than six years prior to the period of review."

*Id.*  Notably, Commerce's decision to utilize non-contemporaneous financial statements when

they are the only reliable information on the record was affirmed by the Federal Circuit.  *See*

*QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1325 (Fed. Cir. 2011).  In short, Ashley's

argument that Commerce's selection of Emirates Sleep's financial statements was unlawful

because they are not contemporaneous is wrong and inconsistent with judicial precedent.

Accordingly, Commerce's selection of Emirates Sleep's financial statements is consistent with

Commerce's practice and supported by substantial evidence

> v.   *Emirates Sleep's Financial Statements are Reflective of Production of the*
>       *Subject Merchandise and Are the Best Available Information*

Ashley further argues that Commerce's reliance on Emirates Sleep's financial statements

was unlawful because "Emirates Sleep's primary business operations in India are completely

dissimilar from those of the Ashley Respondents' business operations in Vietnam."  Ashley Br.

at 20.  In support of its argument, Ashley claims that: (1) Emirates Sleep is a "much smaller

company than either Sheela Foam or Wanek;" and (2) Emirates Sleep is primarily a retailer, not

a manufacturer, as demonstrated by showroom expenses in its financial statements.  *See id.* at 20-

24.  Both arguments are inconsistent with Commerce practice and unsupported by record

evidence.

*First*, the mere fact that Emirates Sleep is a smaller company than Sheela Foam or Wanek is immaterial.  As Commerce explained in the *Final Determination*, its "practice is to disregard the magnitude of a company's revenue when choosing the appropriate surrogate financial statements to calculate ratios."  IDM at Comment 2; *see also Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 41,374 (Aug. 17, 2009), IDM at Comment 14 ("the Department's practice is to disregard company size as a basis upon which to determine the representative nature of a company's financial statements….").  Commerce's practice of disregarding the comparative size of companies when analyzing financial statements has been affirmed by this Court.  *See Lifestyle Enter. v. United States*, 35 C.I.T. 158, 176 (2011) (noting "Commerce can rely on certain financial surrogate companies' financial statements even where distortions based on economies of scale exist…").

*Second*, Emirates Sleep is a manufacturer of mattresses, notwithstanding Ashley's cherry picking of line items in Emirates Sleep's financial statements.  In particular, Ashley asserts that Emirates Sleep's financial statements show "its revenue from operations did not include <u>any</u> revenue from its manufacturing activity, but instead captured its retail activity as shown by the following line items: '(a) Sale of products' in the amount of 47.4 million Rupees…and '(b) Sale of services'…in the amount of 14.4 million Rupees."  Ashley Br. at 20-21.  But Ashley misrepresents these line items.  Emirates Sleep, like other manufacturers, does not earn revenue simply by manufacturing; it must sell its products after they are manufactured in order to earn revenue.  Thus, Ashley fails to recognize that the "sale of products" line item includes revenue from manufacturing activity (*i.e.*, Emirates Sleep's manufacturing activity is included in the "sale of products" line item).  This is confirmed by Emirates Sleep's financial statements, which

explain under "Principal Business Activities of the Company" in Annexure A that 76.71 percent of "total turnover of the company" relates to "manufacture of furniture," primarily mattresses. MP SV Data at Exhibit 11 (PDF 378); *see also id.* at Note 1 (explaining that Emirates Sleep "is a manufacturing company…into the manufacturing of all types and kinds of mattresses, bases and other sleep related products and systems").

