**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| ASHLEY FURNITURE INDUSTRIES, LLC, ASHLEY FURNITURE TRADING COMPANY, WANEK FURNITURE CO., LTD., MILLENNIUM FURNITURE CO., LTD., AND COMFORT BEDDING COMPANY LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS; FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, <br><br> Defendant-Intervenor. | Court No. 21-00283 <br><br> PUBLIC VERSION |

## DEFENDANT'S MOTION TO PARTIALLY DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL
VANIA WANG
Attorney
Department of Commerce
Office of the Chief Counsel
   For Trade Enforcement and Compliance

L. MISHA PREHEIM
Assistant Director

KARA M. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 305-7571
Fax: (202) 514-8264
Email: kara.m.westercamp@usdoj.gov

February 17, 2022

Attorneys for Defendant

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT PURSUANT TO RULE 56.2(c)(1) ..................................................2

    I.     Administrative Determination Under Review .......................................................2

    II.    Issues Presented For Review ...............................................................2

STATEMENT OF FACTS ........................................................................ 3

    I.     Initiation Of Review .......................................................................3

    II.    Preliminary Determination........................................................................ 3

    III.   Final Determination ..................................................................... 4

SUMMARY OF THE ARGUMENT ...............................................................5

ARGUMENT ............................................................................... 6

    I.     Standard Of Review ......................................................................6

    II.    Non-Market Economy Legal Framework................................................ 7

    III.   Substantial Evidence Supports Commerce's Determination To Use Emirates Sleep's Financial Statements Because They Were The Best Available Information ................................................................................. 9

           A.    Commerce's Determination That The Emirates Sleep Financial Statements Were The Best Available Information Is Supported By Substantial Evidence .........................................................................10

           B.    The Court Should Reject Plaintiffs' Various Arguments Challenging The Emirates Sleep Financial Statements .......................................................13

                 1.    The Emirates Sleep Financial Statements Were Non-Contemporaneous Only By A Single Fiscal Year ........................14

                 2.    Emirates Sleep's Financial Statements Were Complete And Reliable Enough To Use To Calculate Financial Ratios ..............15

   3. Emirates Sleep's Financial Statements Reflect The Business Operations Of The Collapsed Entity In Vietnam........................ 17

   4. Emirates Sleep's Financial Statements Were Publicly Available...... ................................................................................................. 20

  C. Commerce Properly Declined To Use The Sheela Foam Financial Statements Because They Contained Evidence Of Countervailable Subsidies ................................................................................................22

IV. Substantial Evidence Supports Commerce's Selection Of Indian HTS 7320.90.90 To Value Innerspring Units ................................................................................27

V. Commerce's Determination That AFI And AFTC Should Not Be Assigned A Separate Rate Is Lawful ................................................................................................31

  A. Legal Framework .................................................................................... 31

  B. AFI And AFTC Failed To Submit Their Own Separate Rate Applications ................................................................................................................. 32

VI. Count IV Of Plaintiffs' Second Amended Complaint Should Be Dismissed........34

  A. Standard Of Review .................................................................................35

  B. Differential Pricing Framework ...............................................................35

  C. Because There Is No "Injury-in-Fact" With The Differential Pricing Analysis, The Court Does Not Possess Jurisdiction ................................37

   1. Relevant Factual Background........................................................ 37

   2. Plaintiffs Have Not Alleged An "Injury-In-Fact" ........................38

  D. In The Alternative, Plaintiffs Failed To Exhaust Administrative Remedies....................................................................................................40

CONCLUSION ..........................................................................................................43

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **PAGES**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013) .................................................... 31

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001).................................................................... 17

*Apex Frozen Foods Private Ltd. v. United States,*
    862 F.3d 1337 (Fed. Cir. 2017)................................................................... 36

*Ass'n of Am. Sch. Paper Suppliers, v. United States,*
    791 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) .................................................. 15

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017)..................................................................... 41

*Bristol Metals L.P. v. United States,*
    703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ....................................... 9, 11, 12

*Camreta v. Greene,*
    131 S. Ct. 2020 (2011).............................................................................. 40

*Catfish Farmers of Am. v. United States,*
    641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) .................................................. 9

*Celta Agencies, Inc. v. United States,*
    865 F. Supp. 2d 1348 (Ct. Int'l Trade 2012) ................................................. 35

*CITIC Trading Co. v. United States,*
    27 C.I.T. 356 (2003) ................................................................................. 9

*Clearon Corp. v. United States,*
    800 F. Supp. 2d 1355 (Ct. Int'l Trade 2011) ....................................... 23, 24, 25

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966).................................................................................. 7

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007)............................................................. 41, 42

*CP Kelco U.S., Inc. v. United States,*
    949 F.3d 1348 (Fed. Cir. 2020)........................................................... passim

*Diamond Sawblades Mfrs. Coalition v. United States*,
    866 F.3d 1304 (Fed. Cir. 2017)............................................................... 31, 32

*Dillinger France S.A. v. United States*,
    350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) .................................... 30

*Dongguan Sunrise Furniture Co., Ltd. v. United States*,
    865 F. Supp. 2d 1216 (Ct. Int'l Trade 2012) .................................... 19

*Dorbest Ltd. v. United States*,
    462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ........................... 28, 29, 31

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015)............................................................... 17, 19

*Fine Furniture (Shanghai) Ltd. v. United States*,
    353 F. Supp. 3d 1323 (Ct. Int'l Trade 2018) ....................... 25, 26, 27

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)............................................................... 6, 7, 17

*Fuyao Glass Industrial Group Co. v. United States*,
    29 CIT 109 (2005) ......................................................................... 25

*Gerber Food (Yunnan) Co. v. United States*,
    601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) ........................... 42, 43

*Gleason Indus. Prods. v. United States*,
    559 F. Supp. 2d 1364 (Ct. Int'l Trade 2008) .................................... 28

*Gold East Paper (Jiangsu) Co. Ltd. v. United States*,
    121 F. Supp. 3d 1304 (Ct. Int'l Trade 2015) .................................... 25

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .................................... 7

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,
    28 C.I.T. 1185 (2004) ..................................................................... 9

*Henke v. United States*,
    60 F.3d 795 (Fed. Cir. 1995)............................................................... 35

*Home Meridian Int'l, Inc. v. United States*,
    772 F.3d 1289 (Fed. Cir. 2014)............................................................... 8

*Home Meridian Int'l, Inc. v. United States,*
864 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) ................................. 14

*Hormel v. Helvering,*
312 U.S. 552 (1941) ................................................................ 42

*Huaiyin Foreign Trade Corp. v. United States,*
322 F.3d 1369 (Fed. Cir. 2003) ................................................ 32

*INS v. Elias-Zacarias,*
502 U.S. 478 (1992) .................................................................. 7

*Itochu Bldg. Prods. v. United States,*
733 F.3d 1140 (Fed. Cir. 2013) ................................................ 41

*Jiangsu Zhongji Lamination Materials Co. v. United States,*
396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019) ............................... 25

*Jinko Solar Co. v. United States,*
229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) ............................... 13

*Jubail Energy Servs. Co. v. United States,*
125 F. Supp. 3d 1352 (Ct. Int'l Trade 2015) .......................... 35, 39

*Juice Farms, Inc. v. United States,*
68 F.3d 1344 (Fed. Cir. 1995) ................................................. 34

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................ 35, 39

*McCarthy v. Madigan,*
503 U.S. 140 (1992) ................................................................ 41

*Mittal Steel Point Lisas Ltd. v. United States,*
548 F.3d 1375 (Fed. Cir. 2008) ................................................ 42

*Nation Ford Chem. Co. v. United States,*
166 F.3d 1373 (Fed. Cir. 1999) .................................................. 8

*PAM, S.p.A. v. United States,*
582 F.3d 1336 (Fed. Cir. 2009) .................................................. 6

*PAO Severstal v. United States,*
219 F. Supp. 3d 1411 (Ct. Int'l Trade 2017) ............................... 39

*POSCO v. United States,*
    296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ................................................................ 40

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014)................................................................ 8, 14

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011)................................................................ 8, 30

*QVD Food Co. v. United States,*
    721 F. Supp. 2d 1311 (Ct. Int'l Trade 2010) ................................................................ 13

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990)................................................................ 30

*Royal Thai Gov't v. United States,*
    978 F. Supp. 2d 1330 (Ct. Int'l Trade 2014) ................................................................ 35

*Samsung Int'l v. United States,*
    887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012) ................................................................ 29

*Shandong Huarong Gen. Corp. v. United States,*
    159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ................................................................ 9

*Sichuan Changhong Elec. Co. v. United States,*
    460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006) ................................................................ 8

*Sichuan Changhong Elec. Co. v. United States,*
    460 F. Supp. 2d 1338 (Ct. Int'l Trade 2006) ................................................................ 14

*Sigma Corp. v. United States,*
    117 F.3d 1401 (Fed. Cir. 1997)................................................................ 32

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976)................................................................ 35, 37, 38, 39

*Since Hardware (Guangzhou) Co. v. United States,*
    977 F. Supp. 2d 1347 (Ct. Int'l Trade 2014) ................................................................ 21

*Stanley Works (Langfang) Fastening Sys., Ltd. v. United States,*
    279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ................................................................ 31

*Thai Plastic Bags Industries Co., Ltd. v. United States,*
    949 F. Supp. 2d 1298 (Ct. Int'l Trade 2013) ................................................................ 19

*Union Steel v. United States,*
713 F.3d 1101 (Fed. Cir. 2013)........................................................................ 36

*United States v. Eurodif S.A.,*
555 U.S. 305 (2009).......................................................................................... 6

*United States v. L.A. Tucker Truck Lines, Inc.,*
344 U.S. 33 (1952)............................................................................................ 42

*Yantai Xinke Steel Structure Co. v. United States,*
Ct. No. 10-00240, 2014 WL 1387529, (Ct. Int'l Trade Apr. 9, 2014) ....... 20, 25

*Zhanjiang Guolian Aquatic Prods. Co. v. United States,*
991 F. Supp. 2d 1339 (Ct. Int'l Trade 2014) .................................................. 39

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
652 F.3d 1333 (Fed. Cir. 2011)............................................................. 9, 19, 31

