Slip Op. 22-131

## UNITED STATES COURT OF INTERNATIONAL TRADE

**ASHLEY FURNITURE INDUSTRIES, LLC; ASHLEY FURNITURE TRADING COMPANY; WANEK FURNITURE CO., LTD.; MILLENNIUM FURNITURE CO., LTD.; AND COMFORT BEDDING COMPANY LIMITED,**

               Plaintiffs,

v.

**UNITED STATES,**

               Defendant,

and

**BROOKLYN BEDDING, LLC; CORSICANA MATTRESS COMPANY; ELITE COMFORT SOLUTIONS; FXI, INC.; INNOCOR, INC.; KOLCRAFT ENTERPRISES INC.; LEGGETT & PLATT, INCORPORATED; THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS; AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**

               Defendant-Intervenors.

**Before: Timothy M. Reif, Judge**

**Court No. 21-00283**
**PUBLIC VERSION**

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's Final Determination in its antidumping duty investigation and order on mattresses from the Socialist Republic of Vietnam.]

               Dated: November 28, 2022

**PUBLIC VERSION**

Kristin H. Mowry and Jeffrey S. Grimson, Mowry & Grimson, PLLC, of Washington, D.C., argued for plaintiffs Ashley Furniture Industries, LLC; Ashley Furniture Trading Company; Wanek Furniture Co., Ltd.; Millennium Furniture Co., Ltd.; and Comfort Bedding Company Limited.  With them on the briefs were Jill A. Cramer, Sarah M. Wyss and Jacob M. Reiskin.

Kara M. Westercamp, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director.  Of counsel on the brief was Vania Wang, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Yohai Baisburd and Chase J. Dunn, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for defendant-intervenors Brooklyn Bedding, LLC; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises Inc.; Leggett & Platt, Incorporated; the International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

* * *

Reif, Judge: Ashley Furniture Industries, LLC ("AFI"), Ashley Furniture Trading

Company ("AFTC"), Wanek Furniture Co., Ltd. ("Wanek"), Millennium Furniture Co., Ltd.

("Millennium"), and Comfort Bedding Company Limited ("Comfort Bedding")

(collectively, "plaintiffs" or the "Ashley Respondents") challenge certain aspects of the

final affirmative determination ("Final Determination") by the U.S. Department of

Commerce ("Commerce") in its antidumping duty ("AD") investigation and order on

mattresses from the Socialist Republic of Vietnam ("Vietnam").  *See Mattresses from*

*the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less than*

*Fair Value ("Final Determination")*, 86 Fed. Reg. 15,889 (Dep't of Commerce Mar. 25,

2021) and accompanying Issues and Decision Memorandum ("IDM") (Dep't of

**PUBLIC VERSION**

Commerce Mar. 18, 2021), PR 505; *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia* ("*Vietnam Mattresses Order*"), 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021).

Plaintiffs move for judgment on the agency record pursuant to Rule 56.2 of the U.S. Court of International Trade ("USCIT" or the "Court") and challenge Commerce's Final Determination with respect to four issues: (1) Commerce's selection of the financial statements of Emirates Sleep Systems Private Limited ("ES") to calculate surrogate financial ratios; (2) Commerce's selection of subheading 7320.90.90 of the Harmonized Tariff Schedule of the Republic of India ("Indian HTS") to calculate the surrogate value for pocket coil innerspring units ("PCIUs"); (3) Commerce's decision to exclude AFI and AFTC from the separate cash deposit rate assigned to Wanek, Millennium and Comfort Bedding; and (4) Commerce's use of the Cohen's *d* test in Commerce's differential pricing analysis. *See* USCIT R. 56.2; Pls.' Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. upon Agency R. ("Pls. Br.") at 2-4, ECF Nos. 39, 40; Pls.' Reply Br. in Supp. of R. 56.2 Mot. for J. upon Agency R. ("Pls. Reply Br."), ECF Nos. 49, 50; *see also* Pls.' Rule 56.2 Mot. for J. upon Agency R. at 2-3, ECF No. 38.

The United States ("defendant") and defendant-intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

**PUBLIC VERSION**

Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "defendant-intervenors" or "petitioners") oppose plaintiffs' motion.[1]  *See* Def.'s Mot. to Partially Dismiss and Resp. to Pls.' Mot. for J. upon Agency R. ("Def. Br."), ECF Nos. 45, 46; Mattress Pet'rs' Resp. Br. in Opp'n to Ashley's R. 56.2 Mot. for J. on Agency R. ("Def.-Intervenors Br."), ECF Nos. 43, 44.  In addition, defendant moves to dismiss plaintiffs' claim regarding Commerce's use of the Cohen's *d* test.  *See* Def. Br. at 2.

For the reasons discussed below, the court sustains in part and remands in part the Final Determination.  In addition, the court will reserve examination of plaintiffs' claim regarding Commerce's use of the Cohen's *d* test until after Commerce issues the remand redetermination.

**BACKGROUND**

AFI is a U.S. domestic producer and U.S. importer of mattresses, and AFTC also is a U.S. importer.  Second Am. Compl. ¶ 5, ECF No. 24.  Wanek, Millennium and Comfort Bedding are exporters of mattresses from Vietnam.  *Id.*

On March 31, 2020, petitioners filed petitions with Commerce and the U.S. International Trade Commission ("Commission") to impose antidumping duties on imports of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey ("Turkey") and Vietnam, and to impose countervailing duties ("CVD")

---

[1] InStevec. is the sole entity listed as a petitioner in the underlying investigation that has not intervened in the instant case.  *See Mattresses from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures* ("*Preliminary Determination*"), 85 Fed. Reg. 69,591 (Dep't of Commerce Nov. 3, 2020) and accompanying Preliminary Decision Memorandum ("PDM") (Dep't of Commerce Oct. 27, 2020) at 1, PR 437; IDM at 2 n.6.

**PUBLIC VERSION**

on mattress imports from the People's Republic of China ("China").  *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations* ("*Initiation Notice*"), 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020); *Mattresses from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 85 Fed. Reg. 22,998 (Dep't of Commerce Apr. 24, 2020) (initiation of CVD investigation).

On April 20, 2020, Commerce initiated AD investigations of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey and Vietnam, as well as a CVD investigation of mattresses from China.  PDM at 1.  Commerce selected Wanek as a mandatory respondent in the AD investigation of mattresses from Vietnam.  *Id.* at 2.  The period of investigation ("POI") was from July 1, 2019, through December 31, 2019.  *Preliminary Determination*, 85 Fed. Reg. at 69,591.

On June 11, 2020, Commerce solicited from interested parties surrogate country and surrogate value comments and information.  PDM at 3.  The Ashley Respondents and petitioners submitted comments and recommended the Republic of India ("India") as a suitable primary surrogate country.[2]  *Id.* at 15-20.  The Ashley Respondents presented the financial statements of Sheela Foam Limited ("SF"), an Indian company, for Commerce to use to calculate surrogate financial ratios.  *See* Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Antidumping Duty Investigation of

---

[2] The Ashley Respondents and Vietnam Glory, another respondent in the underlying investigation, commented also that Egypt would be a "suitable countr[y] to use as a surrogate country."  PDM at 17.

**PUBLIC VERSION**

Mattresses from the Socialist Republic of Vietnam: Surrogate Value Comments (July 30, 2020) ("Respondents Surrogate Value Comments") at 3, Ex. SV-4, PR 278-281.  In addition, the Ashley Respondents proposed the use of Indian HTS subheading 9404.29.90 to determine the surrogate value for PCIUs, an input of the subject merchandise.  *Id.* at Ex. SV-1.  Petitioners presented the financial statements of ES, another Indian company, for Commerce to use to calculate the surrogate financial ratios.  *See* Letter from Cassidy Levy Kent (USA) LLP, to Sec'y of Commerce, re: Mattresses from the Socialist Republic of Vietnam: Petitioners' Surrogate Values Submission (July 30, 2020) ("Petitioners Surrogate Value Comments") at 3, Ex. 11, PR 276-277.  In addition, petitioners proposed the use of Indian HTS subheading 7320.90.90 to determine the surrogate value for PCIUs.  *Id.* at 2-3, Ex. 2.

On November 3, 2020, Commerce published its Preliminary Determination, in which Commerce assigned to Wanek, Millennium and Comfort Bedding an AD margin of 190.79%.  *Preliminary Determination*, 85 Fed. Reg. at 69,592.  Commerce calculated a Vietnam-wide entity margin of 989.90%.  *Id.*  On December 29, 2020, the Ashley Respondents filed a case brief challenging Commerce's Preliminary Determination.  *See* IDM at 2.  On January 5, 2021, petitioners filed a rebuttal brief, and Commerce held a public hearing on February 11, 2021.  *Id.*; Public Hearing ("Public Hearing") (Feb. 11, 2021), PR 501.

On March 18, 2021, Commerce issued its Final Determination.  *See Final Determination*, 86 Fed. Reg. at 15,890-91.  Considering certain adjustments made in the Final Determination, Commerce assigned to Wanek, Millennium and Comfort

**PUBLIC VERSION**

Court No. 21-00283                                                                                                    Page 7

Bedding an AD margin of 144.92%.  *See id.*  Commerce also calculated a Vietnam-wide

entity margin of 668.38%.  *Id.* at 15,891.  Commerce: (1) maintained its selection of

India as the primary surrogate country;[3] (2) selected ES' financial statements to

calculate surrogate financial ratios; and (3) selected Indian HTS subheading 7320.90.90

to calculate the surrogate value for PCIUs.  *See* PDM at 19; IDM at 28-36, 42-45.

On May 14, 2021, Commerce published the Vietnam Mattresses Order.  *See*

*Vietnam Mattresses Order*, 86 Fed. Reg. at 26,460.  In addition, on May 14, 2021, the

Commission published its final affirmative injury determination on mattresses from

Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey and Vietnam.  *See*

*Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and*

*Vietnam*, 86 Fed. Reg. 26,545 (ITC May 14, 2021).

On July 9, 2021, plaintiffs filed a complaint before the USCIT seeking judicial

review of the Final Determination.  *See* Compl., ECF No. 10.  On March 28, 2022, the

court granted in part and denied in part plaintiffs' motion for a statutory injunction on

liquidation.  *See Ashley Furniture Indus., LLC v. United States*, 46 CIT __, Slip Op. 22-

29 (Mar. 28, 2022), at 61.  The court issued a statutory injunction "covering entries

imported by AFI or AFTC, and produced and/or exported by Wanek, Millennium or

Comfort Bedding, from November 3, 2020, through April 30, 2022, excluding any entries

made from May 2, 2021, through May 13, 2021."  *Id.* (footnote omitted).

---

[3] The parties in the instant case do not challenge Commerce's selection of India as the
primary surrogate country.  *See generally* Pls. Br.; Def. Br.; Def.-Intervenors Br.; *see
also* PDM at 17.

**PUBLIC VERSION**

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c).  Plaintiffs bring

this action pursuant to sections 516A(a)(2)(A)(i)(II) and (a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) (2018).[4]  The court

will sustain a final determination by Commerce in an AD investigation unless the

determination is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  *Id.* § 1516a(b)(1)(B)(i).

The "substantial evidence" standard requires "more than a mere scintilla" of

evidence, *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co.

of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)), "but is satisfied by 'something less than the

weight of the evidence.'"  *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir.

2004) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.

Cir. 1984)).  The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has

stated that for a reviewing court to "fulfill [its] obligation" to evaluate whether a

determination by Commerce is supported by substantial evidence and in accordance

with law, Commerce is required to "examine the record and articulate a *satisfactory

explanation* for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376

(Fed. Cir. 2016) (emphasis supplied) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v.

United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)); *see Husteel Co. v. United States*,

31 CIT 740, 748, 491 F. Supp. 2d 1283, 1291 (2007) ("An agency's determination is not

---

[4] References to the U.S. Code are to the 2018 edition.  Further citations to the Tariff Act
of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code.

supported by substantial evidence where the agency fails to adequately explain the basis on which the agency made its decision.") (citing *Viraj Forgings, Ltd. v. United States,* 28 CIT 2086, 2089, 350 F. Supp. 2d 1316, 1320 (2004)) (other citations omitted).