Moreover, Ashley's arguments about showroom expenses (*i.e.*, retail operations) are misplaced. Even if Ashley does not operate showrooms or engage in retail operations in Vietnam, Ashley fails to recognize that Sheela Foam's financial statement, which Ashley avers is the best information available for surrogate financial ratio calculations, has numerous references to its distribution network and retail operations. *See* Ashley SV Data at Exhibit SV-4 at p. P-5 (referencing a "Pan-India presence" and a "wide distribution network," which "includes 110 exclusive distributors, more than 11,500 retail dealers, over 7,400 multi-brand outlets, and more than 4,100 exclusive retails dealers"); at p. P-6 (noting that in 2008 Sheela Foam "changed the face of mattress retail with the launch of its exclusive stores, Sleepwell Worlds and Galleries"); at p. P-32 ("The Company is focused on deepening its domestic retail presence and aggressively sell its low-priced products in rural market"). In other words, both financial statements on the record contain evidence of retail operations. As discussed *supra*, however, only Sheela Foam's financial statement reflected receipt of countervailable subsidies, rendering it unusable and leaving Emirates Sleep's financial statement the best (and only) information available on the record.

      vi.  *Conclusion*

In the context of selecting surrogate values, the Court of Appeals has made clear that "{t}his court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best

available information.'" *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011). A reasonable mind could conclude that Sheela Foam received two countervailable subsidies during the POI insofar as the "names of the programs found in the Sheela Foam financial statements are the same names Commerce previously found countervailable," IDM at Comment 2, and Sheela Foam's financial statements demonstrate it was eligible to receive both subsidies. A reasonable mind could conclude that Emirates Sleep's financial statements, although not contemporaneous, were publicly available, complete (*i.e.*, included all relevant information for calculating surrogate financial ratios), and did not indicate receipt of subsidies or governmental assistance. And a reasonable mind could conclude that Emirates Sleep is a manufacturer of a comparable merchandise that, like Sheela Foam, has some retail operations that do not disqualify its financial statements as the basis for surrogate financial ratios. Accordingly, Commerce's selection of Emirates Sleep's financial statements was reasonable and is supported by substantial evidence. *Cf. Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006) ("If Commerce's determination of what constitutes the best available information is reasonable, then the Court must defer to Commerce.").

### B. Commerce's Decision to Rely on HTS Subheading 7320.90.90 to Value Pocket Coil Innerspring Units is Supported by Substantial Evidence

In NME cases, Commerce determines normal value "on the basis of the value of the factors of production utilized in producing the merchandise," and the "valuation of the factors of production shall be based on the best available information regarding the values of such factors." 19 U.S.C. § 1677b(c)(1). In determining which data constitute the "best available information" to value factors of production, Commerce uses, *inter alia*, "prices specific to the input in question." *Taian Ziyang Food Co. v. United States*, 35 C.I.T. 863, 869 (Ct. Int'l Trade 2011)

PUBLIC VERSION

(quoting *Policy Bulletin 04.1*).  The Federal Circuit has emphasized that the statute "accords Commerce wide discretion in the valuation of factors of production."  *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001).

Ashley contests Commerce's valuation of its pocket coil innerspring units, a key input in the production of innerspring mattresses.  *First*, Ashley argues Commerce's "determination to base the pocket coil innerspring units {surrogate value} on data from Indian HTS subheading 7320.90.90…was unsupported by substantial evidence" because Indian HTS subheading 9404.29.90 "properly describes Indian imports of the input used by the Ashley Respondents." Ashley Br. at 36.  *Second*, Ashley contends Commerce's reliance on HTS 7320.90.90 to value its innerspring FOP was unlawful because it "yielded aberrational results."  Ashley Br. at 39-42.  As demonstrated below, Commerce's reliance on Indian HTS 7320.90.90 to value Ashley's innerspring input was supported by substantial evidence and did not yield aberrational results.

      1.   *Commerce Properly Relied on HTS 7320.90.90 To Value Pocket Coil Innersprings*

Ashley makes two arguments in support of its contention that HTS 9404.29.90, rather than HTS 7320.90.90, is the best available information for valuing its pocket coil innerspring units.  *First*, Ashley asserts that Commerce "did not conduct a proper analysis based on the tariff classification rules and principles set forth in the General Rules of Interpretation ('GRI')" and that its "pocket coil innerspring units are properly considered mattress supports classified under HTS heading 9404 because the pocket coil innerspring units are not articles of iron and steel." Ashley Br. at 36-38.  *Second*, Ashley asserts that classification opinions from Indian law firms support the classification of its pocket coil innerspring units under Indian HTS 9404.29.90.  *See id.* at 38-39.  Ashley's arguments miss the mark.