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) ............................................................................... 6

19 U.S.C. § 1671(a) .................................................................................... 23, 26

19 U.S.C. § 1675(a)(2)(A) ............................................................................... 35

19 U.S.C. § 1677(5) .................................................................................... 23, 28

19 U.S.C. § 1677(5B) .................................................................................. 23, 28

19 U.S.C. § 1677b(c)(1)(B) ............................................................................... 8

19 U.S.C. § 1677b(c) ........................................................................................ 8

19 U.S.C. § 1677f-1(d)(1)(A)(i) ...................................................................... 36

19 U.S.C. § 1677f-1(d)(1)(B) .......................................................................... 36

19 U.S.C § 1673............................................................................................... 7

28 U.S.C. § 2637(d) ........................................................................................ 40

## REGULATIONS

19 C.F.R. § 351.309(c)(2) ............................................................................... 41

19 C.F.R. § 351.404(f) ..................................................................................... 33

19 C.F.R. § 351.414(c)(1) ................................................................ 36

19 C.F.R. § 351.414(c)(2) ................................................................ 36

**<u>OTHER AUTHORITIES</u>**

*Sparklers from the People's Republic of China*,
   56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) ................ 32

*Silicon Carbide from the People's Republic of China*,
   59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) ................ 32

*Polyethylene Terephthalate Film Sheet, and Strip from India*,
   71 Fed. Reg. 7,534 (Dep't of Commerce Feb. 13, 2006) ................ 25

*Wooden Bedroom Furniture from the People's Republic of China*,
   73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008) ............... 22

*1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China*,
   74 Fed. Reg. 10,545 (Dep't of Commerce Mar. 11, 2009) ............... 21

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   74 Fed. Reg. 29,473 (Dep't of Commerce June 15, 2009) ............... 23

*Wooden Bedroom Furniture from the People's Republic of China*,
74 Fed. Reg. 41,374 (Dep't of Commerce Aug. 17, 2009) ............... 18

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*,
   76 Fed. Reg. 56,158 (Dep't Commerce Sept. 12, 2011) ................ 29

*Certain Preserved Mushrooms from the People's Republic of China*,
   76 Fed. Reg. 56,732 (Dep't of Commerce Sept. 14, 2011) ............... 21

*Citric Acid and Certain Citrate Salts from the People's Republic of China*,
   76 Fed. Reg. 77,772 (Dep't of Commerce Dec. 14, 2011). ............... 30

*Certain Preserved Mushrooms from the People's Republic of China*,
   77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) ............... 8

*Circular Welded Carbon-Quality Steel Pipe from India*,
   77 Fed. Reg. 64,468 (Dep't of Commerce Oct. 22, 2012) ............... 20

*Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*,
   85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) ............... 3

*Certain Quartz Surface Products from India*,
    85 Fed. Reg. 25,398 (Dep't of Commerce May 1, 2020) ................................................ 24

*Mattresses From the Socialist Republic of Vietnam*,
    85 Fed. Reg. 69,591 (Dep't of Commerce Nov. 3, 2020).............................................. 3, 4

*Mattresses From the Socialist Republic of Vietnam*,
    86 Fed. Reg. 15,889 (Dep't of Commerce Mar. 25, 2021) ....................................... 2, 4, 5

*Welded Line Pipe From the Republic of Korea*,
    86 Fed. Reg. 58,253 (Dep't of Commerce Oct. 21, 2021).............................................. 40
Omnibus Trade and Competitiveness Act of 1988,
    H.R. Rep. No. 100-576 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547 ...... 22

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | | |
|---|---|---|
| _____ | ) | |
| ASHLEY FURNITURE INDUSTRIES, LLC, | ) | |
| ASHLEY FURNITURE TRADING COMPANY, | ) | |
| WANEK FURNITURE CO., LTD., | ) | |
| MILLENNIUM FURNITURE CO., LTD., AND | ) | |
| COMFORT BEDDING COMPANY LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Court No. 21-00283 |
| | ) | |
| Defendant, | ) | |
| | ) | PUBLIC VERSION |
| and | ) | |
| | ) | |
| BROOKLYN BEDDING, LLC, CORSICANA | ) | |
| MATTRESS COMPANY, ELITE COMFORT | ) | |
| SOLUTIONS; FXI, INC., INNOCOR, INC., | ) | |
| KOLCRAFT ENTERPRISES INC., LEGGETT & | ) | |
| PLATT, INCORPORATED, THE | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, and UNITED STEEL, PAPER AND | ) | |
| FORESTRY, RUBBER, MANUFACTURING, | ) | |
| ENERGY, ALLIED INDUSTRIAL AND | ) | |
| SERVICE WORKERS INTERNATIONAL | ) | |
| UNION, AFL-CIO, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION TO PARTIALLY DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD AND

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motion for judgment upon the agency record filed by

plaintiffs Ashley Furniture Industries, LLC (AFI) (previously Ashley Furniture Industries, Inc.),

Ashley Furniture Trading Company (AFTC), Wanek Furniture Co., Ltd. (Wanek), Millennium

Furniture Co., Ltd. (Millennium), and Comfort Bedding Company Limited (Comfort Bedding) (collectively, plaintiffs). Ashley Br., ECF No. 39. Because the final determination of the United States Department of Commerce (Commerce) in the antidumping duty investigation covering mattresses from Vietnam is supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court sustain Commerce's final determination. In addition, because of a lack of injury-in-fact, the plaintiffs do not possess standing and the Court should dismiss Count IV of the second amended complaint.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.  Administrative Determination Under Review

Plaintiffs challenge Commerce's final determination in the antidumping duty investigation covering mattresses from the Socialist Republic of Vietnam. *See Mattresses From the Socialist Republic of Vietnam*, 86 Fed. Reg. 15,889 (Dep't of Commerce Mar. 25, 2021) (final LTFV determ.) (P.R. 525), and accompanying Issues and Decision Memorandum (Dep't of Commerce Mar. 18, 2021) (IDM) (P.R. 505). The investigation covers entries or sales of mattresses from Vietnam made July 1, 2019, through December 31, 2019. *Id.*

### II.  Issues Presented For Review

1.  Whether substantial evidence supports Commerce's selection of Emirates Sleep's financial statements for calculating the surrogate financial ratios.

2.  Whether substantial evidence supports Commerce's selection of Indian Harmonized Tariff Schedule (HTS) 7320.90.90 as a surrogate value for spring coil innerspring units.

3.  Whether Commerce's determination that AFI and AFTC failed to show that they were eligible for a separate rate is supported by substantial evidence and in accordance with law.

4.     Whether the Court should dismiss Count IV of the second amended complaint because the plaintiffs do not have standing as they failed to allege an injury-in-fact with respect to the differential pricing analysis.

5.     Whether, alternatively, plaintiffs failed to exhaust their administrative remedies regarding the differential pricing analysis.

## STATEMENT OF FACTS

### I.     Initiation Of Review

On April 20, 2020, Commerce initiated an antidumping duty investigation covering mattresses from Vietnam.  *See Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation notice) (P.R. 57).  Commerce selected Wanek and Vietnam Glory Home Furnishings Co., Ltd. (Vietnam Glory) as mandatory respondents. Respondent Selection Memorandum (May 15, 2020) (P.R. 107, C.R. 47).

On June 1, 2020, Wanek, Millennium, and Comfort Bedding submitted separate rate applications.  Wanek Separate Rate Application (SRA) (June 1, 2020) (P.R. 158, C.R. 87-90); Millennium SRA (June 1, 2020) (P.R. 156-157, C.R. 80-82); Comfort Bedding SRA (June 1, 2020) (P.R. 159, C.R. 84-86).  Each application indicated that AFI and AFTC re-invoice -- that is, AFI and AFTC send a second or subsequent invoice for the same goods, but neither AFI nor AFTC submitted separate rate applications.

### II.     Preliminary Determination

On November 3, 2020, Commerce issued its preliminary determination.  *Mattresses From the Socialist Republic of Vietnam*, 85 Fed. Reg. 69,591 (Dep't of Commerce Nov. 3, 2020) (prelim. determ.) (P.R. 524), and accompanying preliminary decision memorandum (PDM) (P.R.

437).  Commerce preliminarily collapsed Wanek, Millennium, and Comfort Bedding (Collapsed Entity) into a single entity but did not include AFI or AFTC in that entity.  PDM at 8-9; Preliminary Collapsing Memorandum (Oct. 27, 2020) (P.R. 441, C.R. 619).  Commerce also preliminarily granted the Collapsed Entity separate rate status.  PDM at 22.

Commerce preliminarily selected India as the primary surrogate country and selected financial statements from an Indian company, Emirates Sleep, to calculate the surrogate financial ratios.  *Id.* at 10.  In addition, Commerce preliminarily determined "to use {Indian} HTS code 7320.90.90 to value {plaintiffs'} innerspring" unit inputs.  *Id.* at 19; *see also* Preliminary Surrogate Value Memorandum (Oct. 27, 2020) (P.R. 449).

Finally, Commerce preliminarily calculated an antidumping rate of 190.79 percent for entries produced and exported by the Collapsed Entity, 989.90 percent for entries produced and exported by Vietnam Glory, 190.79 percent for separate rate companies, and 989.90 percent for the Vietnam-wide entity.  *Preliminary Determination*, 85 Fed. Reg. at 69,592.

## III.    <u>Final Determination</u>

After considering the interested parties' comments on the *Preliminary Determination*, Commerce issued its *Final Determination*.  *See Final Determination*, 86 Fed. Reg. at 15,889.  Commerce continued to find that Emirates Sleep's financial statements and Indian HTS code 7320.90.90 were the best available information on the record to calculate financial ratios and to value the innerspring unit input, respectively.  IDM at 28, 42.  Commerce also declined to add AFI and AFTC in the Collapsed Entity's combination cash deposit rate because neither company had been collapsed with the Collapsed Entity.  *Id.* at 52-53.  AFI and AFTC also did not submit a separate rate application.  *Id.*

Thus, Commerce calculated an antidumping rate of 144.92 percent for the entries produced and exported by the Collapsed Entity, 668.38 percent for entries produced and exported by Vietnam Glory, 144.92 percent for separate rate companies, and 668.38 percent for the Vietnam-wide entity. *Final Determination*, 86 Fed. Reg. at 15,891.