In addition, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.* 463 U.S. 29, 50 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)). However, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States,* 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."). Further, "when a party properly raises an argument before an agency, that agency is required to address the argument in its final decision." *Fine Furniture*, 40 CIT at __, 182 F. Supp. 3d at 1371 (citing *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011)).

## LEGAL FRAMEWORK

19 U.S.C. § 1677b(c)(1) provides that Commerce "shall determine the normal value of the subject merchandise" in an AD investigation that involves a non-market economy ("NME") country "on the basis of the value of the factors of production utilized

**PUBLIC VERSION**

in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *See Juancheng Kangtai Chem. Co. v. United States*, 39 CIT __, Slip Op. 15-93 (Aug. 21, 2015), at 5.

In administrative proceedings that involve an NME country such as Vietnam, Commerce calculates the "normal value" of the subject merchandise by selecting surrogate data from one or several market economy countries that Commerce determines constitute the "best available information" in the record. 19 U.S.C. § 1677b(c)(1); *Heze Huayi Chem. Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1301, 1309-10 (2021). 19 U.S.C. § 1677b(c)(1) does not define "best available information," which means that Commerce has "broad discretion" to determine the information in the record that meets this standard. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011). In reviewing a determination by Commerce, the "court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a *reasonable mind* could conclude that Commerce chose the best available information.'" *Id.* (emphasis supplied) (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

In determining the "best available information" in the record, Commerce selects, "to the extent practicable," data that meet Commerce's surrogate value selection criteria — *e.g.*, data that are complete, publicly available, "product-specific" and "contemporaneous with the period of [investigation]." *Nantong Uniphos Chems. Co. v.*

Court No. 21-00283                                                    Page 11

*United States*, 43 CIT __, __, 415 F. Supp. 3d 1345, 1353-54 (2019) (alteration in

original) (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386

(Fed. Cir. 2014)); *see CP Kelco US, Inc. v. United States*, Slip Op. 16-36, 2016 WL

1403657, at *3 (CIT Apr. 8, 2016) (citation omitted).  Further, "[t]here is no hierarchy for

applying the surrogate value selection criteria," *Carbon Activated Tianjin Co. v. United

States*, 46 CIT __, __, 586 F. Supp. 3d 1360, 1366 (2022) (citing *United Steel &

Fasteners, Inc. v. United States*, 44 CIT __, __, 469 F. Supp. 3d 1390, 1398-99 (2020);

*Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 672, 387 F. Supp. 2d 1236,

1250-51 (2005)), and the weight "accorded to a factor varies depending on the facts of

each case."  *Xiamen Int'l Trade & Indus. v. United States*, 37 CIT 1724, 1728, 953 F.

Supp. 2d 1307, 1313 (2013); *see Fine Furniture (Shanghai) Ltd. v. United States*, 40

CIT __, __, 182 F. Supp. 3d 1350, 1369 (2016).

**DISCUSSION**

I.    **Commerce's selection of financial statements to calculate surrogate
      financial ratios**

      A.    **Legal framework**

      In an AD investigation involving an NME country, and in accordance with 19

U.S.C. § 1677b(c)(1), Commerce calculates the "normal value" for factory overhead,

selling, general and administrative expenses and profit with reference to "financial ratios

derived from financial statements of producers of comparable merchandise in the

surrogate country."  *Changzhou Trina Solar Energy Co. v. United States*, 44 CIT __, __,

450 F. Supp. 3d 1301, 1314-15 (2020) (quoting *Ad Hoc Shrimp Trade Action Comm. v.

United States*, 618 F.3d 1316, 1319-20 (Fed. Cir. 2010)).  The "best available

**PUBLIC VERSION**

information" standard involves "a comparison of the competing data sources" in the record.  *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1364-67 (Fed. Cir. 2019).  Accordingly, "[w]hen presented with multiple imperfect potential" financial statements, Commerce is required to "faithfully compare the strengths and weaknesses of each before deciding which to use."  *CP Kelco US, Inc. v. United States*, 39 CIT __, Slip Op. 15-27 (Mar. 31, 2015), at 13 (citing *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT 1619, 1635-40, 949 F. Supp. 2d 1311, 1328-31 (2013)).

      **B.**    **Positions of the parties**

      Plaintiffs challenge Commerce's selection of ES' financial statements and rejection of SF's financial statements to calculate surrogate financial ratios in this investigation.[5]  *See* Pls. Br. at 11.  Defendant argues that Commerce's decision is supported by substantial evidence, as ES' financial statements constitute the "best available information" in the record.  Def. Br. at 9-10.  Defendant-intervenors raise arguments similar to those of defendant with respect to this issue.  *See* Def.-Intervenors Br. at 9-25.

      Plaintiffs advance five core arguments challenging Commerce's selection of financial statements.  *See* Pls. Br. at 11-35.  The first four arguments correspond to the surrogate value selection criteria that Commerce evaluated in selecting ES' financial statements: (1) contemporaneity; (2) completeness; (3) representativeness of business

---

[5] The financial statements of ES and SF are the only statements that interested parties presented for inclusion in the record.  *See* PDM at 19.

Court No. 21-00283                                                                Page 13

operations; and (4) public availability.  *See id.* at 11-28.  Plaintiffs' fifth argument is that

Commerce rejected unreasonably SF's financial statements.  *See id.* at 28-35.

Defendant and defendant-intervenors respond to each of plaintiffs' five arguments.  *See*

Def. Br. at 9-27; Def.-Intervenors Br. at 9-25.

### 1.    Non-contemporaneity of ES' financial statements

Plaintiffs argue first that Commerce selected unreasonably ES' financial

statements notwithstanding Commerce's acknowledgement that these statements "were

not contemporaneous with the POI."  Pls. Br. at 13; *see* IDM at 30-31.  According to

plaintiff, the record indicates that ES' financial statements covered the financial year

ending on March 31, 2019, and consequently did not overlap with the POI.[6]  Pls. Br. at

15; *see* Petitioners Surrogate Value Comments at Ex. 11.  Plaintiffs contend that

Commerce's practice is to "calculate surrogate financial ratios based on POI-

contemporaneous financial statements."  Pls. Br. at 13 (citing *Hardwood and Decorative*

*Plywood from the People's Republic of China: Final Determination of Sales at Less than*

*Fair Value*, 78 Fed. Reg. 58,273 (Dep't of Commerce Sept. 23, 2013) and

accompanying IDM, A-570-986 (Dep't of Commerce Sept. 16, 2013) at 61; *Home*

*Prods. Int'l, Inc. v. United States*, 32 CIT 337, 342, 556 F. Supp. 2d 1338, 1342 (2008)).

As such, plaintiffs argue that "Commerce unreasonably failed to follow its past practice"

in selecting ES' financial statements.  *Id.* at 15.

In response, defendant and defendant-intervenors contend that while ES'

financial statements were not contemporaneous with the POI, the statements

---

[6] As discussed, the POI was from July 1, 2019, through December 31, 2019.  PDM at 7.

nonetheless constitute the "best available information" in the record.  Def. Br. at 14;

Def.-Intervenors Br. at 21-22.  Defendant notes that "[a]lthough contemporaneity is an

important factor in Commerce's selection of surrogate value, Commerce will rely on less

contemporaneous data" provided that those data are "more accurate or reliable than the

available contemporaneous data."  Def. Br. at 14 (citing *Qingdao*, 766 F.3d at 1386;

*Home Meridian Int'l, Inc. v. United States*, 36 CIT 1279, 1287, 865 F. Supp. 2d 1311,

1319 (2012); *Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1481, 1503-04,

460 F. Supp. 2d 1338, 1358-59 (2006)).  Defendant argues that ES' financial

statements were not contemporaneous with the POI by only one fiscal year, and that

the statements nonetheless constitute the "best available information" in the record in

view of the deficiencies that Commerce identified with respect to SF's financial

statements.  *Id.* at 11 (quoting IDM at 31), 14 (quoting IDM at 31); *see* Def.-Intervenors

Br. at 21-22.

### 2.    Whether ES' financial statements were complete

The parties address next whether ES' financial statements were complete.  *See*

Pls. Br. at 17-19; Def. Br. at 15-17; Def.-Intervenors Br. at 17-20.  Plaintiffs assert that

ES' financial statements were not complete and that Commerce's practice is "to

disregard incomplete financial statements as a basis for calculating surrogate financial

ratios where they are "missing key sections . . . that are vital to [Commerce's] analysis

and calculations.'"  Pls. Br. at 13, 17 (alteration in original) (quoting *Notice of Final*

*Determination of Sales at Less than Fair Value: Steel Concrete Reinforcing Bars from*

*Belarus*, 66 Fed. Reg. 33,528 (Dep't of Commerce June 22, 2001) and accompanying

IDM, A-822-804 (Dep't of Commerce June 14, 2001) at cmt. 2) (citing *Wooden Bedroom Furniture From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review*, 73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008) and accompanying IDM (Dep't of Commerce Aug. 11, 2008) at cmt. 1.C).

In the instant case, the parties acknowledge that ES' financial statements were missing several annexures — *i.e.*, Annexures 1 through 5 ("Annexures").  *See id.* at 17; Def. Br. at 15-17; Def.-Intervenors Br. at 17-20; Petitioners Surrogate Value Comments at Ex. 11.  Plaintiffs challenge Commerce's conclusion that the missing Annexures consisted of "supplemental details" and were "unnecessary" to calculate surrogate financial ratios.  Pls. Br. at 17-18 (quoting IDM at cmt. 2); IDM at 29-30.  Further, plaintiffs argue that the record indicates that Annexure 5 might have contained "key details" regarding ES' "[b]alances with government authorities."  Pls. Br. at 18. Specifically, plaintiffs point to Note 13 of ES' statements, *see id.*, which is entitled "Short-term loans and advances" and includes a line item that refers to "Balances with government authorities (Refer Annexure – 5) — 7,518,007 Rupees."  Petitioners Surrogate Value Comments at Ex. 11.  According to plaintiffs, the comments in Note 13 support the conclusion that information that might have been contained in the missing Annexure 5 was key to determining whether ES had a "countervailable balance with government authorities [that] would disqualify" ES' statements.  Pls. Br. at 18.  On this basis, plaintiffs argue that ES' financial statements were incomplete.  *See id.* at 19 (citing *Weishan Hongda*, 917 F.3d at 1356).

**PUBLIC VERSION**

In response, defendant and defendant-intervenors argue that ES' financial statements were complete and sufficiently reliable to calculate surrogate financial ratios. Def. Br. at 15; *see* Def.-Intervenors Br. at 17-20.  Defendant contends that the missing Annexures did not contain key information and that the omission of these Annexures did not render ES' financial statements "unusable or unreliable."  *Id.* at 16 (citing IDM at 29). Defendant challenges also plaintiffs' argument that Annexure 5 might have been key on the basis that this Annexure might have contained information regarding ES' potential receipt of "countervailable subsidies."  *Id.* (citing Pls. Br. at 18-19).  Defendant contends that plaintiffs' argument is "not substantiated" and that "there is no record evidence" that the line item under Note 13 that refers to Annexure 5 was "a loan or distortive."  *Id.* (quoting IDM at 30); *see* Revised Oral Arg. Tr. at 11:23-12:03, ECF No. 65; *see also* Def.-Intervenors Br. at 20-21.

### 3.   Whether ES' financial statements were representative of the business operations of Wanek, Millennium and Comfort Bedding

The third surrogate value selection criterion that the parties address concerns whether ES' financial statements were representative of the business operations of Wanek, Millennium and Comfort Bedding in Vietnam.  *See* Pls. Br. at 20-24; Def. Br. at 17-19; Def.-Intervenors Br. at 22-24.  Plaintiffs contend that ES' financial statements were not representative in this regard.  Pls. Br. at 20 (quoting *Mid Continent Steel & Wire, Inc. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1348, 1352 (2017)). Plaintiffs address two points with respect to this criterion: (1) difference in the *nature* of the business operations; and (2) difference in the *size* of the operations.  *Id.* at 20-24.