As an initial matter, Ashley incorrectly argues that Commerce "must conduct an analysis based on tariff classification rules and principles to determine the 'best available information' of a certain input." Ashley Br. at 37 (citing *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d 1308, 1320 (Ct. Int'l Trade 2018)). But "arguments {such as Ashley's} regarding the binding nature of the GRI on Commerce in the antidumping context are **misplaced**." *Gleason Indus. Prods. v. United States*, 559 F. Supp. 2d 1364, 1370 (Ct. Int'l Trade 2008) (emphasis supplied). This is because Commerce is often using the HTS, and its associated GRI, "merely to approximate the cost of a factor of production" rather than to assign ordinary customs duties to a particular article of merchandise. *Id.* at 1371. In other words, Commerce has discretion to use the best available information on the record to value FOPs even if such evidence does not align with an interpretation under the GRI. *Id.*

Furthermore, even to the extent that a GRI analysis is required, Commerce did implicitly follow the GRI in reaching its determination that HTS 7320.90.90 more closely or specifically describes Ashley's innerspring input than HTS 9404.29.90. GRI 1 provides that "classification shall be determined according to the terms of the headings and relative Section or Chapter Notes." *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d at 1320. The Indian HTS tariff classification for 7320.90.90 covers the following:

7320 SPRINGS AND LEAVES FOR SPRINGS, OF IRON OR STEEL

> 7320 10 - *Leaf-springs and leaves therefor:*
> --- *Leaf-springs:*
> 7320 10 11----- For motor vehicles
>
> 7320 10 12----- For railways and tramways
>
> 7320 10 19----- Other
>
> 7320 10 20---- Leaves for springs
>
> 7320 20 00 - Helical springs
>
> 7320 90 - *Other:*

    7320 90 10----Coil spring for railways, tramways

    7320 90 20----Spring pins

    **7320 90 90 – Other**

By contrast, Indian HTS 9404.29.90 covers:

> 9404 MATTRESS SUPPORTS; ARTICLES OF BEDDING AND SIMILAR
> FURNISHING (FOR EXAMPLE, MATTRESSES, QUILTS, EIDERDOWNS,
> CUSHIONS, POUFFES AND PILLOWS) FITTED WITH SPRINGS OR
> STUFFED OR INTERNALLY FITTED WITH ANY MATERIAL OR OF
> CELLULAR RUBBER OR PLASTICS, WHETHER OR NOT COVERED

> 9404 10 00 - Mattress supports
>
> *- Mattresses:*
>
> 9404 21 -- *Of cellular rubber or plastics, whether or not covered :*
>
> 9404 21 10 --- Of rubber
>
> 9404 21 90 --- Of plastic
>
> 9404 29 -- *Of other materials:*
>
> 9404 29 10 --- Spring interior
>
> 9404 29 20 --- Of Rubberised coir with or without combination of
> other materials, whether or not with metallic springs.
>
> **9404 29 90 --- other**

Ashley "described its innerspring coil units as being comprised of 'spring coil' and states that

'{t}he compositions are steel wire, needle-punched non-woven fabric and hot-melt glue." IDM

at Comment 3. Ashley also admitted that its innerspring units fall "somewhere between the

spring stage and the mattress stage," Ashley Administrative Br. at 46, and therefore the

innerspring units cannot, pursuant to GRI 1, be *prima facie* classified under either HTS heading

7320 or 9404.