## SUMMARY OF THE ARGUMENT

Commerce's final determination is supported by substantial evidence and in accordance with law. First, substantial evidence supports Commerce's selection of Emirates Sleep's financial statements because those statements constituted the best available information on the record, despite not being contemporaneous with the period of review by only one fiscal year. Commerce also reasonably explained why it did not use the financial statements of another Indian company, Sheela Foam, because those financial statements contained evidence of receipt of countervailable subsidies.

Second, Commerce's selection of Indian HTS 7320.90.90 as a surrogate value for spring coil innerspring units is reasonable and supported by substantial evidence. Indian HTS 7320.90.90 expressly covers springs of iron or steel of coil, other than coil spring for railways, tramways or spring pins, whereas HTS 9404.29.90, which plaintiffs advocate for, covers items that are dissimilar to the innerspring coil unit. Contrary to plaintiffs' argument, Commerce was not required to follow United States Custom and Border Protection (CBP) rulings for the U.S. HTS code and considered, but disagreed with, the six Indian classification opinions. Plaintiffs also failed to provide sufficient evidence that the resulting surrogate values were aberrational.

Third, Commerce's determination that AFI and AFTC had not shown that they were eligible for a separate rate status is in accordance with law. To obtain a separate rate, companies are required to follow the procedures in the initiation notice and submit a separate rate

application, which neither AFI nor AFTC did. As a result, Commerce declined to assign either company a combination rate that is separate from the Vietnam-wide entity.

Finally, because Commerce ultimately used the average-to-average method and the results of the Cohen's *d* test in the differential pricing analysis did not change Commerce's calculation of a weighted-average dumping margin, plaintiffs have not shown an injury-in-fact and this Court should dismiss Count IV of the second amended complaint. Alternatively, plaintiffs failed to exhaust their administrative remedies with respect to Count IV because they did not challenge the use of the average-to-average method in their administrative case brief, and none of the exceptions to the exhaustion requirement apply.

## ARGUMENT

### I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, when Congress has entrusted an agency to administer a statute in fact-intensive inquiries, the agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). "{T}he Court may not substitute its judgment for that of {Commerce} when the choice is between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation omitted). Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

## II.    <u>Non-Market Economy Legal Framework</u>

The antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price." 19 U.S.C § 1673. If the proceeding involves products from a non-market economy, and Commerce determines that available information does not permit a standard normal value calculation, then Commerce determines normal value on the basis of surrogate values for "the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1). This statutory scheme "construct{s} a hypothetical market value" of the subject merchandise in the non-market economy. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

The statute then requires Commerce to value a respondent's factors of production using the "best available information." 19 U.S.C. § 1677b(c)(1)(B). "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). The data selected need not be perfect, *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014), and the statute "does not mandate that Commerce use any particular data source" in reaching its determination. *Guangdong Chems. Imp. & Exp. v. United States*, 460 F. Supp. 2d 1365, 1368-69 (Ct. Int'l Trade 2006).

This statutory gap leaves Commerce with considerable discretion to determine what constitutes the best available information. *See Nation Ford Chem. Co.*, 166 F.3d at 1377 ("While {19 U.S.C.} § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines."). In filling this gap, Commerce has established several criteria that it considers as part of its analysis, including whether the data is "product-specific, representative of a broad market average, publicly available, contemporaneous with the period of review, and free of taxes and duties." *See, e.g.*, *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) (final results of admin. review), and accompanying IDM at 9.

Commerce's surrogate value choice is supported by substantial evidence if the data bears "a rational and reasonable relationship to the factor of production it represents." *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1191 (2004); *accord Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 719 (Ct. Int'l Trade 2001). A

reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011); *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable").

Finally, this Court has recognized that, although "the standard of review precludes the court from determining whether {Commerce's} choice of surrogate values was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices." *CITIC Trading Co. v. United States*, 27 C.I.T. 356, 366 (2003); *see also Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (declining to conduct own evidentiary evaluation).

## III. Substantial Evidence Supports Commerce's Determination To Use Emirates Sleep's Financial Statements Because They Were The Best Available Information

Substantial evidence supports Commerce's selection of Emirates Sleep's financial statements as a surrogate value for calculating the financial ratios. Although both Emirates Sleep and Sheela Foam are companies in the primary surrogate country, India, Commerce determined that both sources of information were flawed because Emirates Sleep's financial statements were non-contemporaneous, and Sheela Foam's financial statements contained receipt of countervailable subsidies. *See* PDM at 34; IDM at 30. However, Commerce determined that Emirates Sleep's financial statements otherwise satisfied the surrogate value criteria and were the best available information. *See* IDM at 28-36. Plaintiffs make numerous arguments advocating

for Commerce to instead use the Sheela Foam financial statements, but as we explain below, these arguments lack merit. *See* Ashley Br. at 11-35.

> **A.** **Commerce's Determination That The Emirates Sleep Financial Statements Were The Best Available Information Is Supported By Substantial Evidence**

Commerce explained in the final determination that it used the Emirates Sleep financial statements "because it showed a profit, was publicly available, representative of a broad market average, and exclusive of those who received subsidies from Indian programs {it has} found to be countervailable." IDM at 28-29. Commerce then addressed the numerous arguments that plaintiffs had made in their administrative case brief. *See id.*

First, Commerce explained that it determined the financial statements were both complete and reliable. *Id.* at 29-30. Although Commerce's practice is to disregard incomplete financial statements, Commerce determined that "{t}he Emirates Sleep financial statements, while missing certain annexures, is complete for purposes of calculating financial ratios" because they included "the audited financial statements, auditors report, and auditors notes, which satisfies Commerce's requirements for sourcing surrogate financial statements." *Id.* at 29. Commerce addressed the various missing annexures cited by plaintiffs and determined that "{t}he missing annexures constitute information related to the sub-parts of line items in the Emirates Sleep financial statements," and that Commerce considered this to be "supplemental details not forming part of the Emirates Sleep financial statements and unnecessary for Commerce purposes of calculating surrogate financial ratios." *Id.* at 30.

Second, Commerce acknowledged that the Emirates Sleep financial statements are not contemporaneous with the period of investigation, but explained that "{w}hile the Emirates Sleep financial statement is not contemporaneous, the only other financial statement on the record, Sheela Foam, has evidence of countervailable subsidies." *Id.* But Commerce explained

that the Emirates Sleep financial statements were the best available information because they "show{ed} a profit, are publicly available and show production of subject merchandise." *Id.* at 31. Moreover, the Emirates Sleep financial statements "are non-contemporaneous by a *single* fiscal year" and "this does not outweigh evidence of countervailable subsidies in the Sheela Foam financial statements." *Id.* (emphasis added).

Third, Commerce determined that Emirates Sleep's business operations are similar to the plaintiffs'. *Id.* at 31-32. Contrary to plaintiffs' assertion, Commerce explained that "record evidence demonstrates that {the Collapsed Entity} in Vietnam does incur showroom expenses" like Emirates Sleep. *Id.* at 31. Although Emirates Sleep's revenue is less than the Collapsed Entity's, Commerce's "practice is to disregard the magnitude of a company's revenue when choosing the appropriate surrogate financial statements to calculate ratios." *Id.* Moreover, Commerce explained that there was no record evidence to show that Emirates Sleep's financial statements "would lead to distortive financial ratios due to this difference in revenue." *Id.*

Further, Commerce declined to make individual line item adjustments to the financial statements on the basis that showroom expenses should be excluded from selling, general, and administrative (SG&A) expenses. *Id.* at 32-33; *id.* at 33 (explaining that Commerce "avoids adjusting individual line items in surrogate financial statements because such distortions may introduce unintended distortions into the data under the guise of increasing accuracy"). This was because it is Commerce's "practice to include all expenses that are standard sales expenses in the surrogate country's home market and deductions will only be made when there is an exact correlation between the expenses incurred by the respondent in the U.S. and those incurred by the surrogate in the surrogate country." *Id.* at 32. And here, the plaintiffs had "presented no record evidence" of this correlation. *Id.* Likewise, Commerce explained that there was no

record evidence showing that the SG&A rate was aberrational, because the "{plaintiffs} provided no comparison data with which to analyze the Emirates Sleep SG&A ratio," and Commerce rejected the argument that the rate was aberrational merely because it bore "no resemblance to {their} expenses." *Id.* at 33-34.

Third, with respect to whether Emirates Sleep produces subject merchandise, Commerce determined that "the notes to the Emirates Sleep financial statements clearly indicate" that it "is involved in the manufacturing of all types and kinds of mattresses." *Id.* at 34.

Next, Commerce determined that the Emirates Sleep financial statements were publicly available, despite being accessible only through a subscription service. *Id.* at 35-36. "While part of the process of obtaining the Emirates Sleep financial statements may involve paying a fee," Commerce explained that it has previously "found that a financial statement need not be free of charge for it to be publicly available," and, moreover, no party argued that the fee in this instance was "too high." *Id.* at 36.

Finally, Commerce explained that the Emirates Sleep financial statements were the best available information because, unlike Sheela Foam, they did not contain evidence of subsidies. *Id.* at 34-35. It is Commerce's practice to not rely on financial statements that contain evidence of subsidies, and Commerce explained that it had previously found an "investment subsidy and duty drawback subsidy to be countervailable in previous proceedings," and "that the names of the programs found in the Sheela Foam financial statements are the *same names* Commerce previously found countervailable." *Id.* (emphasis added). Thus, Commerce explained that because "the Sheela Foam financial statements show receipt of subsidies previously found by Commerce to be countervailable, and it is not Commerce's practice to consider the amount of the

benefit received when analyzing surrogate financial statements, {its} only consideration is whether there is better information on the record." *Id.* at 35.