**PUBLIC VERSION**

Plaintiffs first asserted difference concerns the nature of ES' business operations and those of Wanek, Millennium and Comfort Bedding.  *See id.* at 20.  Plaintiffs argue that ES' business operations focus primarily on retail, whereas the operations of Wanek, Millennium and Comfort Bedding focus primarily on manufacturing.  *Id.*  To support this assertion, plaintiffs point to record evidence that, according to plaintiffs, demonstrates that ES' "primary business is retail and not manufacturing."  *Id.* (emphasis omitted) (quoting Petitioners Surrogate Value Comments at Ex. 11).  This evidence includes that ES' showroom rental expenses are "five times greater than [its] factory rent."  *Id.* (alteration in original) (emphasis omitted) (citing Letter from Dep't of Commerce, to Cassidy Levy Kent (USA) LLP, re: Petition for the Imposition of Antidumping Duties on Imports of Mattresses from Vietnam: Supplemental Questions (Apr. 3, 2020) at 5, PR 19); *see* Letter from Cassidy Levy Kent (USA) LLP, to Sec'y of Commerce and Sec'y, Int'l Trade Comm'n, re: Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Responses to Petition Supplemental Questionnaires (Apr. 8, 2020) ("Petitioners Supplemental Questionnaires Responses") at Ex. I-Supp-5 at 8, PR 23-24.  Further, plaintiffs contend that ES' financial statements indicate that ES' "revenue from operations did not include any revenue from its manufacturing activity."  Pls. Br. at 20-21 (citing Petitioners Surrogate Value Comments at Ex. 11).

In contrast with ES' business operations, plaintiffs argue that the operations of Wanek, Millennium and Comfort Bedding are directed "primarily" toward manufacturing and not retail activities.  *Id.* at 21-22.  Plaintiffs challenge Commerce's finding that Wanek, Millennium and Comfort Bedding incur showroom expenses in Vietnam, arguing

**PUBLIC VERSION**

instead that the financial statements of these entities do not indicate that they "incur[]

any expenses related to retail operations in Vietnam." *Id.* at 22 (citing Letter from

Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Mattresses from the Socialist

Republic of Vietnam: Section A Questionnaire Response (June 19, 2020) at Exs. A-I-3,

A-II-3, A-III-4, CR 108-122); *see* IDM at 31.

      Plaintiffs' second asserted difference concerns the difference in size between ES'

business operations and those of Wanek, Millennium and Comfort Bedding. *See* Pls.

Br. at 20-21. Plaintiffs argue that record evidence indicates that ES' reported revenue

from the sale of products was 47.4 million rupees — approximately $600,000. *Id.* at 21

(citing Petitioners Surrogate Value Comments at Ex. 11; Respondents Surrogate Value

Comments at Ex. SV-4). Wanek, however, reported [[

                          ]]. *Id.* (citing Letter from

Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Antidumping Duty Investigation of

Mattresses from the Socialist Republic of Vietnam: Separate Rate Application of Wanek

Furniture Co., Ltd. (June 1, 2020) at Ex. 7, CR 87-90). This disparity, according to

plaintiffs, is "yet another factor rendering [ES'] financial statements" deficient. Pls.

Reply Br. at 10.

      In response, defendant and defendant-intervenors contend that ES' business

operations were representative of the operations of Wanek, Millennium and Comfort

Bedding. *See* Def. Br. at 17-20; Def.-Intervenors Br. at 22-24. Defendant points to

record evidence that states that ES is "a manufacturing company basically into the

manufacturing of all types and kinds of mattresses, bases and other sleep related

**PUBLIC VERSION**

products and systems."  Def. Br. at 17 (citing Petitioners Surrogate Value Comments at
Ex. 11).  In addition, defendant-intervenors state that notwithstanding plaintiffs' "cherry
picking of line items" in ES' financial statements, the record indicates that 76.71% of the
"total turnover of [ES]" involves the "manufacture of furniture."  Def.-Intervenors Br. at
23-24 (citing Petitioners Surrogate Value Comments at Ex. 11).

Defendant and defendant-intervenors challenge also plaintiffs' argument that
Wanek, Millennium and Comfort Bedding do not engage in retail operations in Vietnam.
Def. Br. at 18 (citing Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re:
Mattresses from Vietnam: Response to Petitioners' Comments (Apr. 17, 2020), PR 41);
Def.-Intervenors Br. at 24.  According to defendant, Commerce relied reasonably upon
record evidence in concluding that plaintiffs "incur showroom expenses" in Vietnam.
Def. Br. at 18-19 (quoting IDM at 31; Petitioners Supplemental Questionnaires
Responses at Ex. IX-Supp-9).

Further, defendant and defendant-intervenors contend that Commerce rejected
reasonably the argument that the Ashley Respondents raised in the administrative
proceedings regarding the alleged "disparity in revenue" between ES and Wanek.  Def.
Br. at 18 (citing IDM at 31; *see* Def.-Intervenors Br. at 23; *see* Letter from Mowry &
Grimson, PLLC, to Sec'y of Commerce, re: Mattresses from the Socialist Republic of
Vietnam: Case Brief (Dec. 29, 2020) ("Ashley Respondents Case Br.") at 13, PR 488.
Defendant argues that it is Commerce's well-established practice "to disregard the
magnitude of a company's revenue when choosing the appropriate surrogate financial
statements to calculate ratios."  Def. Br. at 18 (citing IDM at 31; *Wooden Bedroom*

**PUBLIC VERSION**

Court No. 21-00283                                                                                     Page 20

*Furniture from the People's Republic of China: Final Results of Antidumping Duty*
*Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 41,374 (Dep't of
Commerce Aug. 17, 2009) and accompanying IDM, A-570-890 (Dep't of Commerce
Aug. 10, 2009) at 39).

### 4.   Whether ES' financial statements were publicly available

The fourth surrogate value selection criterion that the parties address concerns
the public availability of ES' financial statements.  *See* Pls. Br. at 24-27; Def. Br. at 20-
21; Def.-Intervenors Br. at 15-17.  Plaintiffs contend that the statements were not
"publicly available," which calls into question the "integrity and reliability" of the
statements.  Pls. Br. at 26 (citing *Since Hardware (Guangzhou) Co. v. United States*, 37
CIT 803, 806, 911 F. Supp. 2d 1362, 1367 (2013)); 19 C.F.R. § 351.408(c)(1) (providing
that "[t]he Secretary normally will use publicly available information to value factors").
Plaintiffs argue that ES' incomplete financial statements were available only through a
fee-based "subscription database," and that Commerce declined unreasonably to
"inquire" with petitioners or to "provide sufficient information" on how to obtain a
complete version of the statements.  Pls. Br. at 26; *see* Pls. Reply Br. at 13-14.  Further,
plaintiffs note that they were "unable to find [ES'] complete financial statements"
notwithstanding a "good faith effort" to locate the statements, including through a search
on the website of the Indian Ministry of Corporate Affairs ("MCA") as well as ES'
website, and that Commerce did not address plaintiffs' argument with respect to this
effort.  Pls. Reply Br. at 13-14.

Plaintiffs challenge also Commerce's conclusion that the Ashley Respondents "acknowledg[ed]" in the administrative proceedings that ES' financial statements were "available in a subscription database." Pls. Br. at 26; IDM at 36. Rather, plaintiffs underscore that they "acknowledged only that [ES'] *incomplete* financial statements . . . existed in a subscription database," and that Commerce did not address plaintiffs' argument with respect to whether the *complete* statements were accessible through such a database. Pls. Br. at 26 (emphasis supplied); *see* Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Antidumping Duty Investigation of Mattresses from the Socialist Republic of Vietnam: Rebuttal Surrogate Value Comments (Aug. 17, 2020) ("Respondents Rebuttal Comments") at 41, PR 311-313.

In response, defendant and defendant-intervenors contend that ES' financial statements were publicly available. *See* Def. Br. at 20-22; Def.-Intervenors Br. at 15-17. Defendant challenges plaintiffs' articulation of Commerce's practice to determine whether information is "publicly available," arguing instead that the "bar for public availability is that interested parties may *independently access* the information." Def. Br. at 20 (quoting IDM at 35; *Yantai Xinke Steel Structure Co. v. United States*, 38 CIT 478, 497 (2014)) (emphasis supplied). In the instant case, defendant points to Commerce's conclusion that ES' financial statements were available through a subscription database, noting that "the fact that information is from a subscription database does not mean that information is not publicly available." *Id.*; *see* IDM at 36 n.251 (citing *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 74 Fed. Reg. 10,545 (Dep't

**PUBLIC VERSION**

of Commerce Mar. 11, 2009) and accompanying IDM, A-570-934 (Dep't of Commerce

Mar. 5, 2009) at cmt. 1; *Certain Preserved Mushrooms from the People's Republic of

China: Final Results of Antidumping Duty Administrative Review and Rescission in Part*,

76 Fed. Reg. 56,732 (Dep't of Commerce Sept. 14, 2011) and accompanying IDM, A-

570-851 (Dep't of Commerce Sept. 14, 2011) at cmt. 4).  Defendant then argues that

there is "evidence that the parties were able to independently access the information" in

ES' statements through a subscription database.  Def. Br. at 20; *see* IDM at 36 ("The

petitioners noted Ashley Group's confirmation that [ES'] financial statement exists within

a subscription database during the hearing."); Public Hearing.  Defendant notes also

that plaintiffs did not argue that the fee associated with this database "was too high."

Def. Br. at 21 (citing IDM at 36).

### 5.    Commerce's rejection of SF's financial statements

Last, the parties address the decision by Commerce to reject SF's financial

statements in calculating surrogate financial ratios.  *See* Pls. Br. at 28-35; Def. Br. at 22-

27; Def.-Intervenors Br. at 10-14.  Plaintiffs contend that Commerce rejected

unreasonably SF's financial statements, which, according to plaintiffs, were

contemporaneous with the POI, complete, representative of the business operations of

Wanek, Millennium and Comfort Bedding, and publicly available.  *See* Pls. Br. at 13, 28-

35.

Commerce stated that it decided to reject SF's financial statements on the basis

that the statements contained evidence of the receipt of countervailable subsidies.  *See*

IDM at 34-35.  Specifically, Commerce concluded that: (1) "the names of the programs

**PUBLIC VERSION**

found in [SF's] financial statements" — "investment subsidy" and "duty drawback

subsidy" — are "the same names Commerce previously found countervailable" in prior

administrative proceedings; and (2) "each of these programs reflected money received

during the POI." *Id.* at 35 nn. 240-241 (citing *Circular Welded Carbon-Quality Steel

Pipe from India: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg.

64,468 (Dep't of Commerce Oct. 22, 2012) and accompanying IDM, C-533-853 (Dep't

of Commerce Oct. 15, 2012) at cmt. 8; *Certain Quartz Surface Products from India:

Final Affirmative Countervailing Duty Determination and Final Affirmative Determination

of Critical Circumstances, In Part*, 85 Fed. Reg. 25,398 (Dep't of Commerce May 1,

2020) and accompanying IDM, C-533-890 (Dep't of Commerce Apr. 27, 2020) at cmt.

6).

　　　　Plaintiffs contend that Commerce did not have a "reasonable basis" to reach this

conclusion with respect to SF's financial statements.  *See* Pls. Br. at 29.  Plaintiffs argue

that the "mere mention" in SF's financial statements of programs found previously to be

countervailable is not sufficient for Commerce to conclude that there was "specific

information in [SF's] financial statements that sufficiently described the nature of the

programs." *Id.* at 29-31 (citing *Clearon Corp. v. United States*, 35 CIT 1685, 1688, 800

F. Supp. 2d 1355, 1359 (2011)).  Separately, plaintiffs argue that even presuming that

there is evidence of countervailable subsidies in SF's financial statements, the

statements displayed "negligible or non-distortive evidence" of such subsidies.  Pls. Br.

at 13.  Plaintiffs contend that the "investment subsidy" item equates to 0.001% of SF's

revenue and the "duty drawback" item equates to only 0.000046% of SF's revenue.  *Id.*

at 32 (citing Respondents Surrogate Value Comments at Ex. SV-4).  As such, plaintiffs argue that "[g]iven the miniscule quantum of alleged subsidies in [SF's] financial statements, no reasonable mind could find such a small amount of subsidization to be distortive."  Pls. Reply Br. at 17.