    Turning to GRI 2, this rule "applies to unfinished or incomplete articles and mixtures or

combinations of materials or substances." *Apple Inc. v. United States*, 375 F. Supp. 3d 1288,

1299 (Ct. Int'l Trade 2019). GRI 2 does not apply here because an innerspring unit is not an

"incomplete or unfinished" or "unassembled" mattress; rather, innerspring units are separate and

unique articles of commerce that have in the past been subject to distinct antidumping duty proceedings. *See Uncovered Innerspring Units From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 79,443 (Dec. 29, 2008). Further, an innerspring unit is also not an "unassembled" mattress as Ashley's own records indicate that substantial additional materials (*e.g.*, foam, fabric, etc.) and further manufacturing are required to transform its innerspring unit into a mattress. Moreover, an innerspring unit also clearly does not have the "essential character" of a finished mattress; the essential character of a mattress is that people can comfortably sleep on them. No one sleeps directly on a steel innerspring unit.

As neither GRI 1 nor GRI 2 applies to Ashley's innerspring units, the next sequential step is to apply GRI 3, which instructs Commerce to apply the heading with the most specific description. *See Apple Inc. v. United States*, 375 F. Supp. 3d at 1299. This is precisely what Commerce did. Given Ashley's description of its innerspring input and the relevant language from the Indian HTS, Commerce reasonably found that:

> HTS 7320.90.90 is a better category because it expressly covers springs of iron or steel of coil, other than coil spring for railways, tramways or spring pins, used by Ashley Group, while HTS 9404.29.90 covers items that are dissimilar to the innerspring coil unit. Specifically, ***HTS 9404.29.90 covers completed mattresses of a material other than a spring interior***….HTS 9404.29.90 does not provide the best valuation of the innerspring coil units in question because it does not contain springs.

*IDM* at Comment 3 (emphasis supplied). Ashley's only objection to this analysis is its assertion that "Commerce did not conduct a proper analysis" because its "innerspring units are not exclusively made of springs." Ashley Br. at 37-38. But the mere fact that Ashley's "innerspring units are not exclusively made of springs" does not mean HTS 9404.29.90 (which covers ***completed mattresses of a material other than a spring interior***) is the proper classification to value its inputs.

PUBLIC VERSION

Finally, Commerce's analysis is supported by its prior antidumping duty investigation concerning mattresses from China.  Specifically, in *Mattresses from China* Commerce classified the mandatory respondent's innerspring input (the same input used by Ashley to produce mattresses) under HTS 7320.90.90, and further explained that:

> HTS classification 9404 is not the proper HTS classification for valuing…innersprings…. The GTA description for HTS 9404 contained in the explanatory notes states that "mattress supports; articles of bedding and similar furnishing (for example, *mattresses*, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs" (emphasis added) are included in HTS classification 9404. The GTA description specifically covers mattresses fitted with springs, *i.e.*, subject mattresses, while ***innersprings are not subject merchandise, but raw materials used in the production of subject merchandise***.

*Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56,761 (Oct. 23, 2019), IDM at 59.  Accordingly, Commerce's reliance on HTS 7320.90.90 to value Ashley's innerspring units is supported by substantial evidence and consistent with its prior practice concerning the same input.

    2.   *Ashley Mischaracterizes Mattress Petitioners' Prior Statements Regarding Innerspring Units*

Ashley also mischaracterizes prior statements by one of the Mattress Petitioners to support its argument.  *See* Ashley Br. at 37-38.  Specifically, Ashley contends that Leggett & Platt, Incorporated, "a petitioner in the Uncovered Innerspring Units case, agreed with {Ashley's classification}, testifying before the ITC that imports of uncovered innersprings, including innerspring units, should be classified under U.S. HTS subheading 9404.29." *Id.* at 38.  Ashley's argument betrays a fundamental misunderstanding of the Harmonized Tariff Schedule of the United States and how it is different from the tariff schedules of other countries.