Therefore, Commerce determined that "Emirates Sleep financial statements represent the best information available on the record for calculating surrogate financial ratios because they meet all of Commerce's criteria for {surrogate values}," other than being non-contemporaneous by a single year, "and, unlike the financial statements of Sheela Foam, evince no receipt of subsidies {Commerce had} previously found to be countervailable." *Id.* at 30-31, 36; *see also QVD Food Co. v. United States,* 721 F. Supp. 2d 1311, 1316-17 (Ct. Int'l Trade 2010) (explaining that when Commerce is presented with a choice between imperfect alternatives, Commerce may find that a non-contemporaneous financial statement to be the best available information on the record); *Jinko Solar Co. v. United States,* 229 F. Supp. 3d 1333, 1350-51 (Ct. Int'l Trade 2017) (describing Commerce's practice to not rely on financial statements when evidence of receipt of countervailable subsidies is present and other usable financial statements are available). This decision is supported by substantial evidence and should be sustained.

**B.      The Court Should Reject Plaintiffs' Various Arguments Challenging The Emirates Sleep Financial Statements**

Although Commerce reasonably determined that the Emirates Sleep financial statements are the best available information, plaintiffs argue that the financial statements are flawed for various reasons. Plaintiffs argue that the Emirates Sleep financial statements are not contemporaneous with the period of investigation, are incomplete, do not reflect the business operations of the respondents, and are not publicly available. *See* Ashley Br. at 11-27. These arguments lack merit, as we explain below.

### 1. The Emirates Sleep Financial Statements Were Non-Contemporaneous Only By A Single Fiscal Year

First, plaintiffs argue that Emirates Sleep's financial statements were non-contemporaneous with the period of investigation. Ashley Br. at 13. Although contemporaneity is an important factor in Commerce's selection of surrogate value, Commerce will rely on less contemporaneous data if that data is more accurate or reliable than the available contemporaneous data. *See, e.g.*, *Qingdao Sea-line Trading*, 766 F.3d at 1386 (sustaining Commerce's determination to use a non-contemporaneous surrogate value because the data's product specificity outweighed the importance of contemporaneity); *Home Meridian Int'l, Inc. v. United States*, 865 F. Supp. 2d 1311, 1319 (Ct. Int'l Trade 2012) (stating that "Commerce frequently uses non-{period of review} values for a variety of reasons" and that "Commerce cannot create a blanket rule that prevents it from comparing the merits of contemporaneous and non-contemporaneous data, and thereby prevents Commerce from determining the best available information"); *Sichuan Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338, 1358-59 (Ct. Int'l Trade 2006) (holding that Commerce was not unreasonable in choosing non-contemporaneous, but more reliable data, as the surrogate value).

Here, Commerce determined that the non-contemporaneity in Emirates Sleep's financial statements did not render the data less reliable than the data tainted by the evidence of receipt of countervailing subsidies in Sheela Foam's financial statements. *See* IDM at 30-31. Indeed, Commerce explained that the Emirates Sleep financial statements were "non-contemporaneous by a *single* fiscal year." *Id.* at 31 (emphasis added).

### 2. Emirates Sleep's Financial Statements Were Complete And Reliable Enough To Use To Calculate Financial Ratios

Second, plaintiffs argue that Emirates Sleep's financial statements were incomplete because they were "missing *multiple* annexures." Ashley Br. at 17 (emphasis in original). In comparison, plaintiffs assert that Sheela Foam's financial statements were complete and were the better source of information. *See id.* at 19.

However, incompleteness alone is not sufficient to reject a financial statement. *Ass'n of Am. Sch. Paper Suppliers, v. United States*, 791 F. Supp. 2d 1292, 1303-04 (Ct. Int'l Trade 2011). Rather, when Commerce rejects incomplete financial statements, it "has often explicitly focused on the importance of the missing information{.}" *Id.* at 1303. Although plaintiffs cite *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020), for the proposition that Commerce "reject{s} incomplete financial statements where they were missing information vital to Commerce's calculations" and can instead rely on financial statements that contained evidence of countervailable subsidies, Ashley Br. at 18, the United States Court of Appeals for the Federal Circuit *also* held that this Court should sustain Commerce's determination when it has "sufficiently explained its reason for choosing between two flawed financial statements." *CP Kelco*, 949 F.3d at 1359.

Indeed, in *CP Kelco*, Commerce rejected the incomplete financial statements of a company because they were "missing complete translations for two paragraphs of the property plant and equipment (i.e., fixed asset) footnote, a key component of a company's financial statements." *Id.* And Commerce further explained that without a translation of the fixed asset footnote, which "supports the use of depreciation expense, a critical component in ratio calculations{,}" it was unable to calculate the "denominator of the selling, general and administrative (SG&A) expense and profit ratios." *Id.* Thus, the Court affirmed Commerce's

rejection of the incomplete financial statements and its decision to use financial statements with countervailable subsidies instead. *See id.* at 1358-59.

Here, Commerce specifically explained why the missing annexures did not render Emirates Sleep's financial statements unusable or unreliable. *See* IDM at 29. For example, Emirates Sleep's financial statements included "the audited financial statements, auditors report, and auditors notes, which satisfies Commerce's requirements for sourcing surrogate financial statements." *Id.* Commerce also explained how each missing annexure had no bearing on Commerce's calculation of its financial ratios, and determined that "Emirates Sleep financial statements, while missing certain annexures, is complete for purposes of calculating financial ratios." *Id.* at 29-30.

Plaintiffs, however, speculate that Annexure 5 must have information about potential countervailable subsidies and also allege that Commerce impermissibly speculated that Annexure 5 references balances, not countervailable government loans. Ashley Br. at 18-19. But plaintiffs' belief that Annexure 5 has evidence of countervailable subsidies is not substantiated. For example, Commerce explained that the Emirates Sleep's financial statement states, "Note 13 – Short-term loans and advances" with parts (a) to (c), and in particular, part (b) of Note 13 states, "(b) Balances with government authorities (Refer Annexure – 5)." IDM at 30; *see also* Petitioner Surrogate Value Cmts. (July 30, 2020) (P.R. 276), at Exhibit 11. Commerce observed that "this line item does not reference government loans, *only balances*" and "only non-market based government loans would be distortive and there is no record evidence that the line item balances with government authorities is a loan or distortive." IDM at 30 (emphasis added).

Further, Commerce explained that it "consider{ed} the missing annexures . . . to be supplemental details not forming part of the Emirates Sleep financial statements and unnecessary

for Commerce purposes of calculating surrogate financial ratios." *Id.* This was because the "missing annexures constitute information related to the sub-parts of line items" and the "line items include explanatory notes." *Id.*; *id.* at 29 (explaining the line items have "no bearing on {Commerce's} financial ratio calculations").

Plaintiffs may disagree with Commerce's conclusion considering the evidence, but that does not undermine Commerce's determination. *See Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence.") (citing *Fujitsu*, 88 F.3d at 1044). At bottom, plaintiffs' argument is an invitation for this Court to "reweigh this evidence, {which} this {C}ourt may not do{.}" *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015). Thus, the Court should find that Commerce reasonably explained why the Emirates Sleep financial statements were complete enough and reliable to be used for calculating surrogate financial ratios. IDM at 30.

### 3. Emirates Sleep's Financial Statements Reflect The Business Operations Of The Collapsed Entity In Vietnam

Plaintiffs argue that Emirates Sleep's financial statements do not reflect the Collapsed Entity's business operations in Vietnam. Ashley Br. at 20. Specifically, they claim that Emirates Sleep's primary business is retail and not manufacturing. *Id.* at 20-21. However, although Emirates Sleep may engage in retail, Commerce explained that Note 1 of Emirates Sleep's financial statements states Emirates Sleep is "a manufacturing company basically into the manufacturing of all types and kinds of mattresses, bases and other sleep related products and systems." Petitioner Surrogate Value Cmts at Exhibit 11; *see also* IDM at 34.

Plaintiffs also contend that Emirates Sleep is a smaller company and there is "disparity in revenue," Ashley Br. at 21, but "Commerce's practice is to disregard the magnitude of a company's revenue when choosing the appropriate surrogate financial statements to calculate ratios." IDM at 31; *see also Wooden Bedroom Furniture from the People's Republic of China*, 74 Fed. Reg. 41,374 (Dep't of Commerce Aug. 17, 2009), and accompanying IDM at 39 ("{Commerce's} practice is to disregard company size as a basis upon which to determine the representative nature of a company's financial statements"). As Commerce explained, "there is no information that establishes that using Emirates Sleep's financial statements, which show less revenues than {the Collapsed Entity}, would lead to distortive financial ratios due to this difference in revenue, thus rendering Emirates Sleep financial statements inadequate." IDM at 31. Therefore, Commerce did "not consider{} company size in {its} analysis of which financial statement is appropriate to use for the final determination." *Id.*

Additionally, plaintiffs assert that the Collapsed Entity does not engage in retail activities in Vietnam, and that Emirates Sleep's "showroom expenses alone account for more than half of Commerce's total calculated SG&A expenses." Ashley Br. at 21-22. Plaintiffs also argue that Sheela Foam's financial statements are more comparable because it engages in manufacturing and has "similar operations." *Id.* at 23-24.

However, plaintiffs point to unsupported statements made in a letter to Commerce that the Collapsed Entity does not "own{} or operate{} any retail locations in Vietnam," *id.* at 22 (citing AFI Response to Petitioners Comments (Apr. 17, 2020) (P.R. 41)), whereas Commerce determined that the record evidence demonstrated that "{the Collapsed Entity} in Vietnam does incur showroom expenses" based upon an exhibit showing "an Ashley Furniture HomeStore in Ho Chi Minh City, Vietnam webpage{.}" IDM at 31. Specifically, the webpage for Ashley

Furniture HomeStore stated, "Visit your nearest Ashley HomeStore showroom today." Petitioners Initiation Supplemental Response (Apr. 8, 2020) (P.R. 23-24, C.R. 13-14), at Exhibit IX-Supp-9.