In response, defendant and defendant-intervenors argue that Commerce rejected reasonably SF's financial statements on the basis that the statements "contained evidence of countervailable subsidies."  Def. Br. at 22; *see* Def.-Intervenors Br. at 10-14.  According to defendant, "Commerce had reason to believe or suspect that [SF's] financial statements reflected countervailable subsidies," as the statements referred to "specific subsidy programs" that Commerce previously has found to be countervailable. Def. Br.  at 24, 34-35; *see* Def.-Intervenors Br. at 14.  In addition, defendant argues that in rejecting SF's financial statements, Commerce was not required to demonstrate that distortion resulted from the alleged subsidies, as countervailable subsidies are "presumed distortive under the law."  Def. Br. at 25 (citing *Yantai Xinke*, 38 CIT at 503).

## C.    Analysis

The court remands the Final Determination with respect to Commerce's selection of financial statements to calculate surrogate financial ratios in this investigation. Specifically, the court concludes that a remand is required for Commerce to explain further or reconsider its conclusions that ES' financial statements were: (1) complete and (2) publicly available.

In remanding the Final Determination, "the court does not require Commerce to choose any particular financial statement or [to] reject" ES' statements.  *Carbon*

*Activated*, 46 CIT at __, 586 F. Supp. 3d at 1381. "Commerce must, however, fairly weigh the available options and explain its decision in light of its selection criteria, addressing any shortcomings." *Id.*

> ### 1.    Whether ES' financial statements were complete

The court concludes that Commerce did not explain adequately its conclusion that ES' financial statements were complete within the meaning of Commerce's surrogate data selection practice. *See Husteel*, 31 CIT at 748, 491 F. Supp. 2d at 1291 (citing *Viraj Forgings,* 28 CIT at 2089, 350 F. Supp. 2d at 1320) (other citations omitted); *Zhengzhou Harmoni Spice Co. v. United States*, 33 CIT 453, 499, 617 F. Supp. 2d 1281, 1321 (2009); *Wooden Bedroom Furniture from the People's Republic of China: Final Results of the 2004-2005 Semi-Annual New Shipper Reviews*, 71 Fed. Reg. 70,739 (Dep't of Commerce Dec. 6, 2006) and accompanying IDM, A-570-890 (Dep't of Commerce Nov. 21, 2006) at cmt. 2. Accordingly, the court is not able to ascertain that Commerce's conclusion is supported by substantial evidence, and the court remands this conclusion for further explanation or reconsideration.

The Court previously has stated that Commerce "does not invariably reject incomplete financial statements, but instead looks to whether the missing information is 'vitally important'" or "key." *CP Kelco*, 2016 WL 1403657, at *5 (citing *Ass'n of Am. Sch. Paper Suppliers v. United States*, 35 CIT 1046, 1054, 791 F. Supp. 2d 1292, 1301 (2011)); *see also Notice of Final Determination of Sales at Less than Fair Value: Steel Concrete Reinforcing Bars from Belarus*, 66 Fed. Reg. 33,528 (Dep't of Commerce June 22, 2001) and accompanying IDM, A-822-804 (Dep't of Commerce June 14, 2001)

**PUBLIC VERSION**

at cmt. 2 (stating that Commerce's practice is to reject financial statements in circumstances in which the statements are "missing key sections . . . that are vital to [Commerce's] analysis and calculations.").  In the instant case, the parties do not dispute that the version of ES' financial statements in the record omitted Annexures 1 through 5.  *See* Pls. Br. at 17-19; Def. Br. at 15-17; Def.-Intervenors Br. at 17-20. However, the parties dispute whether information that might have been contained in the missing Annexures might be key such that their omission rendered ES' financial statements incomplete.  *See* Pls. Br. at 17-19; Def. Br. at 15-17; Def.-Intervenors Br. at 17-20.

In its IDM, Commerce concluded that "the missing annexures . . . [constitute] supplemental details not forming part of [ES'] financial statements and [are] unnecessary for Commerce purposes of calculating surrogate financial ratios."  IDM at 30.  In addition, Commerce explained that the line item under Note 13 of ES' financial statements that refers to Annexure 5 "has no bearing on [Commerce's] financial ratio calculations," as no record evidence indicates that this line item was "a loan or distortive."  *Id.*

To start, Commerce explained adequately its conclusion that the omission of Annexures 1 through 4 did not render ES' financial statements incomplete.  *See* IDM at 29-30; *cf. Husteel*, 31 CIT at 748, 491 F. Supp. 2d at 1291 (citing *Viraj Forgings,* 28 CIT at 2089, 350 F. Supp. 2d at 1320) (other citations omitted); *Zhengzhou Harmoni*, 33 CIT at 499, 617 F. Supp. 2d at 1321.  With respect to Annexure 1, Note 6 of ES' financial statements refers to "Trade Payables . . . Sundry Creditors – Expenses (Refer

Annexure – 1)."  Petitioners Surrogate Value Comments at Ex. 11; *see* IDM at 29.

Commerce explained that "[t]rade payables are typical balance sheet items reporting

monies owed to vendors and historically do not enter into the calculation of surrogate

financial ratios."  IDM at 29.  Based on the comments in Note 6, Commerce concluded

that information that might have been contained in the referenced Annexure 1 was not

key, as Note 6 did not indicate that any such information would "bear[] on [Commerce's]

financial ratio calculations."  *Id.*

      With respect to Annexure 2, Note 8 of ES' financial statements refers to "Short

Term Provisions . . . Other Provisions: Salaries Payable (Refer Annexure – 2)."

Petitioners Surrogate Value Comments at Ex. 11; *see* IDM at 29.  Commerce noted that

there was no balance associated with "Salaries Payable" under this Note.  IDM at 29.

On this basis, Commerce found that the reference in Note 8 to Annexure 2 does not

support the conclusion that information that might have been contained in this Annexure

was key, as the information in the line item under this Note would not "impact"

Commerce's calculations.  *Id.*

      With respect to Annexures 3 and 4, one line item under Note 12 refers to "Cash

and Bank balances . . . Cash in hand (Refer Annexure – 3)" and another item refers to

"Fixed Deposits (Refer Annexure – 4)."  Petitioners Surrogate Value Comments at Ex.

11); *see* IDM at 29-30.  Commerce explained that these items constituted supplemental

"part[s] of the balance sheet" of ES and were not "related to Commerce's financial ratio

calculations."  IDM at 30.  Commerce noted also that ES' financial statements provided

a "detailed explanation for the fixed assets" that correspond to each item.  *Id.*; *see*

**PUBLIC VERSION**

Petitioners Surrogate Value Comments at Ex. 11.  On this basis, Commerce found that

the "explanatory notes" in these items do not support the conclusion that the omission of

Annexures 3 and 4 rendered ES' statements incomplete.  IDM at 30.

 The Ashley Respondents argued in the administrative proceedings in regard to

Annexures 1 through 4, that they "[were] referenced . . . as integrated parts of the audit

report" included in ES' financial statements and, consequently, might have contained

information that might be key to Commerce's calculations.  Ashley Respondents Case

Br. at 7-8; *see* IDM at 18.  Specifically, the Ashley Respondents pointed to the

references in Notes 6, 8 and 12 to Annexures 1 through 4 to support this conclusion.

*See* Ashley Respondents Case Br. at 7-8; *see also* Letter from Mowry & Grimson,

PLLC, to Sec'y of Commerce, re: Mattresses from the Socialist Republic of Vietnam:

Response to Petitioners' October 21, 2020 Submission (Oct. 22, 2020) ("Respondents

Selection Resp.") at 8-10, PR 431.

 Commerce addressed the arguments of the Ashley Respondents in concluding

that ES' financial statements, "while missing certain annexures, [were] complete for

purposes of calculating financial ratios."  IDM at 29.  Commerce explained that the

record contained sufficient information — including the audited financial statements of

ES as well as the independent auditor's report and notes — to "satisf[y] Commerce's

requirements for sourcing surrogate financial statements."  *Id.*

 Moreover, Commerce addressed the arguments that the Ashley Respondents

raised regarding the Notes that refer to Annexures 1 through 4.  *See id.* at 29-30.

Commerce found that the references in Notes 6 and 12 to Annexures 1, 3 and 4

PUBLIC VERSION

"constitute[d] information related to the sub-parts of [the] line items" and, consequently, were "unnecessary for Commerce purposes of calculating surrogate financial ratios." *Id.* at 30.  In addition, Commerce found that the line item under Note 8 that refers to Annexure 2 was not relevant to Commerce's calculations in view of the absence of a balance associated with this item.  *See id.* at 29.  On this basis, Commerce concluded that these Notes do not indicate that Annexures 1 through 4 each might have contained information that would render ES' statements incomplete.  *See id.* at 30.  In reaching this conclusion, Commerce addressed the arguments that the Ashley Respondents presented and provided an explanation that "reasonably tie[s]" Commerce's conclusion to "the governing statutory standard" and to "record evidence."  *CS Wind*, 832 F.3d at 1377.  Consequently, Commerce explained adequately its conclusion that the omission of Annexures 1 through 4 did not render ES' financial statements incomplete.  *See Paper Suppliers*, 35 CIT at 1052, 791 F. Supp. 2d at 1299 (concluding that financial statements were "sufficiently complete" notwithstanding the "lack [of] any schedules or breakouts for line items on the balance sheet"); *cf. Husteel*, 31 CIT at 748, 491 F. Supp. 2d at 1291 (citing *Viraj Forgings,* 28 CIT at 2089, 350 F. Supp. 2d at 1320) (other citations omitted); *Zhengzhou Harmoni*, 33 CIT at 499, 617 F. Supp. 2d at 1321.

With respect to Annexure 5, however, Commerce did not explain adequately its conclusion.  In its IDM, Commerce concluded overall that Annexure 5 did not contain information related to ES' potential receipt of subsides that would have distorted Commerce's surrogate financial ratio calculations.  *See* IDM at 30.

**PUBLIC VERSION**

Court No. 21-00283                                                                                  Page 30

Commerce made the following particular findings to support its conclusion. Commerce stated that Note 13 of ES' statements contains a line item that refers to "Balances with government authorities (Refer Annexure – 5)." *Id.* (citing Petitioners Surrogate Value Comments at Ex. 11). The record indicates that the balance associated with this item is 7,518,007 Rupees. Petitioners Surrogate Value Comments at Ex. 11. The Ashley Respondents noted — and petitioners did not dispute — that this sum represented a substantial amount, accounting for "more than 12 percent of [ES'] revenue." Ashley Respondents Case Br. at 8-9; Respondents Selection Resp. at 9; *see* Letter from Cassidy Levy Kent (USA) LLP, to Sec'y of Commerce, re: Mattresses from Vietnam: Mattress Petitioners' Rebuttal Brief (Jan. 5, 2021) at 4-10, PR 490.[7] Commerce found that "this line item [did] not reference government loans, only balances." IDM at 30. Moreover, Commerce stated that "only non-market based government loans would be distortive" with respect to Commerce's calculations and further stated that "there is no record evidence that the line item . . . [was] a loan or distortive." *Id.* Commerce then concluded that this line item — and the reference in this item to Annexure 5 — did not "bear[] on [Commerce's] financial ratio calculations." *Id.*

In the administrative proceedings, the Ashley Respondents argued that Note 13 supported the conclusion that Annexure 5 might have contained information that might have been "critical" to Commerce's calculations. *See* Ashley Respondents Case Br. at 8-9; Respondents Selection Resp. at 8-10. The Ashley Respondents noted that the line

---

[7] Plaintiffs raise the same argument and figure before the court in the instant case. *See* Pls. Br. at 32 n.4.

item that referred to Annexure 5 was listed under Note 13, which was entitled "Short-term loans and advances."  Respondents Selection Resp. at 9.  According to the Ashley Respondents, this item indicated that Annexure 5 might have contained information regarding whether ES "received an amount of government support that would be significantly distortive."  Ashley Respondents Case Br. at 9.

Commerce's explanation is inadequate for three reasons.  First, Commerce did not address in its IDM the fact that Note 13 was *entitled* "Short-term loans and advances."  Petitioners Surrogate Value Comments at Ex. 11; *see* IDM at 29-30.  Commerce stated only that the *line item* under Note 13 "does not reference government loans, only balances," and concluded on this basis that this item was not relevant to Commerce's calculations.  IDM at 30.  Commerce did not address the potential relevance of the title of Note 13 in ascertaining whether the line item under this Note — and, consequently, Annexure 5 — would "bear[] on [Commerce's] financial ratio calculations," nor did Commerce address the arguments that the Ashley Respondents raised with respect to this issue.  *Id.*; *see* Ashley Respondents Case Br. at 8-10; Respondents Selection Resp. at 8-10.  Accordingly, Commerce's explanation failed to "reasonably tie" the record evidence to Commerce's conclusion that Annexure 5 did not contain key information related to ES' potential receipt of distortive subsidies.  *See CS Wind*, 832 F.3d at 1377.