As explained in Mattress Petitioners' rebuttal brief before Commerce, the United States created an *eo nomine* provision for "uncovered innerspring units," but India and other countries

have not.  *See* MP Rebuttal Br. at 25-27.  An "*eo nominee* provision 'describes an article by a specific name,' whereas a use provision describes articles according to their principal or actual use."  *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017).  In other words, the United States expressly names "uncovered innerspring units" in its tariff schedule, but India (and other countries) do not.  Accordingly, prior statements by Mattress Petitioners discussing **the U.S. HTS** and the *eo nomine* provision for uncovered innerspring units are irrelevant to Commerce's analysis of **the Indian HTS**, which does not include the same *eo nomine* provision.  Because the Indian HTS does not specifically name "uncovered innerspring units," Commerce was forced to choose between two Indian HTS provisions in selecting the "best available information" for valuing Ashley's innerspring input.  As discussed above, Commerce reasonably concluded that HTS subheading 7320.90.90 "covers imports more specific to the input in question than HTS 9404.29.90."  IDM at Comment 3.

      3.   *Commerce Rebutted Indian Classification Opinions on the Record, Which Ashley Failed to Discuss*

Ashley contends that opinions from Indian law firms support its classification of its pocket coil innerspring units under Indian HTS 9404.29.90.  *See* Ashley Br. at 38-39.  But Ashley failed to grapple with Commerce's rebuttal of the classification opinions on the record.  *See* IDM at Comment 3.  Instead, Ashley requests that this Court ignore Commerce's reasoned analysis, which Ashley did not address, and accept at face value the opinions of Indian law firms instead.  This Court should reject Ashley's attempt to supplant Commerce's authority to conduct its surrogate value methodology.

Ashley's assertion that Commerce "ignored" the classification opinions from Indian law firms on the record is false.  Ashley Br. at 39.  In fact, Commerce provided a detailed discussion in its *Final Determination* specifically rebutting the opinions of Indian law firms on the record

regarding the classification of Ashley's innerspring units.  Commerce first noted that it "is not bound by outside opinions or rulings when selecting import values…."  IDM at Comment 3. Commerce nevertheless engaged with the Indian opinions, explaining that it "disagree{d} that innerspring coil units have the essential character of a mattress as determined by the six Indian classification opinions" because "{i}nerspring coil units are an input for a completed mattress. Innerspring coil units comprise part of the core but are not sold or marketed to take the place of a mattress." *Id.*  Commerce reiterated that the "Ashley Group described its innerspring FOP input as 'spring coil' and also state{d} that '{t}he compositions are steel wire, needle-punched non-woven fabric and hot melt glue.'" *Id.*  Commerce then explained that "HTS 7320.90.90, contains springs which are a component of innerspring coil units." *Id.*  In contrast, "HTS code 9404 are mattress supports described as articles of bedding fitted with material other than springs, and HTS code 9404.29.90 are mattress supports of materials other than cellular rubber or plastics, whether or not covered." *Id.*  Moreover, "Ashley Group's proposed HTS code of 9404.29.90 does not reference mattress supports of springs but rather mattress supports of 'other' material." *Id.*; *see also id.* ("HTS 9404.29.90, by its description, is an 'other' category covering articles of mattresses that do not contain springs").  Ashley ignored all of Commerce's analysis rebutting the opinions of Indian law firms in its brief before this Court.  *See* Ashley Br. at 38-39.

Although the Court may "consider{} expert opinions, not as fact witnesses, but as experts on the common meaning or understanding of a term in a particular industry," Ashley Br. at 38-39 (citing *Samsung Int'l v. United States*, 887 F. Supp. 2d 1330, 1338 n.18 (Ct. Int'l Trade 2012)), those "{e}xpert opinions are merely advisory." *Samsung Int'l v. United States*, 887 F. Supp. 2d at 1338 n.18; *see also Toyota Motor Sales, U.S.A., Inc. v. United States*, 585 F. Supp. 649, 653 (Ct. Int'l Trade 1984) (relying on lexicographic sources to construe tariff term and finding that

PUBLIC VERSION

the testimony regarding industry usage of a term in issue may serve as an aid, but is not binding), *aff'd based on opinion below*, 753 F.2d 1061 (Fed. Cir. 1985).  Again, Ashley did not address any of Commerce's reasonable analysis in the *Final Determination* rebutting the classification opinions from the Indian law firms.  *See* Ashley Br. at 38-39.  Accordingly, these "advisory" opinions, standing alone, are not sufficient to overcome Commerce's analysis in the *Final Determination*.