Commerce also explained why it declined to exclude showroom expenses from SG&A expenses, because it is Commerce's "practice to include all expenses that are standard sales expenses in the surrogate company's home market and deductions will only be made when there is an exact correlation between the expenses incurred by the respondent in the U.S. and those incurred by the surrogate in the surrogate country." IDM at 32. In other words, where there is information on the record "demonstrating a clear connection between showroom expenses incurred by Emirates Sleep in India and U.S. selling expenses incurred by" AFTC or AFI, Commerce could deduct such showroom expenses from SG&A, but there was no such information on this record. *Id.* This practice "serve{s} the goal of balancing increasing accuracy against the danger of introducing distortions in cases where either the difference between {non-market economy} and {market economy} producers or differences between the nationality of producers would make line-by-line comparisons misleading." *Thai Plastic Bags Industries Co., Ltd. v. United States*, 949 F. Supp. 2d 1298, 1306 (Ct. Int'l Trade 2013); *see also Dongguan Sunrise Furniture Co., Ltd. v. United States*, 865 F. Supp. 2d 1216, 1244 (Ct. Int'l Trade 2012) (sustaining Commerce's decision not to exclude selling costs from surrogate financial statement to match respondent's exact expenses).

Thus, although plaintiffs prefer that Commerce use Sheela Foam's financial statements, substantial evidence supports Commerce's determination that Emirates Sleep's business operations are similar to that of the Collapsed Entity's. *See* IDM at 31-34; *see also Downhole Pipe*, 776 F.3d at 1376-77; *Zhejiang DunAn*, 652 F.3d at 1341.

#### 4. Emirates Sleep's Financial Statements Were Publicly Available

Finally, plaintiffs argue that Emirates Sleep's financial statements were not publicly available because they are only available in a fee-based, subscription database. *See* Ashley Br. at 24-27. However, substantial evidence supports Commerce determination that Emirates Sleep's financial statements were publicly available. *See* IDM at 35-36.

As Commerce explained in the final determination, the "bar for public availability is that interested parties may independently access the information." *Id.* at 35; *see also Yantai Xinke Steel Structure Co. v. United States*, Ct. No. 10-00240, 2014 WL 1387529, at *15, (Ct. Int'l Trade Apr. 9, 2014) ("Commerce's concern is that other interested parties may not be able to independently access the information, and this is the bar that Commerce has reasonably set for public availability."). "The purpose of public availability is to ensure that interested parties are able to comment on the reliability and relevance of such information in the particular case." IDM at 35. Here, Commerce determined that "there is record evidence demonstrating that the Emirates Sleep financial statements was obtained from a non-proprietary source because {the Collapsed Entity} argued, and the petitioners agreed, that the Emirates Sleep financial statements were obtained through a subscription database." *Id.* at 36. Therefore, there is evidence that parties were able to independently access the information.

However, plaintiffs contend that Emirates Sleep's financial statements were not publicly available because they were from a subscription database and Commerce did not request a step-by-step explanation from the petitioners regarding how to access the financial statements. *See* Ashley Br. at 26-27. First, Commerce explained that the fact that information is from a subscription database does not mean that information is not publicly available. IDM at 36 (citing *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China*, 74 Fed. Reg.

10,545 (Dep't of Commerce Mar. 11, 2009), and accompanying IDM at Comment 1; *Certain Preserved Mushrooms from the People's Republic of China*, 76 Fed. Reg. 56,732 (Dep't of Commerce Sept. 14, 2011), and accompanying IDM at Comment 4).

Moreover, plaintiffs misunderstand Commerce's practice regarding public availability. As explained above, Commerce will normally use financial statements that are publicly available because of the importance of ensuring that interested parties are able to comment on the reliability and relevance of the information. *See Since Hardware (Guangzhou) Co. v. United States*, 977 F. Supp. 2d 1347, 1352 (Ct. Int'l Trade 2014) ("the primary purpose for obtaining publicly available information for financial statements 'is to ensure that all interested parties have access to such information, and are able to comment on the reliability and relevance of such information in the particular case, and not as much for purposes of obtaining broader information that reflects numerous transactions as is the case for material inputs.'") (citations omitted). Here, plaintiffs have made no claims about their inability or difficulty in commenting on the reliability or relevance of Emirates Sleep's financial statements during the investigation.

Commerce also acknowledged that it did not request further information (such as how to step-by-step access the information), but that the record reflected that plaintiffs had been able to locate Emirate Sleep's financial statements in a subscription database because they indicated that they knew that Emirate Sleep's financial statements were from a subscription database. *See* IDM at 36. Plaintiffs also did not argue that the subscription fee was too high. *Id.* Thus, Commerce determined that the purpose of public availability was met because plaintiffs did not claim difficulty in accessing Emirate Sleep's financial statements, and "a financial statement need not be free of charge for it to be publicly available." *Id.*

**C.      Commerce Properly Declined To Use The Sheela Foam Financial Statements Because They Contained Evidence Of Countervailable Subsidies**

Additionally, plaintiffs argue that Commerce should have used the Sheela Foam financial statements because there is no "conclusive evidence" that Sheela Foam received countervailable subsidies. *See* Ashley Br. at 28-33. And even if Sheela Foam received countervailable subsidies, Commerce also should have rejected the Emirates Sleep financial statements because there was alleged evidence of distortive government loans. *See id.* at 33-35. Between the two financial statements, plaintiffs assert that "no reasonable person could conclude that Emirates Sleep was superior to Sheela Foam" and that Sheela Foam is the *better* data on the record. *See id.* at 35. We explain below why Commerce reasonably declined to use the Sheela Foam financial statements, and why substantial evidence supports Commerce's determination to use the Emirates Sleep financial statements.

Commerce avoids "using any prices which it has reason to believe or suspect may be dumped or subsidized prices," consistent with the legislative history of the 1988 Omnibus Trade and Competitiveness Act. *See* Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 59 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24. The financial statements of a company receiving countervailable subsidies may not fairly reflect the company's actual experience, and using the statements in calculating the financial ratios could be distortive. *See, e.g.*, *Wooden Bedroom Furniture from the People's Republic of China*, 73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008), and accompanying IDM at Comment 1C. Thus, Commerce will reject financial statements of a company when there is reason to believe or suspect that the company may have received countervailable subsidies and there are other useable financial statements on the record. *See* IDM at 34-35.

In determining whether there is a "reason to believe or suspect" that financial statements reflect countervailable subsidies, Commerce examines the financial statements (and accompanying notes) and any other pertinent information placed on the record.  *See id.*  When reviewing the financial statements for evidence of countervailable subsidies, Commerce employs general guideposts:

> (1) If a financial statement contains a reference to a specific subsidy program found to be countervailable in a formal CVD determination, Commerce will exclude that financial statement from consideration. (2) If a financial statement contains only a mere mention that a subsidy was received, and for which there is no additional information as to the specific nature of the subsidy, Commerce will not exclude the financial statement from consideration.

*Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1359 (Ct. Int'l Trade 2011) (citing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 29,473 (Dep't of Commerce June 15, 2009), and accompanying IDM at 4-5)).  Thus, if a specific subsidy program is mentioned or identified within a company's financial statements, and that subsidy program has previously been determined to be countervailable, Commerce will exclude the financial statements from consideration.  *Id.*; *see also* 19 U.S.C. § 1671(a) (allowing duties to be imposed only upon a finding that a countervailable subsidy is being provided); 19 U.S.C. § 1677(5) & (5B) (differentiating countervailable and non-countervailable subsidies, respectively).

Here, plaintiffs argue that Sheela Foam's financial statements did not show receipt of countervailable subsidies.  Ashley Br. at 28.  However, Commerce found that it had reason to believe or suspect that Sheela Foam had received countervailable subsidies.  *See* IDM at 34-35. For example, Sheela Foam's financial statements showed "duty drawback" under "31. Revenue from Operations" and "Investment Subsidy received" under "32. Other Income."  Ashley Surrogate Value Cmts. at Exhibit SV-4, pgs. 119 and 120 (July 30, 2020) (P.R. 278-280).

Commerce explained that it had previously found the duty drawback program to be countervailable in *Certain Quartz Surface Products from India*, 85 Fed. Reg. 25,398 (Dep't of Commerce May 1, 2020), and accompanying IDM at 30 (stating that Commerce "determine{d} that the {duty drawback} Scheme confers a countervailable subsidy."). IDM at 35 n.241. Commerce had also previously determined that the investment subsidies program was countervailable. *See id.* at 35 n.240 (citing *Circular Welded Carbon-Quality Steel Pipe from India*, 77 Fed. Reg. 64,468 (Dep't of Commerce Oct. 22, 2012), and accompanying IDM at Comment 8). Therefore, because Sheela Foam's financial statements referred to specific subsidy programs that Commerce had previously found to be countervailable in formal countervailing duty investigations, Commerce had reason to believe or suspect that Sheela Foam's financial statements reflected countervailable subsidies. *See id.* at 34-35.

Plaintiffs contend that there was not *specific* evidence of countervailable subsidies. Ashley Br. at 31. However, as Commerce explained, the subsidy names in Sheela Foam's financial statements were *identical* to the names of subsidy programs Commerce had previously found to be countervailable. *See* IDM at 34-35. This Court has held that such an approach is reasonable. For example, in *Clearon*, Commerce found that a company's financial statements demonstrated that it had received a benefit from a "Capital Subsidy" program. 800 F. Supp. 2d at 1359. Plaintiff argued that although Commerce pointed to instances in which the term, "Capital Subsidy" was referenced, the financial statements omitted any references explaining the meaning of the term and it should instead be interpreted as contributions made by the majority owners of the company. *Id.* However, this Court held that Commerce's interpretation was reasonable and supported by substantial evidence, in that the "Capital Subsidy" term implicated a subsidy program that Commerce previously had found to be countervailable in *Polyethylene*

*Terephthalate Film Sheet, and Strip from India*, 71 Fed. Reg. 7,534 (Dep't of Commerce Feb. 13, 2006). *Id.* at 1360-61.

And although plaintiffs also argue for using the standard in *Fuyao Glass Industrial Group Co. v. United States*, 29 CIT 109, 114 (2005), Ashley Br. at 30, this Court has held that Commerce is not required to follow the *Fuyao* framework to determine whether financial statements reflect countervailable subsidies. *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 396 F. Supp. 3d 1334, 1348 (Ct. Int'l Trade 2019) ("Additionally, Commerce is not required to follow the *Fuyao* framework advocated for by Zhongji.") (citing *Gold East Paper (Jiangsu) Co. Ltd. v. United States*, 121 F. Supp. 3d 1304, 1307-08 (Ct. Int'l Trade 2015)). That is because this Court has held that *Fuyao* is not the only reasonable method for evaluating whether evidence meets the "believe or suspect" standard. *Gold East Paper*, 121 F. Supp. 3d at 1307-08. Moreover, *Fuyao* is not binding precedent and Commerce has consistently used the framework articulated in *Clearon*, instead. *See* IDM at 34-35 & n.238 (citing administrative reviews).