The second reason that Commerce's explanation is inadequate is that Commerce did not address the relevance of the *size* of the balance associated with the line item under Note 13 in concluding that this item was not distortive.  *See* IDM at 30.

Based on record evidence, this balance amounted to more than 12% of ES' revenue.

*See* Petitioners Surrogate Value Comments at Ex. 11; *see also* Ashley Respondents

Case Br. at 8-9.  The Ashley Respondents maintained in this regard that Annexure 5

might have been key to determining whether ES received subsidies that would

"significantly distort[]" Commerce's calculations.  Ashley Respondents Case Br. at 9.

Commerce's failure to address arguments related to the size of the balance renders

Commerce's explanation inadequate.  *See SKF USA*, 630 F.3d at 1374*.*

The third reason that Commerce's explanation is inadequate is that Commerce's

statement that "only non-market based government loans would be distortive" is a non

sequitur.  IDM at 30.  Since Commerce had no information about the item listed under

Note 13 that referred to Annexure 5, Commerce did not have a basis to determine

whether this item constituted a market-based loan.  As such, Commerce did not

substantiate its finding in this respect, nor did Commerce address how this finding is

relevant to Commerce's evaluation as to whether Annexure 5 might have contained key

information.  For the foregoing reasons, the court concludes that Commerce failed to

articulate an adequate explanation with respect to its conclusion on this issue.[8]

---

[8] The court notes that at oral argument defendant-intervenors stated that the line item under Note 13 that refers to Annexure 5 cannot logically "refer to subsidies" to ES from governmental authorities, as this item refers to "balances" and consequently falls "on the asset side of [ES'] balances sheet."  Revised Oral Arg. Tr. at 13:05-14.  However, Commerce did not provide such an explanation in its IDM, and "a post-hoc explanation by [defendant-intervenors] at oral argument cannot cure the lack of explanation by Commerce."  *Cooper (Kunshan) Tire Co. v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1316, 1332 (2021); *see State Farm*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

**PUBLIC VERSION**

This conclusion is consistent with prior decisions of the Court.  For example, in *Dongguan Sunrise*, Commerce selected financial statements that were "missing" information that the court concluded was relevant "to determin[ing] whether the entity received disqualifying subsidies."  *Dongguan Sunrise Furniture Co. v. United States*, 36 CIT 860, 886, 865 F. Supp. 2d 1216, 1242 (2012).  The court rejected Commerce's finding that the missing information was not "critical" and that the plaintiffs "[had] not cited to any evidence of subsidies received by [the entity]," concluding instead that the missing information constituted "a relevant consideration that must be explained by Commerce."  *Id.*; *see also Home Meridian*, 36 CIT at 1296-97, 865 F. Supp. 2d at 1326-27.

Accordingly, the court remands to Commerce for further explanation or reconsideration the conclusion that ES' financial statements were complete.

### 2.    Whether ES' financial statements were publicly available

The court concludes next that Commerce did not adequately explain its conclusion that ES' financial statements were publicly available within the meaning of Commerce's surrogate data selection practice.  *See* 19 C.F.R. § 351.408(c)(1), (4) (directing Commerce to select "publicly available . . . non-proprietary information" to determine the surrogate values for factors of production and "manufacturing overhead, general expenses, and profit"); *Husteel*, 31 CIT at 748, 491 F. Supp. 2d at 1291 (citing *Viraj Forgings,* 28 CIT at 2089, 350 F. Supp. 2d at 1320) (other citations omitted); *Zhengzhou Harmoni*, 33 CIT at 499, 617 F. Supp. 2d 1281, 1321.  Accordingly, the court is not able to ascertain that this conclusion is supported by substantial evidence,

**PUBLIC VERSION**

and the court remands the Final Determination to Commerce for further explanation or reconsideration.

Commerce's selection of financial statements is "guided by a general regulatory preference for publicly available, non-proprietary information." *Since Hardware*, 37 CIT at 805, 911 F. Supp. 2d at 1366 (citing 19 C.F.R. § 351.408(c)(1), (4)). The goal of this practice is to "ensure that interested parties are able to comment on the reliability and relevance of such information in the particular case." IDM at 35; *see Yantai Xinke*, 38 CIT at 497.

In the instant case, Commerce did not explain adequately its conclusion that ES' financial statements met the "bar" that Commerce has set for public availability. *See* IDM at 35; *Yantai Xinke*, 38 CIT at 497. To support this conclusion, Commerce stated that it previously has "found that a financial statement need not be free of charge for it to be publicly available." IDM at 35. Here, Commerce explained that certain record evidence — in particular, the Ashley Respondents' acknowledgment "that [ES'] financial statements [were] available in a subscription database" — demonstrated that ES' statements were publicly available. *See id.* at 36. However, the Ashley Respondents argued that they and Commerce had not been able to verify that the version of ES' statements "*provided by the Petitioners*" that existed "within subscription databases" was complete. Respondents Rebuttal Comments at 41 (emphasis supplied); *see also* Pls. Br. at 26 ("Commerce's conclusion elides the fact that the Ashley Respondents acknowledged only that the *incomplete* financial statements provided by Petitioners existed in a subscription database.") (emphasis supplied). The Ashley Respondents

noted further that ES did not "maintain a website" through which to publish its financial statements and that the statements were "not available on the Indian [MCA] website." Ashley Respondents Case Br. at 33; *see* Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Antidumping Duty Investigation of Mattresses from the Socialist Republic of Vietnam: Factual Information Submission (Oct. 7, 2020) ("Respondents Factual Information Submission") at 32, PR 406-411.  On this basis, the Ashley Respondents argued that Commerce and interested parties were unable to "fully verify [the] accuracy" of the version of ES' statements in the record.  Ashley Respondents Case Br. at 33.

Commerce's explanation as to the public availability of ES' financial statements is inadequate for two reasons.  First, Commerce failed to address whether the version of the statements that was available in the subscription database was complete.  *See* IDM 35-36; *Itochu Bldg Prods. Co. v. United States*, 41 CIT __, Slip Op. 17-66 (June 5, 2017), at 14 (stating that a "financial statement [was] not fully publicly available" on the basis that the accessible version was "missing several of the statement's sections").

Second, Commerce did not address the record evidence to which the Ashley Respondents referred with respect to their alleged efforts to obtain ES' financial statements.  Specifically, the Ashley Respondents argued that they were unable to confirm the availability of ES' statements through "a public source that can be verified based on the record," as the statements were available through neither the ES website nor "the Indian [MCA] website."  Ashley Respondents Case Br. at 33 (citing Respondents Rebuttal Comments at 41); *see* Public Hearing at 54 (indicating that the

PUBLIC VERSION

Ashley Respondents "tried to find the financial statement[s]" of ES, but were "not . . . able to").  Notwithstanding Commerce's reference to prior determinations in which Commerce found that financial statements "need not be free of charge" to be publicly available, *see* IDM at 36 n.251, Commerce's conclusion that ES' statements were publicly available neither indicates that Commerce considered the foregoing evidence nor demonstrates that Commerce addressed the arguments that the Ashley Respondents "properly raise[d]" with respect to this evidence.  *See SKF USA*, 630 F.3d at 1374; *Since Hardware (Guangzhou) Co. v. United States*, 2012 WL 11802604, at *2 (CIT Aug. 14, 2012) (remanding Commerce's selection of financial statements in view of "more than a fair amount of record information demonstrating that the [selected] statements may not have been publicly available," including evidence that interested parties "tried unsuccessfully to obtain" the statements).  Consequently, Commerce did not provide an adequate explanation with respect to this issue.

### 3. Remaining arguments with respect to Commerce's selection of financial statements

The court remands the Final Determination with respect to Commerce's selection of financial statements to calculate surrogate financial ratios and directs Commerce to explain further or reconsider its conclusions with respect to whether ES' financial statements were complete and publicly available.

Accordingly, the court "does not consider it necessary at this time to rule on the other grounds" that the parties address with respect to Commerce's selection of financial statements.  *Fine Furniture*, 40 CIT at __, 182 F. Supp. 3d at 1361.  As discussed, the "other grounds" that the parties address concern the non-

contemporaneity of ES' financial statements, whether ES' financial statements were representative of the business operations of Wanek, Millennium and Comfort Bedding, and whether SF's financial statements contained evidence of the receipt of countervailable subsidies.  *See* Pls. Br. at 11-36; Def. Br. at 9-27; Def.-Intervenors Br. at 9-25.  "Instead, the court will consider [Commerce's] new decision after reviewing the comments of the parties."  *Fine Furniture*, 40 CIT at __, 182 F. Supp. 3d at 1361.  It is possible that Commerce's reconsideration of whether ES' financial statements were complete and publicly available will lead Commerce to reevaluate the remaining selection criteria in selecting the financial statements with which to calculate surrogate financial ratios in this investigation.

## II.    Commerce's calculation of the surrogate value for pocket coil innerspring units

### A.    Legal framework

To determine the "best available" surrogate value for a factor of production of the subject merchandise, Commerce evaluates the data in the record to reach a product-specific and case-specific determination.  *See SolarWorld Ams., Inc. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1254, 1262 (2017); *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 75 Fed. Reg. 41,808 (Dep't of Commerce July 19, 2010) and accompanying IDM, A-570-952 (Dep't of Commerce July 12, 2010) at cmt. 2.  The data that Commerce selects are required to "evidence[] a rational and reasonable relationship to the factor of production [they] represent[]."  *Shandong Huarong General Corp. v. United States*, 25 CIT 834, 838, 159 F. Supp. 2d 714, 719 (2001).  Further, in

**PUBLIC VERSION**

evaluating the record, Commerce "need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a *reasonable* way." *Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 118, 44 F. Supp. 2d 229, 258 (1999) (emphasis supplied) (citation omitted).

"In calculating factors of production, Commerce typically employs data sets" as a basis to estimate factor values. *Dorbest Ltd. v. United States*, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268 (2006). In this investigation, the Ashley Respondents and petitioners presented for inclusion in the record data sets that each referenced a subheading of the Indian HTS with which to classify and calculate the surrogate value for PCIUs. *See* Respondents Surrogate Value Comments at Exs. SV-1, SV-3; Petitioners Surrogate Value Comments at 2-3, Ex. 2; *see also* Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Mattresses from the Socialist Republic of Vietnam: Second Supplemental Section D Questionnaire Response (Sept. 14, 2020) ("Respondents Supplemental Questionnaire Response") at Ex. SD2-3b, PR 352-354. Petitioners presented Indian HTS subheading 7320.90.90, which covers: "Springs and leaves for springs, of iron or steel; Other; Other." *See* Petitioners Surrogate Value Comments at 2-3, Ex. 2; Preliminary Determination of the Antidumping Duty Investigation of Mattresses from the Socialist Republic of Vietnam: Surrogate Value Memorandum (Oct. 27, 2020) ("Surrogate Value Memorandum") at 6-7, PR 449; Respondents Surrogate Value Comments at Ex. SV-3. The Ashley Respondents presented Indian HTS subheading 9404.29.90, which covers: "Mattress supports;

PUBLIC VERSION

articles of bedding and similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs or stuffed or internally fitted with any material or of cellular rubber or plastics, whether or not covered; Mattresses; Of other materials; Other." *See* Surrogate Value Memorandum at 5-7; Respondents Surrogate Value Comments at Ex. SV-3.  Commerce selected subheading 7320.90.90 as the "best available information" with which to value PCIUs.  *See* Surrogate Value Memorandum at 5-8; IDM at 42.

> **B.    Positions of the parties**

Plaintiffs contend that Commerce's selection is not supported by substantial evidence. *See* Pls. Br. at 36.  Plaintiffs argue that Commerce "improperly concluded that Indian HTS subheading 7320.90.90 'covers imports more specific to the [PCIUs] than HTS 9404.29.90.'" *Id.* (quoting IDM at 42).