Moreover, the opinions of the Indian law firms on the record do not relate to "the common meaning or understanding of a term" but purport to provide legal analysis as to the proper HTS classification of a factor of production as part of Commerce's surrogate value methodology.  The Federal Circuit has stressed that constructing normal value "for a producer in a nonmarket economy is difficult and necessarily imprecise."  *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1407 (Fed. Cir. 1997)).  Accordingly, Commerce, not Indian law firms nor Ashley, has "wide discretion in the valuation of factors of production…."  *Id.*; *see also Heze Huayi Chem. Co. v. United States*, Slip Op. 2021-97 at *12 (Ct. Int'l Trade 2021) (noting Commerce "has broad discretion to determine what record material constitutes the best available information").

In sum, Ashley's failure to address any of Commerce's reasons for rejecting the analysis of the Indian law firms reflects its desire to supplant Commerce's authority as a decision maker and to use this Court to enforce the opinions of law firms not party to this proceeding; this Court should reject Ashley's attempt to supplant Commerce's authority as "the 'master' of the antidumping laws."  *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995).  In antidumping cases, the Federal Circuit "has previously recognized 'Commerce's special expertise,' and it has 'accorded substantial deference to its construction of pertinent statutes.'"

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d at 1381

(quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394 (Fed. Cir. 1997)).  Commerce

rebutted the Indian classification opinions on the record at length, IDM at Comment 3, and

Ashley does not address any of Commerce's analysis in its brief.  *See* Ashley Br. at 38-39.

Accordingly, Commerce's selection of HTS 7320.90.90 to value Ashley's innerspring inputs is

in accordance with law and supported by substantial evidence.

> 4. *Commerce's Valuation of Pocket Coil Innersprings Using HTS 7320.90.90 Does Not Yield an Aberrational Result; Using HTS 9404.29.90 Would Yield an Aberrational Result*

Ashley argues that "Commerce's determination also cannot represent the best available

information because reliance on HTS 7320.90.90 to value the Ashley Respondents' pocket coil

innerspring units yielded results so aberrational as to be unusable based on Commerce

precedent."  Ashley Br. at 39.  Specifically, Ashley contends that "Commerce's calculation of

the SV for pocket coil innerspring units using HTS 7320.90.90 produced distorted and inflated

value that was 'greater than all other material inputs combined.'"  *Id.* at 41.  Ashley's argument

falls flat.

Although Ashley states that courts of review have upheld Commerce's decision in prior

cases not to use a surrogate value that exceeds the total cost of all other direct materials (citing

*Gleason Industrial Products*), reliance on that case is misplaced.  *See* Ashley Br. at 40.  There,

the product was hand trucks, and the input Commerce was valuing was a bearing.  *Gleason*

*Indus. Products v. United States*, 559 F. Supp. 2d at 1369-70.  Commerce's selection of the

surrogate value was specific to the facts of the case (*i.e.*, concerning one bearing) and the

industry in question (*i.e.*, production of an entire hand truck).  Given the facts of that case,

valuing a single bearing such that it exceeded the total cost of all other direct materials was