Plaintiffs' cite *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, 1351 (Ct. Int'l Trade 2018) and *Yantai Xinke* to support their argument but these cases are readily distinguishable. *See* Ashley Br. at 31-33. In *Yantai Xinke*, Commerce declined to find "Duty Entitlement on Exports" a countervailable subsidy when the subsidy previously found to be countervailable was "Duty Entitlement Pass Book Scheme." 2014 Westlaw 1387529, at *20-21. Moreover, plaintiffs ignore an important part of the Court's analysis in *Yantai Xinke*: "Thus, *except for countervailable subsidies*, the Department requires evidence of distortion before it will discard financial statements." *Id.* at *20 (emphasis added). In other words, Commerce does not need to prove distortion because countervailable subsidies are presumed distortive under the law.

Here, unlike in *Yantai Xinke*, the names of the subsidies in Sheela Foam's financial statements were *identical* to subsidies that Commerce previously had found countervailable. *See* IDM at 35.

In *Fine Furniture*, Commerce declined to find the term "Investment Subsidy" in a Romanian financial statement met its reason to believe or suspect standard because it had never previously found any subsidy programs to be countervailable in Romania and there was no other additional information about the subsidy. 353 F. Supp. 3d at 1351. Here, in contrast, the names of the subsidies in Sheela Foam's financial statements are identical to subsidy programs that Commerce has previously found countervailable in India. *See* IDM at 35. Therefore, substantial evidence supports Commerce's determination that Sheela Foam's financial statements reflected countervailable subsidies.

Finally, plaintiffs argue that Emirates Sleep's financial statements show receipt of distortive government loans and that Sheela Foam's financial statements are "superior." *See* Ashley Br. at 33-35. However, unlike the subsidies in Sheela Foam's financial statements, the alleged subsidies in Emirates Sleep's financial statement do not meet "the reason to believe or suspect" standard. As Commerce explained in the final determination, Note 13 to the financial statements references to "Balances with Government authorities (Refer Annexure -5)" and only balances are referenced, not government loans. IDM at 30. Plaintiffs also do not indicate which prior programs that Commerce found countervailable for India match the "balances with the government authorities" line item in Emirates Sleep's financial statements: indeed, the name does not even *reference* a loan. *See id*. Moreover, the possibility that Emirates Sleep *may have* received a loan is not sufficient; under the law, not all subsidies are countervailable or distortive. 19 U.S.C. §§ 1671(a), 1677(5) & (5B).

In sum, both Emirates Sleep's and Sheela Foam's financial statements were imperfect. However, Emirate Sleep's financial statements were only non-contemporaneous by one year and otherwise satisfied Commerce's surrogate value criteria, whereas Sheela Foam's financial statements reflected countervailable subsidies. IDM at 28-35. Because it is Commerce's practice to disqualify financial statements reflecting countervailable subsidies when there is other usable information on the record, Commerce declined to use Sheela Foam's financial statements and determined that Emirates Sleep's financial statements were the best available information on the record. *See id.* The Court should find that "Commerce sufficiently explained its reason for choosing between two flawed financial statements." *CP Kelco*, 949 F.3d at 1359.

## IV. Substantial Evidence Supports Commerce's Selection Of Indian HTS 7320.90.90 To Value Innerspring Units

Substantial evidence supports Commerce's selection of Indian HTS 7320.90.90 to value the innerspring coil units surrogate value input. *See* IDM at 42-45. Plaintiffs argue that Indian HTS 7320.90.90 was not specific to the Collapsed Entity's input and that Commerce should have instead relied on Indian HTS 9404.29.90. *See* Ashley Br. at 36-39. Plaintiffs also assert that Commerce's reliance on HTS 7320.90.90 yielded aberrational results. *See id.* at 39-42. These arguments are unavailing.

To value a factor of production, Commerce must first classify a factor of production under the relevant HTS, and then determine the price listed for goods classified under the tariff provision. *See* IDM at 42. In the final determination, Commerce explained that "HTS 7320.90.90 is a better category because it expressly covers springs of iron or steel of coil, other than coil spring for railways, tramways or spring pins, used by {the Collapsed Entity}, while HTS 9404.29.90 covers items that are dissimilar to the innerspring coil unit." *Id.* "Specifically, HTS 9404.29.90 covers completed mattresses of a material other than a spring interior and {the

Collapsed Entity} has described its innerspring coil units as being comprised of 'spring coil' and states that '{t}he compositions are steel wire, needle punched non-woven fabric and hot-melt glue'." *Id.*; *see also* Preliminary Surrogate Value Memorandum at 7. Commerce concluded that "HTS 9404.29.90 does not provide the best valuation of the innerspring coil units in question because it does not contain springs." *Id.*; *see also* Preliminary Surrogate Value Memorandum at 6 ("{plaintiffs} further describes its innerspring as an innerspring unit. However, the HTS code proposed by {plaintiffs}, 73209090, does not describe an innerspring, it describes a finished mattress.").

Plaintiffs assert that Commerce did not analyze the subheadings under the general rules of interpretation, that is, that "'classification shall be determined according to the terms of the headings and relative Section or Chapter notes.'" Ashley Br. at 37. But this Court has held that the general rules of interpretation are not binding when Commerce used HTS to approximate the cost of a factor of production. *See e.g.*, *Gleason Indus. Prods. v. United States*, 559 F. Supp. 2d 1364, 1370 (Ct. Int'l Trade 2008). Nonetheless, Commerce still "must articulate in what way the surrogate value chosen relates to the factor input." *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1309 (Ct. Int'l Trade 2006).

Plaintiffs argue that six Indian classification opinions support using the Indian HTS subheading 9404.29.90. Ashley Br. at 38-39. But Commerce explained that the HTS subheadings were not subheadings under the U.S. HTS code, but were *Indian* HTS subheadings, and Commerce also disagreed with the analysis presented in those opinions. *See* IDM at 43. Commerce explained that "{a}lthough the six Indian classification opinions opine that innerspring coil units used to produce mattresses should be classified under HTS 9404.29.90 (Mattresses of other materials, other), HTS 9404.29.90, by its description, is an 'other' category

covering articles of mattresses that do *not* contain springs." *Id.* (emphasis added). Moreover, HTS 7390.90.90 "contains springs which are a component of innerspring coil units" and even the plaintiffs had "described its innerspring {factors of production} input as 'spring coil' and also state{d} that 'the compositions are steel wire, needle-punched non-woven fabric and hot-melt glue.'" *Id.* Thus, based upon record evidence, Commerce disagreed that "innerspring coil units have the essential character of a mattress as determined by the six Indian classification opinions." *Id.*; *see also Dorbest*, 462 F. Supp. 2d at 1309.

Furthermore, Commerce also rejected CBP rulings of U.S. HTS codes because "{n}one of the CBP rulings involve Indian HTS codes or their interpretation" and as such are not "relevant to this analysis which involves the valuation of a Vietnamese {factor of production} which does not have an Indian HTS code." *Id.* Moreover, Commerce is not bound by either the CBP or six Indian classification opinions. *See Samsung Int'l v. United States*, 887 F. Supp. 2d 1330, 1338 n.18 (Ct. Int'l Trade 2012) ("Expert opinions are merely advisory, however, and are given weight only to the extent they are consistent with lexigraphic and other reliable sources.").

Second, plaintiffs claim that using Indian HTS 7320.90.90 to value pocket coil innerspring units yielded results that were aberrational. Ashley Br. at 39-42. To determine aberration, Commerce's "practice is to compare the surrogate values in question to the UN ComTrade average unit values ("AUVs") calculated for the same period using data from the other potential surrogate countries {Commerce} identified for the review, to the extent that such data are available." *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 76 Fed. Reg. 56,158 (Dep't Commerce Sept. 12, 2011), and accompanying IDM at 12. In *Certain Frozen Warmwater Shrimp from Vietnam*, the parties failed to place evidence on the record that would allow Commerce to determine whether the data were aberrational. *See id.*

Here, Commerce explained that "the existence of higher prices alone does not necessarily indicate that the price data are distorted or misrepresentative, and thus is not a sufficient basis upon which to exclude a particular {surrogate value}." IDM at 45. It is the responsibility of the parties to build the record, and Commerce explained that "{i}f a party presents sufficient evidence to demonstrate a particular {surrogate value} is aberrational, and therefore unreliable, Commerce will examine all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question." *Id.* Commerce determined, however, that the plaintiffs "provided insufficient evidence that the Indian value used in the *Preliminary Determination* is aberrational and not the best information available on the record." *Id.* at 45; *see also QVD Food*, 658 F.3d at 1324 ("Moreover, QVD is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that QVD itself failed to introduce into the record."); *Citric Acid and Certain Citrate Salts from the People's Republic of China*, 76 Fed. Reg. 77,772 (Dep't of Commerce Dec. 14, 2011) and accompanying IDM at Comment 12.

Finally, plaintiffs also claim that the data are aberrational because total contribution to normal value of the pocket coil innerspring unit surrogate value equates to [█] percent of the total net sales value. Ashley Br. at 41. However, although plaintiffs generally argued that the data are aberrational, they failed to present this specific argument in their case brief in the investigation and thus they failed to exhaust this argument. *See* Ashley Case Br. (C.R. 684); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (appellant waived argument even though it was characterized as "simply another angle to an issue" raised) (emphasis removed); *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1371 (Ct.

Int'l Trade 2018); *Stanley Works (Langfang) Fastening Sys., Ltd. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017).