Plaintiffs present two arguments in support of their position.  Plaintiffs argue first that the record indicates that PCIUs are properly classified under Indian HTS subheading 9404.29.90, rather than subheading 7320.90.90. *Id.* at 36-39.  Plaintiffs maintain that Commerce should have but did not apply the General Rules of Interpretation ("GRIs") in selecting the subheading with which to value PCIUs. *Id.* at 37 (citing *Jiangsu Senmao Bamboo and Wood Indus. Co. V. United States*, 42 CIT __, __, 322 F. Supp. 3d 1308, 1320 (2018)).  Further, plaintiffs point to the description in the record of PCIUs as "[i]nnerspring assemblies unit made of steel wire, fabric and glue." *Id.* (citing Respondents Supplemental Questionnaire Response at Ex. SD2-3b).  This description, according to plaintiffs, indicates that PCIUs are neither "exclusively made of

springs" nor "articles of iron and steel" and, consequently, are not best classified under Indian HTS subheading 7320.90.90.  *Id.* at 37-38.  Rather, plaintiffs assert that this description indicates that PCIUs "are properly considered mattress supports classified under HTS heading 9404."  *Id.* at 37.

Moreover, plaintiffs contend that Commerce "unreasonably ignored" six expert opinions that the Ashley Respondents presented and that were included in the record regarding the classification of PCIUs under the Indian HTS.  *Id.* at 38-39 (citing Respondents Factual Information Submission at Exs. SV2-16, SV2-17; Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Mattresses from the Socialist Republic of Vietnam: Comments on Petitioners' Surrogate Value Comments (Oct. 16, 2020) ("Respondents Comments on Surrogate Value") at Exs. SV3-1, SV-2, SV-3, SV-4, PR 420-421).  Plaintiffs contend that the "professional opinions of Indian classification legal experts are highly relevant in ensuring that Commerce uses the correct HTS code to capture the specific material."  *Id.* at 38.  Here, plaintiffs argue that the analysis set forth in the opinions indicates that PCIUs are "best" classified under HTS subheading 9404.29.90 and, consequently, that Commerce's selection of subheading 7320.90.90 was unreasonable.  *Id.* at 38-39.

Plaintiffs' second argument with respect to this issue is that Indian HTS subheading 7320.90.90 "cannot represent the best available information because reliance" on this subheading "yield[s] results so aberrational as to be unusable."  *Id.* at 39.  Plaintiffs contend that Commerce's selection results in a "distorted and inflated value that [is] 'greater than all other material inputs combined.'"  *Id.* at 41 (quoting

**PUBLIC VERSION**

Ashley Respondents Case Br. at 53, Ex. 1).  Specifically, plaintiffs note that when

classified under Indian HTS subheading 7320.90.90, PCIUs represent [[        ]] of the

total normal value of the subject merchandise, whereas the remaining inputs represent

[[        ]] of the total normal value.  *Id.* (citing Ashley Respondents Case Br. at 53, Ex.

1)).  Plaintiffs note also that when classified under Indian HTS subheading 7320.90.90,

the value of PCIUs represents [[        ]] of the total net sales value of the subject

merchandise.  *Id.*

Defendant and defendant-intervenors argue that Commerce's selection is

supported by substantial evidence.  *See* Def. Br. at 27-31; Def.-Intervenors Br. at 25-36.

Defendant and defendant-intervenors contend in response to plaintiffs' first argument

that Commerce decided reasonably to select Indian HTS subheading 7320.90.90 and to

reject Indian HTS subheading 9404.29.90.  *See* Def. Br. at 27-29; Def.-Intervenors Br.

at 26-34.  To start, defendant notes that the Court previously has concluded that the

GRIs "are not binding when Commerce use[s] [a foreign] HTS to approximate the cost

of a factor of production" and, consequently, that Commerce was not required to apply

the GRIs here.  Def. Br. at 28 (citing *Gleason Indus. Prods., Inc. v. United States*, 32

CIT 382, 388, 559 F. Supp. 2d 1364, 1370 (2008)).  Further, defendant contends that

Commerce concluded reasonably that "HTS 7320.90.90 is a better category because it

expressly covers springs of iron or steel of coil, other than coil spring for railways,

tramways or spring pins, used by [Wanek, Millennium and Comfort Bedding], while HTS

9404.29.90 covers items that are dissimilar to" PCIUs.  *Id.* at 27 (quoting IDM at 42).

Defendant notes also that Commerce explained that subheading 9404.29.90 applies to

mattresses of a material "other" than a "spring interior," whereas PCIUs are described

as being composed of "spring coil."  *Id.* at 27-28 (citing IDM at 42; Surrogate Value

Memorandum at 7); *see also* Respondents Supplemental Questionnaire Response at

Ex. SD2-3b.  On this basis, defendant contends that Commerce concluded reasonably

that "HTS 9404.29.90 does not provide the best valuation of [PCIUs] because [this

subheading] does not contain springs."  Def. Br. at 28 (quoting IDM at 42) (internal

quotation marks omitted).

Defendant and defendant-intervenors argue also that Commerce considered and

rejected reasonably the expert opinions that the Ashley Respondents presented for

inclusion in the record.  *See id.* at 28-29; Def.-Intervenors Br. at 31-34.  Defendant

contends that Commerce is not "bound" by these opinions, Def. Br. at 29 (citing

*Samsung Intern. v. United States*, 36 CIT 1531, 1540 n.18, 887 F. Supp. 2d 1330, 1338

n.18 (2012)), and that Commerce explained adequately its disagreement with the

analysis set forth in the opinions.  *See id.*  Defendant points to Commerce's explanation

that while the "Indian classification opinions opine that innerspring coil units used to

produce mattresses should be classified under [Indian HTS subheading] 9404.29.90,"

this subheading is in fact "an 'other' category covering articles of mattresses that do not

contain springs."  *Id.* at 28-29 (quoting IDM at 43) (emphasis omitted).  Defendant notes

also that Commerce explained its disagreement with the analysis in the opinions that

PCIUs have the "essential character" of a mattress.  *Id.* at 29 (quoting IDM at 43).

According to defendant, Commerce concluded reasonably that PCIUs do not have the

"essential character" of a mattress, *see id.*, as Commerce explained that PCIUs "are an

input for a completed mattress" and "comprise part of the core but are not sold or marketed to take the place of a mattress." IDM at 43.

Defendant and defendant-intervenors address next plaintiffs' second argument and contend that Commerce rejected reasonably the contention that Indian HTS subheading 7320.90.90 "yield[s] aberrational results." *See* Def. Br. at 29-31; Def.-Intervenors Br. at 34-36. According to defendant, Commerce concluded reasonably that the Ashley Respondents "provided insufficient evidence" that subheading 7320.90.90 is "aberrational." Def. Br. at 30 (quoting IDM at 45). Defendant notes that in determining whether data are "aberrational," Commerce found that "the existence of higher prices alone does not necessarily indicate that the price data are distorted or misrepresentative, and thus is not a sufficient basis upon which to exclude a particular" surrogate value. *Id.* (quoting IDM at 45). Here, defendant-intervenors note that in the administrative proceedings, the Ashley Respondents argued only that when classified under Indian HTS subheading 7320.90.90, PCIUs represent [[        ]] of the total normal value of the subject merchandise. *See* Def.-Intervenors Br. at 35. On this basis, defendant and defendant-intervenors contend that the Ashley Respondents did not provide sufficient evidence to buttress their argument. *See id.*; Def. Br. at 30.

In addition, defendant contends that plaintiffs did not exhaust administrative remedies with respect to the specific argument that when PCIUs are classified under subheading 7320.90.90, the value of PCIUs represents [[        ]] of the total net sales value of the subject merchandise. Def. Br. at 30 (citing Pls. Br. at 41). According to defendant, "although plaintiffs generally argued that the data are aberrational, they

failed to present this specific argument in their case brief in the investigation and thus

they failed to exhaust this argument."  *Id.*

> ### C.    Analysis

The court concludes that Commerce's selection of data with which to calculate

the surrogate value for PCIUs is supported by substantial evidence.

In its IDM, Commerce explained its selection of Indian HTS subheading

7320.90.90 as the "best available information" with which to value PCIUs — which are

composed of "steel wire, fabric and glue" and described as "spring coil" — on the basis

that this subheading covers springs of iron or steel "other" than "coil spring for railways,

tramways or spring pins."  IDM at 42; *see* Respondents Supplemental Questionnaire

Response at Ex. SD2-3b; Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce,

re: Mattresses from the Socialist Republic of Vietnam: Pre-Prelim Comments (Oct. 2,

2020) ("Respondents Pre-Preliminary Comments") at 6, PR 391.  Further, Commerce

concluded that subheading 9404.29.90 is not the "better category," as this subheading

"covers items that are dissimilar to" PCIUs.  IDM at 42.  Commerce explained that

subheading 9404.29.90 covers completed mattresses of a material "other" than a spring

interior, whereas PCIUs are inputs that are composed of spring coil.  *Id.*; *see*

Respondents Surrogate Value Comments at Ex. SV-3.

To buttress its conclusion, Commerce addressed and explained its disagreement

with the expert opinions that the Ashley Respondents presented to support the selection

of subheading 9404.29.90.  *See* IDM at 43-44 (citing Respondents Factual Information

Submission at Exs. SV2-16, SV2-17; Respondents Comments on Surrogate Value at

**PUBLIC VERSION**

Exs. SV3-1, SV-2, SV-3, SV-4); *see also* Ashley Respondents Case Br. at 44-53;

Respondents Factual Information Submission at 17-19.  In addition, Commerce rejected

the argument that the selection of subheading 7320.90.90 results in "aberrational"

values, explaining that the Ashley Respondents provided "insufficient evidence" to

support this argument.[9]  IDM at 45.

      Commerce's explanation of its selection of surrogate data demonstrates that

Commerce addressed the arguments of the Ashley Respondents and "reasonably tie[d]"

its decision to "the governing statutory standard" and to "record evidence."  *CS Wind*,

832 F.3d at 1377.  The parties raise two points in challenge to Commerce's selection.

The court evaluates those points in sequence.

### 1.    Whether Commerce decided reasonably to select Indian HTS subheading 7320.90.90 and to reject subheading 9404.29.90

      In evaluating Indian HTS subheadings 7320.90.90 and 9404.29.90, Commerce

was not required to apply the GRIs to select the subheading with which to calculate the

surrogate value for PCIUs.  The Federal Circuit has stated that Commerce is not

"required to engage in a classification analysis" and apply the GRIs in selecting a

---

[9] In the administrative proceedings, the Ashley Respondents noted that one of the petitioners, Leggett & Platt, Incorporated, as well as counsel to petitioners, previously argued in different proceedings before Commerce and the Commission that inputs "nearly identical" to PCIUs were properly classified under HTSUS 9404.29.90.  *See* Respondents Factual Information Submission at 6-12; Ashley Respondents Case Br. at 40-43.  Commerce explained, however, that the "best available information" standard requires a "product-specific and case-specific decision."  IDM at 42.  Moreover, it is Commerce's established practice to evaluate separately each administrative proceeding, as "each investigation and administrative review present[s] . . . a unique set of facts and circumstances."  *Krupp Stahl A.G. v. United States*, 17 CIT 450, 457, 822 F. Supp. 789, 795 (1993); *see Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT 1632-33, 1651, 28 F. Supp. 3d 1317, 1336 (2014).

provision of a foreign Harmonized Tariff Schedule with which to value a particular factor

of production. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1379

(Fed. Cir. 2015); *see Gleason*, 32 CIT at 389, 559 F. Supp. 2d at 1370 (stating that the

plaintiffs' arguments "regarding the binding nature of the GRI[s] . . . in the antidumping

context [we]re misplaced"). Rather, Commerce is required by statute "to determine

which of the competing subheadings constitute[s] the *best available information*" in the

record. *Downhole Pipe*, 776 F.3d at 1379 (emphasis supplied); *see* 19 U.S.C. §

1677b(c).