found to be unreasonable.  *Id.*

In contrast, the ratio calculated by Ashley of the value of innersprings in the normal value calculation as a percentage of total direct materials (*i.e.*, [                    ]) using Commerce's surrogate value selection of HTS 7320.90.90 does not produce an aberrational result.  As an initial matter, the "mere fact a surrogate value is the highest on the record does not make that value aberrational." *Fresh Garlic Producers Ass'n v. United States*, Slip Op. 2017-127 at *19 (Ct. Int'l Trade 2017).  Furthermore, Ashley admits that innersprings are a major material input of innerspring mattresses.  Accordingly, it is not aberrational that the primary material input to the subject merchandise would be an important cost item, and, depending on the product, an input could constitute a majority of the product's material cost (as is the case here).  In addition, although Ashley conspicuously omits this information, the application of Ashley's selected surrogate value for innerspring units using HTS 9404.29.90 would yield an aberrationally low percentage of total direct materials (*i.e.*, [                    ]).  *See* MP Rebuttal Br. at 36, Exhibit 1. Such a low valuation of the primary material input would be "an extreme outlier, distorted {and} misrepresentative" (*i.e.*, aberrational).  *Tri Union Frozen Prods. v. United States*, 277 F. Supp. 3d 1387, 1394-95 (Ct. Int'l Trade 2017).

In sum, Commerce "need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a reasonable way." *Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*, 44 F. Supp. 2d 229, 258 (Ct. Int'l Trade 1999).  As demonstrated, Commerce was faced with two potential valuations.  The first was to value Ashley's innerspring units, the primary input in innerspring mattresses, using HTS 7320.90.90, which resulted in a value of [

] of total direct materials.  The second was to value Ashley's innerspring units, the primary input in innerspring mattresses, using HTS 9404.29.90, which resulted in a value of [

] of total direct materials (*i.e.*, valuing the primary input at less than [                    ] of its

total value).  Commerce reasonably concluded that, for this product and for this industry, the

value of the primary input to produce the subject merchandise using HTS 7320.90.90 was more

accurate.  As discussed above, Commerce's reliance on HTS 7320.90.90 was reasonable and

supported by substantial evidence.

### C.   Ashley's Challenge to Commerce's Application of the Cohen's *d* Test is not Justiciable

Ashley asserts that the "results of Commerce's Cohen's *d* test are unreasonable as applied

to the Ashley Respondents' sales data" because Commerce's analysis allegedly "includes data

which violates the assumptions present in the Cohen's *d* test."  Ashley Br. at 44-47.  The Court

should reject Ashley's argument as not ripe for consideration.

Pursuant to Article III of the Constitution, the Court "may adjudicate only actual,

ongoing controversies."  *See Honig v. Doe*, 484 U.S. 305, 317 (1988).  To satisfy the "case or

controversy" requirement of Article III, "there must exist 'a present, live controversy . . . to

avoid advisory opinions on abstract propositions of law.'"  *American Spring Wire Corp. v.

United States*, 569 F. Supp. 73, 74-75 (Ct. Int'l Trade 1983) (quoting *Tennessee Gas Pipeline

Co. v. FPC*, 606 F.2d 1373, 1379 (D.C. Cir. 1979)).  At its "irreducible constitutional minimum,"

the constitutional doctrine of standing requires satisfaction of three elements: (1) a concrete and

particularized injury-in-fact, either actual or imminent; (2) a causal connection between the

injury and defendant's challenged conduct; and (3) a likelihood that the injury suffered will be

redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992);

*see also Perry Chemical Corp. v. United States*, 375 F. Supp. 3d 1324, 1332 (Ct. Int'l Trade

2019) (recognizing the constitutional requirement of suffering an "injury in fact" applies in a

1581(i) case); *Camara Nacional de las Industrias Azucarera y Alcoholera*, 118 F. Supp. 3d

1360, 1364-65 (Ct. Int'l Trade 2015) (citing the *Lujan* requirements).