Accordingly, substantial evidence supports Commerce's "articulat{ion} in what way the surrogate value chosen relates to the factor input," *Dorbest*, 462 F. Supp. 2d at 1308, and Commerce did not err when it concluded that Indian HTS 7320.90.90 was the best available information for valuing plaintiffs' innerspring coil units. *See* IDM at 42; *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1345 (Fed. Cir. 2011) ("Because Commerce's reading of the evidence was reasonable, the court rejects DunAn's challenge to Commerce's use of HTS 7407.21.10").

## V. Commerce's Determination That AFI And AFTC Should Not Be Assigned A Separate Rate Is Lawful

### A. Legal Framework

A company that receives "separate rate status" is one that is granted a company-specific rate separate from the rate assigned to the country-wide entity. *See, e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013). To grant separate rate eligibility, Commerce relies on an applicant's comprehensive submissions to determine its independence from a non-market economy entity. Policy Bulletin on the Topic of Separate Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (Apr. 5, 2005) (Policy Bulletin 05.1), available at http://enforcement.trade.gov/policy/bull05-1.pdf.4; *see also, e.g.*, *Diamond Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304, 1311-12 (Fed. Cir. 2017).

In a non-market economy antidumping investigation, Commerce presumes that all companies within the non-market economy country are subject to government control and should be assigned the country-wide rate. *Diamond Sawblades*, 866 F.3d 1304 at 1311-12. Every

company in an investigation will be given this calculated country-wide rate unless the company can affirmatively rebut the presumption of both *de jure* and *de facto* governmental control over its export activities.  *See id.*; *see also, e.g., Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003); *Sigma Corp. v. United States*, 117 F.3d 1401, 1404-06 (Fed. Cir. 1997).

To assess whether a company has met its burden and demonstrated freedom from government control, Commerce's analysis focuses on a company's decision-making process, including "export related investment, pricing, and output decisions at the individual firm level." *See Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991), as modified in *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994).  Specifically, Commerce relies on a test first established in *Sparklers from the People's Republic of China* to determine an absence of both *de jure* and *de facto* government control.  *Id.*

### B. AFI And AFTC Failed To Submit Their Own Separate Rate Applications

Plaintiffs argue that AFI and AFTC should have been included in the customs instructions with the Collapsed Entity because AFI and AFTC re-invoice exports made by Wanek, Millennium, and/or Comfort Bedding prior to importation to the United States.  Ashley Br. at 42-44.  However, Commerce's determination to exclude AFI and AFTC from the Collapsed Entity's separate rate and its resulting decision to follow that determination in its instructions to CBP is lawful, as we explain below.  *See* IDM at 52-53.

At initiation, Commerce explained that pursuant to its policy outlined in Policy Bulletin 05.1, it would "calculate combination rates for certain respondents that are eligible for a separate rate in a non-market economy investigation." *Initiation Notice*, 85 Fed. Reg. at 23,007.

Respondents were required to show eligibility for separate rate status for Commerce to calculate a combination rate applicable to those respondents, and were required to "submit a separate-rate application." *Id.* Yet, neither AFI nor AFTC submitted a separate application. IDM at 52.

Plaintiffs claim that AFI and AFTC may appear as the exporting party of subject merchandise, without submitting separate rate applications. *See* Ashley Br. at 43. However, there is no record evidence that "either company is a producer or exporter of subject merchandise from Vietnam, a criterion to receive a separate rate." IDM at 53. Commerce's separate rate analysis and test examines *exporters* but is not extended to producers (but plaintiffs do not claim producer status, in any event). *See* Policy Bulletin 05.1 at 6 ("Firms that produce the subject merchandise are not required to demonstrate their eligibility for separate rate status unless they also export the merchandise to the United States. The Department's separate rate test, which focuses exclusively on the respondent's export activities, is not being altered by the extension of combination rates to all {non-market economy} exporters receiving a separate rate."). Moreover, plaintiffs' claims of re-invoicing do not substitute nor allow for AFI nor AFTC to circumvent the proper procedures for obtaining a separate rate by submitting a separate rate application. *See* IDM at 52.

Although plaintiffs argue that the affiliation memorandum stated [███████████ ████████████████████████], Ashley Br. at 43, neither AFI nor AFTC are collapsed with the Collapsed Entity comprised of Wanek, Millennium, and Comfort Bedding, and no party challenges that determination. IDM at 52-53; *see also* 19 C.F.R. § 351.404(f). Because AFI and AFTC are not included within the Collapsed Entity, the rate that applies to entries produced and exported by the Collapsed Entity does not apply to AFI and AFTC. *See* IDM at 53.

Further, while plaintiffs may have "consistently requested that Commerce include AFI/AFTC in the customs instructions to avoid improper collection of duties," Ashley Br. at 42, the number of times that plaintiffs have made this request does not change the fact that, under Commerce's longstanding practice, exporters were required to submit a separate rate application for Commerce to calculate a combination rate to apply to the separate rate companies. *See Initiation Notice*, 85 Fed. Reg. at 23,007; IDM at 52-53. Moreover, while plaintiffs do not contest the antidumping duty rate assigned to the Collapsed Entity's exports of subject merchandise, "AFTC and AFI are U.S. companies and Commerce does not provide U.S. companies with a dumping rate." IDM at 53.

Therefore, Commerce reasonably declined to assign AFI and AFTC the combination rate calculated for entries produced and exported by the Collapsed Entity, and to include AFI and AFTC in the CBP instructions. *Id.*

## VI.    Count IV Of Plaintiffs' Second Amended Complaint Should Be Dismissed

Pursuant to Rule 12(b)(1) of the Rules of this Court, defendant, respectfully submits this partial motion to dismiss Count IV of the second amended complaint because the plaintiffs do not possess standing. For the reasons below, plaintiffs have failed to show an injury-in-fact or an actual case or controversy arising from Commerce's use of the average-to-average methodology.

Alternatively, because plaintiffs failed to challenge the application of the differential pricing analysis before Commerce, plaintiffs have failed to exhaust their administrative remedies.

### A.    Standard Of Revie

The plaintiff bears the burden of proving jurisdiction. *Juice Farms, Inc. v. United States*, 68 F.3d 1344, 1345 (Fed. Cir. 1995). "In deciding a Rule 12(b)(1) motion to dismiss that does

not challenge the factual basis for the complainant's allegations, the court assumes 'all factual allegations to be true and draws all reasonable inferences in plaintiff's favor.'" *Celta Agencies, Inc. v. United States*, 865 F. Supp. 2d 1348, 1352 (Ct. Int'l Trade 2012) (quoting *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).

Moreover, the jurisdiction of Federal courts is constitutionally limited to actions that involve actual cases or controversies. *Royal Thai Gov't v. United States*, 978 F. Supp. 2d 1330, 1332-33 (Ct. Int'l Trade 2014) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). To establish standing to bring a claim, a plaintiff must demonstrate an "injury in fact" that is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A further requirement to establish standing is that the injury is "fairly traceable to the challenged action" and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* Further, "{t}he Court of Appeals for the Federal Circuit and this Court have held that a respondent attempting to contest the results of an administrative antidumping duty proceeding in which it has prevailed in the entirety cannot demonstrate an injury in fact." *Jubail Energy Servs. Co. v. United States*, 125 F. Supp. 3d 1352, 1356 (Ct. Int'l Trade 2015).

### B. Differential Pricing Framework

In an antidumping proceeding, the statute directs Commerce to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (or constructed export price) and the normal value of merchandise. 19 U.S.C. § 1675(a)(2)(A). To perform this pricing comparison, Commerce may use one of three methodologies:

> (1) Average-to-transaction (A-T), in which Commerce compares the weighted average of the normal values to the export prices (or

constructed export prices) of individual transactions.

> (2) Average-to-average (A-A), in which Commerce compares the weighted average of the normal values to the weighted average of the export prices (or constructed export prices).

> (3) Transaction-to-transaction (T-T), in which Commerce compares the normal value of an individual transaction to the export price (or constructed export price) of an individual transaction.

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1340-41 (Fed. Cir. 2017)

(citing *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).

In general, antidumping duties are calculated using the average-to-average method or "comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A)(i); *see also* 19 C.F.R. § 351.414(c)(1) ("the Secretary will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case."). Commerce "will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made." 19 C.F.R. § 351.414(c)(2). The statute also provides that the average-to-transaction method can be used when "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce explains why such differences cannot be taken into account using the average-to-average method. 19 U.S.C. § 1677f-1(d)(1)(B).

Commerce uses its differential pricing analysis to determine whether the average-to-transaction method should be used. *See* PDM at 25. In the first stage of the differential pricing analysis, the Cohen's *d* test is applied to determine whether the respondent's pricing behavior, as exhibited in its reported prices in the U.S. market, differed significantly between purchasers,

regions, or time periods. *Id.* at 26. Next, the ratio test assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test. *Id.* at 25.

Then, in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences. *Id.* at 27. Even if some of a respondent's sales pass the Cohen's *d* test, if the ratio test shows that less than 33 percent of total sales passes the Cohen's d test or that the average-to-average method can appropriately account for such differences, Commerce will use the average-to-average method. *Id.* at 26-27.

### C. Because There Is No "Injury-in-Fact" With The Differential Pricing Analysis, The Court Does Not Possess Jurisdiction

#### 1. Relevant Factual Background

After Commerce initiated its investigation covering mattresses from Vietnam, it solicited information and parties were able to comment prior to the preliminary determination. In their pre-preliminary comments, plaintiffs argued that their sales structure was too complicated for the Cohen's *d* test. Ashley Pre-Preliminary Comments at 2-3 (Oct. 2, 2020) (P.R. 391, C.R. 515).

On November 3, 2020, Commerce issued its preliminary determination. Preliminary Determination, 85 Fed. Reg. at 69,591. Commerce preliminarily determined that although "75.60 percent of {plaintiffs'} export sales pass the Cohen's *d* test, and confirms the existence of a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods," "Commerce determine{d} that the average-to-average method can appropriately account for such differences." PDM at 28. Commerce determined that "there is not a meaningful difference in the weighted-average dumping margins when calculated using the average-to-average method and an alternative method based on the average-to-transaction method applied to the U.S. sales which pass the

Cohen's *d* test." *Id.* Thus, Commerce used "the average-to-average method for all U.S. sales to calculate the weighted average dumping margin for {plaintiffs}." *Id.*

Commerce then established a briefing schedule to allow for comments on the preliminary determination. Briefing Schedule (Dec. 14, 2020) (P.R. 483). Plaintiffs did not submit any challenges to Commerce's preliminary determination regarding the differential pricing analysis in their case brief. *See generally* Ashley Case Br. (C.R. 684). Commerce's determination regarding differential pricing remained unchanged in the final determination, and Commerce used the average-to-average method for all United States sales. Final Analysis Memorandum at 6 (Mar. 18, 2021) (P.R. 511, C.R. 694).