Commerce selected reasonably Indian HTS subheading 7320.90.90 as the "best

available information" in the record. *See* 19 U.S.C. § 1677b(c); IDM at 42-45. The

Court previously has stated that "Commerce may rely on the plain meaning of [foreign

Harmonized Tariff Schedule] descriptions to determine the best available information to

value a specific input." *Carbon Activated*, 46 CIT at __, 547 F. Supp. 3d at 1317. As

discussed, PCIUs are "[i]nnerspring assemblies unit[s]" composed of "steel wire, fabric

and glue" and described as "spring coil." Respondents Supplemental Questionnaire

Response at Ex. SD2-3b; Respondents Pre-Preliminary Comments at 6. Indian HTS

subheading 7320.90.90 refers to "[s]prings . . . of iron or steel *other* than "coil spring for

railways, tramways" or "spring pins." Respondents Surrogate Value Comments at Ex.

SV-3. Commerce relied reasonably on this subheading to value PCIUs.

Plaintiffs argue also that PCIUs are not "exclusively made of springs." *See* Pls.

Br. at 37-38. Commerce explained that the existence of "spring coil" and "steel wire" in

PCIUs indicates that subheading 7320.90.90 — which "expressly covers springs of iron

**PUBLIC VERSION**

Court No. 21-00283                                                                 Page 47

or steel of coil" — covers merchandise that corresponds reasonably to PCIUs.  IDM at

42; *see* Respondents Supplemental Questionnaire Response at Ex. SD2-3b;

Respondents Pre-Preliminary Comments at 6; *see also Mid Continent Steel & Wire, Inc.*

*v. United States*, 42 CIT __, __, 321 F. Supp. 3d 1313, 1325 (2018) (sustaining

Commerce's selection of an HTS category that "more closely matched the description"

of the material contained in the factor of production).

Moreover, Commerce decided reasonably to reject Indian HTS subheading

9404.29.90.  Relying upon a plain meaning of this subheading, *see Carbon Activated*,

46 CIT at __, 547 F. Supp. 3d at 1317, Commerce reached two conclusions.  First,

Commerce concluded that this subheading — which covers "[m]attresses" — is not the

"best available information" with which to value PCIUs.  IDM at 43; *see* Respondents

Surrogate Value Comments at Ex. SV-3.  Commerce explained that PCIUs do not "take

the place of a mattress."  IDM at 43.  Commerce cited to record evidence that

buttresses this conclusion, including a submission of the Ashley Respondents that

indicates that PCIUs constitute only one of the factors of production comprising the

subject merchandise.  *See id.* at 42 (citing Mattresses from the Socialist Republic of

Vietnam: Supplemental Section D Questionnaire Response (July 22, 2020)

("Respondents Supplemental Section D Questionnaire Response") at Ex. 1;

Respondents Factual Information Submission at 4); *see also* Respondents

Supplemental Questionnaire Response at Ex. SD2-3b.  On this basis, Commerce

explained that Indian HTS subheading 9404.29.90 is not a "better" choice than

PUBLIC VERSION

subheading 7320.90.90, as the former covers completed mattresses.  *See* IDM at 42-
43.

The second conclusion that Commerce reached with respect to subheading

9404.29.90 is that this subheading covers mattresses of a material "*other*" than a

"spring interior."  *Id.* at 42 (emphasis supplied); *see* Respondents Surrogate Value

Comments at Ex. SV-3.  Notwithstanding that Heading 9404 of the Indian HTS covers,

among other merchandise, "articles of bedding and similar furnishing . . . fitted with

springs," *see* Respondents Surrogate Value Comments at Ex. SV-3, Commerce

explained that the specific subheading in question is an "other" category that does *not*

cover mattresses that contain a "spring interior."  IDM at 42 (citing Surrogate Value

Memorandum at 6-7).  Consequently, relying upon the description in the record of

PCIUs — which consist of "spring coil" — Commerce concluded that subheading

9404.29.90 is not the "better" selection, as this subheading "covers items that are

dissimilar to" PCIUs.  *Id.*; Respondents Pre-Preliminary Comments at 6.

The court concludes also that Commerce explained adequately its disagreement

with the expert opinions that the Ashley Respondents presented and that were included

in the record.  As expert opinions are "merely advisory" in nature, *Samsung*, 36 CIT at

1540 n.18, 887 F. Supp. 2d at 1338 n.18, Commerce was not required to accept the

analysis set forth in the opinions; rather, Commerce was required to evaluate and

explain its decision whether to rely upon this evidence in selecting the "best available"

information" in the record.  19 U.S.C. § 1677b(c)(1)(B).  In its IDM, Commerce explained

that it "disagree[d] that [PCIUs] have the essential character of a mattress as determined by the six Indian classification opinions."[10]  IDM at 43.

Based on the foregoing, the court concludes that Commerce explained adequately its decision not to rely upon the analysis set forth in the expert opinions regarding the applicability of subheading 9404.29.90.

### 2.    Whether Commerce's selection of Indian HTS subheading 7320.90.90 results in "aberrational" values

The court concludes next that Commerce rejected reasonably the argument that Commerce's selection of Indian HTS subheading 7320.90.90 results in "aberrational" values.  *See* Ashley Respondents Case Br. at 53-54, Ex. 1; Pls. Br. at 39-41.  The Ashley Respondents stated in support of this argument that when classified under subheading 7320.90.90, PCIUs represent [[        ]] of the total normal value of the subject merchandise.  *See* Ashley Respondents Case Br. at 53-54, Ex. 1.  Consistent with its established practice, Commerce explained that "the existence of higher prices alone" is not sufficient to support the argument that subheading 7320.90.90 results in "aberrational" values.  IDM at 45 (citing *Final Determination of Sales at Less than Fair Value: Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of*

---

[10] Commerce substantiated its explanation on the basis that PCIUs constitute only one of the factors of production comprising the subject merchandise.  *See* IDM at 42-43 (citing Respondents Supplemental Section D Questionnaire Response at Ex. 1; Respondents Factual Information Submission at 4); *see also* Respondents Supplemental Questionnaire Response at Ex. SD2-3b; *Final Determination*, 86 Fed. Reg. at 15,891 ("The products covered by this investigation are all types of youth and adult mattresses . . . [that] may consist of innersprings, foam, other resilient filling, or a combination . . . .  'Innerspring mattresses' contain innersprings, a series of metal springs joined together in sizes that correspond to the dimensions of mattresses.").  Moreover, Commerce explained that PCIUs are not sold or marketed in place of a completed mattress.  IDM at 43.

**PUBLIC VERSION**

*Vietnam*, 69 Fed. Reg. 71,005 (Dep't of Commerce Dec. 8, 2004) and accompanying

IDM, A-552-802 (Dep't of Commerce Nov. 29, 2004) at 12; *Citric Acid and Certain*

*Citrate Salts from the People's Republic of China: Final Results of the First*

*Administrative Review of the Antidumping Duty Order*, 76 Fed. Reg. 77,772 (Dep't of

Commerce Dec. 14, 2011) and accompanying IDM, A-570-937 (Dep't of Commerce

Dec. 7, 2011) at cmt. 12).  Moreover, Commerce determined that the Ashley

Respondents did not include in the record any evidence other than the higher prices to

support their argument.  *See id.*

        The court's conclusion that Commerce rejected reasonably this argument is

consistent with prior decisions of the Court.  For example, in *Jacobi Carbons*, the court

stated that the plaintiff's "observation that the [selected] surrogate" data resulted in a

value "eight times higher" than other data was "no doubt, factually correct."  *Jacobi*

*Carbons AB v. United States*, 38 CIT 932, 950, 992 F. Supp. 2d 1360, 1375-76 (2014),

*aff'd*, 619 F. App'x 992 (Fed. Cir. 2015).  However, the court concluded that "without

more [this observation] cannot be given much weight" and, consequently, sustained

Commerce's selection.  *Id.*; *see also Tr. Chem Co. v. United States*, 35 CIT 1012, 1018-

19, 791 F. Supp. 2d 1257, 1264 (2011) (stating that notwithstanding the plaintiff's

reference to a "large discrepancy in price" values, the plaintiff "did not place sufficient

comparative data on the record . . . to support its challenge based on numerical

differences alone").

        Further, the court concludes that plaintiffs did not exhaust administrative

remedies with respect to the specific argument that when PCIUs are classified under

**PUBLIC VERSION**

Court No. 21-00283                                                                                          Page 51

Indian HTS subheading 7320.90.90, the value of PCIUs represents [[          ]] of the total

net sales value of the subject merchandise.  *See* Pls. Br. at 41.  "[T]he Court of

International Trade shall, where appropriate, require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d).  In the instant case, the Ashley Respondents did not

raise this argument in the administrative proceedings.  Rather, plaintiffs raise this

argument and figure in the first instance before the court.  *See* Pls. Br. at 41.

Accordingly, plaintiffs did not exhaust administrative remedies with respect to this

argument, and the court declines to consider the argument.  *See Blue Field*, 37 CIT at

1631-32, 949 F. Supp. 2d at 1324-25.

* * *

In view of the "absence of a category" in the Indian HTS that applies "specifically"

to PCIUs, Commerce was required to determine whether Indian HTS subheading

7320.90.90 or subheading 9404.29.90 constitutes the "best available information" in the

record.  *SolarWorld Ams.*, 41 CIT at __, 273 F. Supp. 3d at 1271 (sustaining

Commerce's selection notwithstanding Commerce's "[a]cknowledg[ment] that the HTS

categories were imperfect" and that "a perfect fit was not available").  In accordance

with its statutory mandate, Commerce selected Indian HTS subheading 7320.90.90 and

explained adequately its conclusion that this subheading more closely applies to PCIUs

than does subheading 9404.29.90.  *See* 19 U.S.C. § 1677b(c)(1).  Accordingly, the

court concludes that Commerce's selection is supported by substantial evidence, and

the court sustains the Final Determination with respect to this issue.

III.    **Commerce's decision to exclude AFI and AFTC from the separate rate assigned to Wanek, Millennium and Comfort Bedding**

A.      **Legal framework**

In an AD proceeding involving imports from an NME country, "'rates' may consist of a single dumping margin applicable to all exporters and producers."  19 C.F.R. § 351.107(d).  In such a proceeding, Commerce will assign to an exporter or producer the calculated country-wide rate unless the entity rebuts the presumption of governmental control over its activities.  *See Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1311-12 (Fed. Cir. 2017).  Should an entity rebut this presumption, Commerce may assign to the entity a "separate" rate.  *See id.*; *Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries*, Import Administration Policy Bulletin 05.1 (Apr. 5, 2005) ("Policy Bulletin 05.1"); *see also Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT 1407, 1417, 647 F. Supp. 2d 1368, 1379 (2009) ("To determine the [AD] margin for non-mandatory respondents in NME cases (that is, to determine the 'separate rates' margin), Commerce normally relies on the 'all others rate' provision of 19 U.S.C. § 1673d(c)(5)).  To facilitate its assessment in this regard, Commerce requires an entity that requests "separate-rate status" to submit a separate rate application.  *See* Policy Bulletin 05.1, at 3-6.

In this investigation, Wanek, Millennium and Comfort Bedding — each exporter of mattresses from Vietnam — submitted separate rate applications ("Separate Rate Applications") and were assigned a separate rate of 144.92%, rather than the Vietnam-wide entity rate of 668.38%.  *See* Letter from Mowry & Grimson, PLLC, to Sec'y of

**PUBLIC VERSION**

Commerce, re: Antidumping Duty Investigation of Mattresses from the Socialist

Republic of Vietnam: Separate Rate Application of Millennium Furniture Co., Ltd. (June

1, 2020), PR 156-157; Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re:

Antidumping Duty Investigation of Mattresses from the Socialist Republic of Vietnam:

Separate Rate Application of Wanek Furniture Co., Ltd. (June 1, 2020), PR 158; Letter

from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Antidumping Duty

Investigation of Mattresses from the Socialist Republic of Vietnam: Separate Rate

Application of Comfort Bedding Company Limited (June 1, 2020), PR 159; *see also*

*Final Determination*, 86 Fed. Reg. at 15,890.  AFI and AFTC — neither of which is a

foreign exporter or producer — did not submit separate rate applications and,

consequently, were not assigned the separate rate assigned to Wanek, Millennium and

Comfort Bedding.[11]  *See* Second Am. Compl. ¶ 5; IDM at 52-53.  Commerce concluded

in its Final Determination that "[t]he companies denied a separate rate will be treated as

part of the Vietnam-wide entity" and assigned the corresponding rate of 668.38%.  *Final*

*Determination*, 86 Fed. Reg. at 15,890.