"Justiciability concerns not only the standing of litigants to assert particular claims, but

also the appropriate timing of judicial intervention." *Renne v. Geary*, 501 U.S. 312, 320 (1991)

(holding that the issue was not ripe for consideration because the respondents failed to

demonstrate a live dispute involving the actual or threatened application of § 6(b) of the

California Constitution to bar particular free speech). A ripe controversy could not be found

where "no adverse consequences" exist. *Id.*

Ashley does not possess constitutional standing to challenge Commerce's use of the

Cohen's *d* test in the underlying investigation because it cannot demonstrate that it was injured

by any of those actions. More importantly, the Court cannot redress any purported injury

because there was no injury. There is no live case or controversy in Ashley's argument

regarding the Cohen's *d* test because regardless of the results of the Cohen's *d* test, Commerce in

fact used the average-to-average method to calculate Ashley's dumping margin. *See* Final

Analysis Memo at 6.

Pursuant to Section 777A(d)(1)(A) of the Act and 19 C.F.R. § 351.414(c), Commerce

calculates weighted-average dumping margins by comparing weighted-average NVs to

weighted-average EPs or CEPs, *i.e.*, the average-to-average method, or transaction-specific NVs

to transaction specific EPs or CEPs, *i.e.*, the transaction-to-transaction method, unless the

Department determines that another method is appropriate in a particular situation. *See*

*Preliminary Determination* I&D Memo at 25.

Commerce applies a "differential pricing" analysis for determining whether application

of an alternative comparison method is appropriate in a particular situation pursuant to 19 C.F.R.

**PUBLIC VERSION**

§ 351.414(c) and consistent with Section 777A(d)(1)(B) of the Act.  *See id*.  In the first stage of

the differential pricing analysis, the Cohen's *d* test is applied.  *See id*. at 26.  The Cohen's *d*

coefficient is a generally recognized statistical measure of the extent of the difference between

the mean, *i.e.*, weighted-average price, of a test group and the mean, *i.e.*, weighted-average price,

of a comparison group.  *See id*.  In the *Preliminary Determination* and unchanged in the *Final*

*Determination*, Commerce determined that the average-to-average method appropriately

accounted for such differences because there was not a meaningful difference in the weighted-

average dumping margins when calculated using the average-to-average method and an

alternative method based on the average-to-transaction method applied to the US sales which

pass the Cohen's *d* test.  *See id*. at 28.  Accordingly, the Department used the average-to-average

method for all US sales to calculate the weighted average dumping margin for Ashley.  *See id.*

Because Commerce relied on the average-to-average method in both the *Preliminary* and

*Final Determinations*, Ashley never suffered any injury because the Cohen's *d* test did not result

in use of an alternative comparison methodology.  Put simply, there is nothing for the Court to

redress.

Moreover, Mattress Petitioners note that Ashley failed to raise this issue in its case brief

before Commerce and, therefore, has failed to exhaust its administrative remedies as required by

28 U.S.C. § 2637(d).  *See* Ashley Administrative Br.  Section 2637(d) "indicates a congressional

intent that, absent a strong contrary reason, the {trade} court should insist that parties exhaust

their remedies before the pertinent administrative agency."  *Itochu Bldg. Prods. v. United States*,

733 F.3d 1140, 1145 (Fed. Cir. 2013) (citations omitted).  Similarly, Commerce's regulations

require that a "case brief must present all arguments that continue in the submitter's view to be

relevant to" Commerce's final determination.  19 C.F.R. § 351.309(c)(2).  Ashley has not

claimed any exception to the exhaustion doctrine applies in this case. *See* Ashley Br. at 44-47.

Accordingly, Ashley's failure to raise this issue before Commerce was a failure to exhaust its

administrative remedies, and the Court should therefore not consider this argument.

## V.   Conclusion

For the foregoing reasons, the Court should affirm Commerce's *Final Determination* as

supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ Yohai Baisburd

Yohai Baisburd
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
*Counsel to Brooklyn Bedding, LLC, et al.*

Date:   February 17, 2022

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 11,247 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     <u>/s/ Yohai Baisburd</u>
       Yohai Baisburd