On June 11, 2021, and July 9, 2021, plaintiffs filed a summons and a complaint, respectively, to challenge Commerce's final determination. Summons, ECF No. 1; Compl., ECF No. 10. On June 28, 2021, plaintiffs amended their complaint to challenge Commerce's determination that plaintiffs' United States sales exhibited a pattern of export prices (or constructed export prices) that differed significantly among purchasers, regions, or time periods, using the Cohen's d test. First Am. Compl. ¶¶ 17, 25, ECF No. 18. A second amended complaint was later filed on August 6, 2021, to fix a clerical error in the first amended complaint. Second Am. Compl. ECF No. 24.

### 2. Plaintiffs Have Not Alleged An "Injury-In-Fact"

Plaintiffs challenge Commerce's finding that their United States sales exhibited an existence of a pattern of export prices (or constructed export prices) that differed significantly among purchasers, regions, or time periods, using the Cohen's *d* test. Second Am. Compl. ¶ 36. Citing *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), plaintiffs argue that "Commerce failed to explain whether {plaintiffs'} sales data conformed with the underlying

assumptions necessary for the Cohen's *d* test, specifically whether the test and comparison groups were normally distributed, equally variable, and equally numerous." Ashley Br. at 46-47. Further, they argue that the data "likely generate{d} false positives above the 0.8 threshold, invalidating the entire test." *Id.* at 47.

But plaintiffs have not alleged an "injury-in-fact" with respect to Commerce's application of differential pricing because Commerce used the "average-to-average" method and not the "average-to-transaction" method. *See* PDM at 27-28. When a party has prevailed, there is no injury-in-fact and no case or controversy. *See, e.g.*, *PAO Severstal v. United States*, 219 F. Supp. 3d 1411, 1414 (Ct. Int'l Trade 2017) (holding a prevailing party lacks standing to sue); *Zhanjiang Guolian Aquatic Prods. Co. v. United States*, 991 F. Supp. 2d 1339, 1342 (Ct. Int'l Trade 2014) (finding that a respondent receiving favorable outcome in antidumping determination lacks standing); *Jubail*, 125 F. Supp. 3d at 1356.

As explained above, the Cohen's *d* test and Commerce's differential pricing analysis is used to determine whether Commerce should use the average-to-transaction method over the average-to-average method that Commerce typically uses for calculating a weighted-average dumping margin. *See* PDM at 25. Even though the results of the Cohen's *d* test indicated a pattern of prices that differ according to customer, time period, or region, with 75.60 percent of the sales passing the Cohen's *d* test, Commerce still used its standard average-to average-method to all United States sales when calculating the weighted-average dumping margin because it determined that this method could account for such differences. *See id.* at 27-28; Final Analysis Memo at 6. Therefore, the results of the Cohen's *d* test did not change Commerce's calculation of a weighted-average dumping margin for the Collapsed Entity. *See id.* Thus, there is no injury that would be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560.

Indeed, when parties have challenged Commerce's differential pricing analysis, but Commerce determined that the average-to-transaction method should not be used and instead used the average-to-average method for calculating a weighted-average dumping margin, Commerce has found these arguments to be moot. *See e.g.*, *Welded Line Pipe From the Republic of Korea*, 86 Fed. Reg. 58,253 (Dep't of Commerce Oct. 21, 2021) (final admin. review), and accompanying IDM at Comment 2. Essentially, in such situations, plaintiffs seek an advisory opinion when they have suffered no injury and when the relief requested would not redress any injury. *See Camreta v. Greene*, 131 S. Ct. 2020, 2038 (2011) ("judicial Power is one to render dispositive judgments, not advisory opinions") (quotation omitted). Put another way, plaintiffs' "request is, in part, prospective because it seeks 'methodological clarity' as to how Commerce will conduct its {differential pricing} analysis in future cases," but "the {C}ourt's post-remand review of any such clarification would amount to an impermissible advisory opinion because the court would be opining on matters outside the scope of the instant case and controversy." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1357 n.53 (Ct. Int'l Trade 2018).

Therefore, because plaintiffs have suffered no injury-in-fact with respect to the application of the differential pricing analysis, the Court should dismiss Count IV of the second amended complaint.

### D. Alternatively, Plaintiffs Failed To Exhaust Administrative Remedies

Alternatively, the Court should decline to consider plaintiffs' differential pricing argument for failure to exhaust administrative remedies.

Congress has directed that "the Court of International Trade shall, where appropriate require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties

exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Also, Commerce's regulations *specifically* require a party to raise *all* arguments in a timely manner before the agency. *Corus Staal*, 502 F.3d at 1379 (citing 19 C.F.R. § 351.309(c)(2)). "The exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Id.* Finally, "general policies underlying the exhaustion requirement — 'protecting administrative agency authority and promoting judicial efficiency'"— would be vitiated if the Court were to consider arguments raised for the first time in judicial proceedings. *See id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). For these reasons, this Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id.*

Courts have recognized exceptions to exhaustion -- when exhausting remedies would have been "futile," the relevant matter is a "pure question of law," an intervening court decision would affect the agency's action, or a party had no reason to believe the agency would not follow established precedent. *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–48 (Fed. Cir. 2013).

Although plaintiffs argue that the application of the Cohen's *d* test is unreasonable because the underlying assumptions of the Cohen's *d* test were allegedly not met, Ashley Br. at 44-47, plaintiffs' case brief submitted to Commerce contained *no* arguments regarding differential pricing or the Cohen's *d* test. *See generally* Ashley Case Br. Parties are required by regulation to include all arguments relevant to Commerce's final determination, including arguments presented before the preliminary determination. *See* 19 C.F.R. § 351.309(c)(2).

If plaintiffs had raised their arguments about differential pricing in their case brief, then Commerce would have had the opportunity to consider and address these arguments in the final determination. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against *objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008) (emphasis added) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). However, plaintiffs did not raise these arguments before Commerce and, thus, failed to exhaust administrative remedies.

Moreover, none of the exceptions to exhaustion apply. As evidenced by plaintiffs' brief, their claim is not a purely legal question because it is grounded in the data and is dependent on the facts of this case. Ashley Br. at 45-47. Their claim also does not qualify for the futility exception because there is no indication that Commerce would not have considered or addressed the argument. The futility exception is also narrow and strictly viewed, and the "mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Corus Staal*, 502 F.3d at 1378-81.

Finally, the intervening judicial decision exception does not apply. Although *Stupp*, a precedential Federal Circuit opinion on differential pricing was issued after the final determination was published, "{t}o qualify for the intervening judicial decision exception, there must have been 'judicial interpretations of existing law after decision below and pending appeal-interpretations which if applied might have materially altered the result.'" *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1380 (Ct. Int'l Trade 2009) (quoting *Hormel v. Helvering*, 312 U.S. 552, 558-59 (1941) (footnote omitted)).

However, the Cohen's *d* test is part of Commerce's differential pricing analysis to determine the method of price comparison used in calculating the weighted-average dumping margin, and, therefore, even if *Stupp* had been issued before the final determination, it would not have materially impacted the result of Commerce's differential pricing analysis, which was to use the average-to-average method to calculate the weighted-average dumping margin. *See* PDM at 27-28. As such, the intervening judicial decision exception does not apply here. *See Gerber Food*, 601 F. Supp. 2d at 1380.

Thus, because plaintiffs failed to exhaust their administrative remedies with respect to this claim, the Court should decline to consider this argument.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain the final determination in its entirety and enter judgment in favor of the United States. We also respectfully request that this Court dismiss Count IV of plaintiffs' second amended complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                              s/Kara M. Westercamp
VANIA WANG                               KARA M. WESTERCAMP
Attorney                                 Trial Attorney
Department of Commerce                   U.S. Department of Justice
Office of the Chief Counsel              Civil Division
  for Trade Enforcement & Compliance   Commercial Litigation Branch
                                         P.O. Box 480
                                         Ben Franklin Station

Washington, D.C.  20044
Tel: (202) 305-7571

February 17, 2022                                    Attorneys for Defendant

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

_____
)
ASHLEY FURNITURE INDUSTRIES, LLC,    )
ASHLEY FURNITURE TRADING COMPANY,  )
WANEK FURNITURE CO., LTD.,        )
MILLENNIUM FURNITURE CO., LTD., AND  )
COMFORT BEDDING COMPANY LIMITED,  )
)
         Plaintiffs,        )
)
         v.           )
)
THE UNITED STATES,         )    Court No. 21-00283
)
         Defendant,       )
)
         and         )
)
BROOKLYN BEDDING, LLC, CORSICANA  )
MATTRESS COMPANY, ELITE COMFORT  )
SOLUTIONS; FXI, INC., INNOCOR, INC.,  )
KOLCRAFT ENTERPRISES INC., LEGGETT & )
PLATT, INCORPORATED, THE      )
INTERNATIONAL BROTHERHOOD OF   )
TEAMSTERS, and UNITED STEEL, PAPER AND)
FORESTRY, RUBBER, MANUFACTURING,  )
ENERGY, ALLIED INDUSTRIAL AND   )
SERVICE WORKERS INTERNATIONAL   )
UNION, AFL-CIO,        )
)
         Defendant-Intervenors.  )
_____)

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the administrative record filed by

plaintiffs, responses thereto, plaintiffs' reply, the administrative record, and all other pertinent

papers, it is hereby

ORDERED that plaintiffs' motion is DENIED;

ORDERED that Count IV of plaintiffs' second amended complaint is dismissed;

ORDERED that the Department of Commerce's determination at issue in this action is sustained; and

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated: _____

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 12,150 words, including text, footnotes, and headings.

<u>/s/ Kara M. Westercamp</u>