> **B.      Positions of the parties**

Plaintiffs contend that Commerce declined unreasonably to "list" AFI and AFTC

in Commerce's cash deposit instructions to Customs as eligible for the rate assigned to

Wanek, Millennium and Comfort Bedding.  Pls. Br. at 42.  Plaintiffs argue that AFI and

---

[11] The record indicates that AFI and AFTC were involved in the reinvoicing of the subject merchandise.  *See* Letter from Mowry & Grimson, PLLC, to Sec'y of Commerce, re: Mattresses from the Socialist Republic of Vietnam: Section A Questionnaire Response (June 19, 2020), vol. I at A-31, vol. II at A-25, vol. III at A-27, CR 108-122.

**PUBLIC VERSION**

Court No. 21-00283                                                                 Page 54

AFTC are "reinvoicing entities" of the subject merchandise and, consequently, that the names of AFI and AFTC may "appear on certain entry documents presented to Customs." *Id.* As such, plaintiffs argue that "[b]ecause AFI or AFTC may appear as the seller or exporting party in the final invoice presented to Customs," Commerce's "instructions could incorrectly expose merchandise reinvoiced by AFI or AFTC to the Vietnam-wide rate." *Id.* at 3-4, 43.

Defendant argues that Commerce determined reasonably that AFI and AFTC should be excluded from the separate rate assigned to Wanek, Millennium and Comfort Bedding. *See* Def. Br. at 31-34; *see also* IDM at 52-53. Defendant argues that there is no record evidence that indicates that "either [AFI or AFTC] is a producer or exporter of subject merchandise from Vietnam, a criterion to receive a separate rate." Def. Br. at 33 (quoting IDM at 53).[12] Further, even presuming that AFI and AFTC, as reinvoicing entities, "may appear as the exporting party of subject merchandise," defendant contends that plaintiffs' claims "do not substitute nor allow for AFI nor AFTC to circumvent the proper procedures for obtaining a separate rate by submitting a separate rate application." *Id.* (citing Pls. Br. at 43; IDM at 52).

   **C.    Analysis**

Commerce's decision to exclude AFI and AFTC from the separate rate assigned to Wanek, Millennium and Comfort Bedding is supported by substantial evidence. Pursuant to regulation, there are two reasons that AFI and AFTC are not eligible for

---

[12] Defendant cites to page 53 of Commerce's IDM to substantiate this argument. *See* Def. Br. at 33. However, the statement to which defendant cites appears on page 52 of the IDM. *See* IDM at 52.

**PUBLIC VERSION**

separate rate status and the corresponding cash deposit rate of 144.92% assigned to Wanek, Millennium and Comfort Bedding.  *See* Policy Bulletin 05.1.  First, neither AFI nor AFTC is a foreign exporter or producer of mattresses from Vietnam.  *See* Second Am. Compl. ¶ 5; Policy Bulletin 05.1; *see also* 19 C.F.R. § 351.107(d); 19 U.S.C. § 1673d(c)(5).  Further, neither the statute nor Commerce's regulation *requires* that Commerce assign to an entity a separate rate in a circumstance in which the entity *might* reinvoice certain entries of subject merchandise.[13]  *See* 19 U.S.C. § 1673d(c)(1)(B), (5); 19 C.F.R. § 351.107(d).  Second, the record indicates that neither AFI nor AFTC submitted a separate rate application to establish its eligibility for separate rate status.  *See* IDM at 52; *Initiation Notice*, 85 Fed. Reg. at 23,007 ("In order to obtain separate-rate status in an NME investigation, exporters and producers must submit a separate-rate application.").

Moreover, AFI and AFTC are not eligible for separate rate status through their relationship with Wanek, Millennium and Comfort Bedding because Commerce decided to collapse only those three into a single entity; Commerce did not include AFI or AFTC because they are located in a different country and Commerce's practice is "not [to] collapse across country lines."[14]  *Notice of Final Determination of Sales at Less Than*

---

[13] Contrary to plaintiffs' argument, the possibility that AFI and AFTC might "appear as the seller or exporting party in the final invoice presented to Customs" does not provide a legal basis to assign to AFI and AFTC a separate rate.  Pls. Br. at 43; *see* Ashley Respondents Case Br. at 60-61.

[14] As discussed, Wanek, Millennium and Comfort Bedding are exporters of mattresses from Vietnam.  *See supra* Background.  AFI is a U.S. domestic producer and U.S. importer of mattresses, and AFTC also is a U.S. importer.  *See id.*; *see also* Separate Rate Applications.

**PUBLIC VERSION**

*Fair Value and Final Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29,310 (Dep't of Commerce May 22, 2006) and accompanying IDM, A-580-855 (Dep't of Commerce May 15, 2006) at cmt. 15; *see* IDM at 53; Antidumping Duty Investigation of Mattresses from the Socialist Republic of Vietnam: Ashley Furniture Industries, Inc., Ashley Furniture Trading Company, Wanek Furniture Co., Ltd., Millennium Furniture Co., Ltd., and Comfort Bedding Company Limited Preliminary Affiliation and Collapsing Memorandum (Oct. 27, 2020) ("Collapsing Memorandum") at 4-8, CR 619.; *see also* Less-Than-Fair-Value Investigation of Mattresses from the Socialist Republic of Vietnam: Allegation of Ministerial Error in the Preliminary Determination (Dec. 1, 2020) at 3, PR 478.  The Ashley Respondents did not challenge this decision.  *See* Collapsing Memorandum at 4-8; *see generally* IDM.

Accordingly, Commerce's exclusion of AFI and AFTC from the separate rate assigned to Wanek, Millennium and Comfort Bedding is consistent with 19 U.S.C. § 1673d(c)(1)(B)(ii) and is supported by substantial evidence, and the court sustains the Final Determination with respect to this issue.

**IV.    Commerce's use of the Cohen's *d* test**

**A.    Legal framework**

The Cohen's *d* test is a statistical measure that Commerce uses to conduct its "differential pricing" analysis.  *Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722-23 (Dep't of Commerce May 9, 2014).  Commerce conducts this analysis to determine "when it may be appropriate to use . . . the average-to-

**PUBLIC VERSION**

transaction comparison method," rather than the default average-to-average method, to

calculate the margin (or margins) in an AD investigation.  *Id.* at 26,720; *see* 19 C.F.R. §

351.414.  In cases in which Commerce has selected the average-to-transaction method,

the Federal Circuit has stated that Commerce's use of the Cohen's *d* test may "bias" the

calculated AD margin.  *See generally Stupp Corp. v. United States*, 5 F.4th 1341 (Fed.

Cir. 2021); *Mid Continent Steel & Wire Co. v. United States*, 31 F.4th 1367 (Fed. Cir.

2022).

      **B.     Positions of the parties**

      Plaintiffs argue that Commerce's use of the Cohen's *d* test in this investigation is

not supported by substantial evidence and not in accordance with the law.  *See* Pls. Br.

at 44-47 (citing *Stupp*, 5 F.4th 1341); *see* Notice Supp. Authority, ECF No. 56.  Plaintiffs

do not dispute that Commerce's use of the Cohen's *d* test did not have a "margin

effect," as Commerce selected the average-to-average method, *not* the average-to-

transaction method, to calculate the AD margin.  *See* Revised Oral Arg. Tr. at 45:03-

46:09; PDM at 28.

      Defendant and defendant-intervenors challenge plaintiffs' claim regarding

Commerce's use of the Cohen's *d* test on two grounds: (1) plaintiffs do not have

standing, as plaintiffs have not suffered an injury resulting from Commerce's use of the

Cohen's *d* test; and (2) plaintiffs have failed to exhaust administrative remedies with

respect to this claim.  *See* Def. Br. at 34-43; Def.-Intervenors Br. at 36-39.  Defendant

notes that Commerce did not select the average-to-transaction method to calculate the

AD margin in this investigation.  *See* Def. Br. at 38 (citing Final Determination in the

**PUBLIC VERSION**

Court No. 21-00283                                                                    Page 58

Antidumping Duty Investigation of Mattresses from the Socialist Republic of Vietnam:

Analysis Memorandum for Ashley Furniture Industries, Inc., Ashley Furniture Trading

Company, Wanek Furniture Co., Ltd., Millennium Furniture Co., Ltd., and Comfort

Bedding Company Limited (Collectively, Ashley Group) (Mar. 18, 2021) at 6, PR 511,

CR 694).  At oral argument, defendant conceded that "if something [with respect to

Commerce's selected comparison method] were to change on remand, then that would

be a different scenario" with respect to plaintiffs' claim.  Revised Oral Arg. Tr. at 48:13-

14.

>       C.     Analysis

>       The court will reserve examination of this issue and related arguments until

Commerce reconsiders, consistent with this decision, the Final Determination.  It is

possible that Commerce will reconsider on remand its use of the Cohen's *d* test.

**CONCLUSION**

>       The fairy tale *Goldilocks and the Three Bears* is based on the 1837 story by

Robert Southey, "The Story of the Three Bears."[15]  In the tale, three bears — a Great

Big Bear, a Middle-sized Bear and a Little Wee Bear — return home to quite a surprise:

a young girl, Goldilocks, has broken in, eaten their porridge, sat in their chairs and made

her way upstairs to their bedchamber.  The bears head upstairs to confront Goldilocks,

who is slumbering comfortably in the bed of the Little Wee Bear, which is "neither too

high at the head nor at the foot, but just right."

---

[15] Flora Annie Steel, "The Story of the Three Bears," *in English Fairytales* (1922)
(commonly referred to as *Goldilocks and the Three Bears*); Robert Southey, "The Story
of the Three Bears," *in The Doctor* (1837).

PUBLIC VERSION

Great Big Bear (noticing that his pillow is out of place): "SOMEBODY HAS BEEN LYING IN MY BED!"

Middle-sized Bear (noticing that the bolster is out of place): "SOMEBODY HAS BEEN LYING IN *MY* BED!"

Little Wee Bear (noticing that Goldilocks is asleep in his bed): "SOMEBODY HAS BEEN LYING IN MY BED — AND HERE SHE IS STILL!"

Goldilocks, awakened by the little wee voice of the Little Wee Bear, tumbles out of the bed with a startle.  She flings herself out of the bedchamber window and runs into the woods, never to be seen again.

* * *

In conclusion, the court sustains in part and remands in part Commerce's Final Determination.  The court remands the Final Determination with respect to Commerce's selection of financial statements to calculate surrogate financial ratios and directs Commerce to explain further or reconsider its conclusions that ES' financial statements were complete and publicly available.  Upon receiving the remand redetermination, the court will address the remaining arguments — to the extent that they remain relevant — presented by the parties challenging the Final Determination.

Accordingly, it is hereby

**ORDERED** that the Final Determination is remanded to Commerce for further explanation or reconsideration, consistent with this decision, of Commerce's determination that ES' financial statements were complete and publicly available with

**PUBLIC VERSION**

Court No. 21-00283                                                                Page 60

respect to Commerce's selection of financial statements to calculate surrogate financial ratios; it is further

ORDERED that Commerce is required on remand to explain further or reconsider its decision to select ES' financial statements and to reject SF's statements in view of the deficiencies identified in this decision with respect to ES' statements; it is further

ORDERED that the Final Determination is sustained with respect to Commerce's selection of data to calculate the surrogate value for PCIUs; it is further

ORDERED that the Final Determination is sustained with respect to Commerce's decision to exclude AFI and AFTC from the separate rate assigned to Wanek, Millennium and Comfort Bedding; it is further

ORDERED that the court reserves decision on plaintiffs' claim regarding Commerce's use of the Cohen's *d* test until the remand redetermination is before the court; it is further

ORDERED that Commerce shall file its remand redetermination within 90 days following the date of this Opinion and Order; it is further

ORDERED that within 14 days of the date of filing of Commerce's remand redetermination, Commerce shall file an index and copies of any new administrative record documents; and it is further

ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand redetermination no later than seven days after Commerce files its remand redetermination with the court.

**PUBLIC VERSION**

Court No. 21-00283                                                    Page 61

/s/      Timothy M. Reif

Timothy M. Reif, Judge


Dated: November 28, 2022

New York, New York